**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **NICOLE ALTIERI,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:11-CV-00905(AVC)** |
| | : | |
| **v.** | : | |
| | : | |
| **BIC USA INC.** | : | **October 18, 2011** |
| **Defendant** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS**

The Plaintiff, Nicole Altieri, files this Memorandum in support of Plaintiff's Objection to Defendant's Motion to Dismiss.  In support thereof, the Plaintiff offers the following:

### I.      PROCEDURAL BACKGROUND

The Plaintiff, Nicole Altieri, commenced this action on June 3, 2011 alleging violations of Title VII, the Connecticut Fair Employment Practices Act and other state law. The defendant filed the present Motion to Dismiss on August 4, 2011.

### II.     FACTS

The Plaintiff was hired by the Defendant in or around August of 2000 as a Product Manager trainee.  Following her training program, the Plaintiff was hired as an Assistant Trade Marketing Manager in the Defendant's Stationary Department.  She was later promoted to the position of Brand Manager for Stationary Marketing.  Throughout her employment with the Defendant, the Plaintiff has always received excellent reviews and performed her job in a superior manner.

1

While employed by the Defendant, the Plaintiff has continually been subjected to an environment that is permeated with inappropriate, lewd, vulgar and insulting sexual comments and actions by Plaintiff's co-workers, supervisors and management.  In 2002 or 2003, at an annual sales meeting, the General Manager and President of BIC showed the mixed male-female group a picture of the model Kathy Ireland in a bathing suit.  On another occasion during the Plaintiff's midyear formal review, Jerry Simmons, a sales and trade marketing director, expressly told the Plaintiff that he would not promote her if she ever got pregnant.  Plaintiff made a complaint about this statement to Tim Koletsos, the Director of Marketing, who did nothing.  Plaintiff then complained to her boss, Jim Gluck, Trade Marketing Manager, who also did nothing.  When Plaintiff complained to Susan Lanzarotto, a Senior Brand Manager, she was finally advised to speak with Human Resources ("HR").  Plaintiff did speak with Bill MacDougall in Defendant's HR department regarding Mr. Simmons' statement, but after several months, Plaintiff's complaint was summarily dismissed.  HR stated months later that his statement was neither sexual harassment nor discrimination, and HR refused to consider the Plaintiff's complaint to be formal since it was not in writing despite the formal meeting with HR (HR had not previously advised her to submit a written complaint).  Further evidence of the absence of an investigation was that when the Plaintiff met with HR, the only explanation offered by Mr. Simmons was that Mr. Simmons spoke to women that way in his native Great Britain.

Plaintiff asked Mr. Simmons to be transferred to another department but was ignored.  Thereafter, Mr. Simmons continued to harass and humiliate the Plaintiff with additional sexual statements and inappropriate touching.  On one occasion Mr. Simmons

told the Plaintiff repeatedly that his favorite song was "Chitty Chitty Bang Bang", emphasizing the word "bang" in a sexual sense.  On another occasion he told the Plaintiff that he was "hung like a giant sub".  Mr. Simmons also showed the Plaintiff a picture of a Mini Cooper automobile with a picture of women's breasts painted on it.  Another time while the Plaintiff was walking by, Mr. Simmons grabbed the Plaintiff's arm inappropriately.  Plaintiff again reported this conduct to HR, but again no corrective action was taken, only reinforcing the Plaintiff's feelings of powerlessness, institutional insensitivity and a pervasive male cultural bias.

In or around October of 2007, the Plaintiff and her direct supervisor Tim Koletsos attended a company function, a United Way Benefit in Milford, Connecticut.  During the benefit, Mr. Koletsos discussed the Plaintiff's recent divorce and asked her if she liked the "lickey lickey".  He also stated that the Defendant's President and General Manager, Rick McEttrick thought that the Plaintiff was a lesbian and had asked if she liked the "lickey lickey".  Later on that evening, Mr. Koletsos told the Plaintiff that she had a "sweet ass".

On or about November 15, 2007, Mr. Koletsos and the Plaintiff attended a business meeting in New York City.  Upon returning from the meeting, Mr. Koletsos told the Plaintiff that he did not want to go home and insisted that the Plaintiff drive him somewhere where they could get drinks.  Mr. Koletsos then proceeded to consume numerous drinks.  He told the Plaintiff that his favorite form of sexual behavior was to first have sexual intercourse and then finish in his wife's mouth.  Plaintiff felt extremely uncomfortable, but did not know how to get out of the situation because Mr. Koletsos was her boss.  Mr. Koletsos then began talking about the bartender; stating she was a

lesbian, and again saying "don't you think she has nice breasts". He made this comment while staring at the Plaintiff's chest. The Plaintiff attempted to leave numerous times, saying that she was tired and wanted to go home, before Mr. Koletsos finally agreed to leave. Mr. Koletsos then told the Plaintiff that if she reported him to HR that he would deny it and that no one would listen to her. The Plaintiff then drove Mr. Koletsos back to his car; however Mr. Koletsos refused to get out of the Plaintiff's vehicle. He kept telling the Plaintiff that she was a nice girl and that the Plaintiff must hate him because she refused to return his "compliments". He then brushed her hair behind her ear while the Plaintiff continued to remind him that he was married with children, stating that he should return home to his wife.

On another occasion, while at a company sales meeting in Hawaii, a sales representative told the Plaintiff that she had "become wet" while looking at a passing surfer, he then repeated the same vulgar remark to Mr. Koletsos in front of the Plaintiff, Mr. Koletsos laughed.

On another occasion in or around September of 2009, a Senior Brand Manager, Joe Franzino, was making a presentation and used a visual of three different point sizes for ball point pens. When discussing this, he stated that "the size of the ball really does matter" and laughed. The Senior Vice President, General Manager and Vice President of Marketing observed this and looked at each other, but did nothing regarding the statement.

On June 8, 2010, the Plaintiff attended a sales meeting dinner that was being held at a country club in Shelton, Connecticut. Plaintiff was seated at the table with the Vice President of Sales, Patrick Cordle along with four other women and four men. At the

dinner, Mr. Cordle stated that his favorite kind of pen is the kind where the woman is in a bathing suit that falls off when the pen is turned upside down.  He also stated that he forgets his pants wherever he goes and once had to borrow pants from a co-worker that fit, but were too tight in the crotch.  He also repeatedly stated that clothing was optional at the country club.  He then stated at the table that he could not use his right hand to masturbate anymore because he had a bad wrist and now had to use his left hand.  After making all of these statements, he stated that he was pretty sure his wife was going to leave him and asked which of the females at the table would like to go home with him.

Later that night, the Plaintiff was told by a co-worker, Heather Pfrommer, that she was seated at a nearby table with Tim Koletsos, Trace Gentry and other male senior managers who all witnessed Mr. Cordle making the vulgar statements.  Ms. Gentry even told Mr. Koletsos that it "looked bad" at that table when she observed the Plaintiff with her head in her hands.  Mr. Koletsos responded that "Nicole knows how to handle Pat".  Despite observing Mr. Cordle making the vulgar statements, none of the senior managers including company Directors did anything to stop his actions.  When the Plaintiff complained to Mr. Koletsos the next morning that she found Mr. Cordle's statements highly disturbing, vulgar and offensive, Mr. Koletsos dismissively responded that Mr. Cordle was "joking".  Only after continuing to push the matter and stating that there were other witnesses did Mr. Koletsos say that he would inform his superior, Vice President of Marketing Traci Gentry, about the Plaintiff's complaints.

The next day, Ms. Gentry informed the Plaintiff that she had spoken with HR about the incident.  Plaintiff was then called into HR where she was asked about the incident.  The questions posed to the Plaintiff by HR were narrowly focused on how

much the Plaintiff had to drink and whether the comments were made in jest.  HR promised that an investigation would be conducted.  While the investigation was pending, a supervisor and Senior Packaging Engineer, came to Plaintiff's desk on June 30, 2010 and stated that he had to get a penis reduction because his back was killing him from carrying around so much weight.

On or about July 6, 2010, the Plaintiff was informed that HR had completed their investigation and that an unspecified corrective action had been taken.  Plaintiff was also told that Mr. Cordle wanted to apologize to her, but was expressly told that it was unrelated to any corrective action taken by the Defendant.  Plaintiff said that if Mr. Cordle wished to apologize that he could do so in writing.  On July 8, 2010 HR called the Plaintiff and repeatedly demanded that she meet with Mr. Cordle so that they could close the case; this is despite the fact that Mr. Cordle's apology was unrelated to any corrective action taken by the Defendant.  Plaintiff again responded that she remained too uncomfortable to speak with Mr. Cordle due to his previous sexually outrageous and degrading behavior.  No corrective action was taken by HR; Mr. Cordle was not disciplined, transferred or relieved of any supervisory capacity.

Despite having made complaints regarding sexually harassing behavior in the workplace, such behavior continued to occur.  On August 16, 2010, Plaintiff was asked by the Director of Trade Marketing during a sales meeting whether she used birth control.  Then on August 18, 2010, during a sales presentation, Joseph Franzino, the Senior Brand Manager, inappropriately stated that competitors could "suck it".  At a meeting on August 19, 2010, Traci Gentry made inappropriate comments about candy that looked like "cute little penises".  A week later, on August 26, 2010, Mr. Koletsos presented the

Plaintiff with an award for having worked for the company for ten years.  When presenting her with the award in his office, Mr. Koletsos spent most of the time discussing embarrassing personal issues including her marriage, her divorce and what Mr. Koletsos called the Plaintiff's "commitment issues".  All of this was done in front of the Plaintiff's assistant.  On October 5, 2010, at a meeting with HR representatives present, Jim Geraci spoke about blowjobs being given on planes.  HR personnel present did nothing to stop his statement.  Then on October 7, 2010, Mr. Geraci told the Plaintiff that his dessert "was like an orgasm in his mouth".  On October 27, 2010, Mr. Koletsos again invaded her private life by unnecessarily commenting that she was also getting married for the second time to the distress and embarrassment of the Plaintiff.

On September 3, 2010 the Plaintiff filed a complaint with the Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC").  On October 27, 2010, Plaintiff was called into HR and was questioned by Defendant's outside counsel for four and one half hours.  Defendant's counsel aggressively tried to intimidate, confuse and mislead the Plaintiff and tried to pressure her into altering or recanting facts that Plaintiff had reported in her CHRO complaint.  Plaintiff was not allowed to take any breaks or have lunch during this meeting, despite the fact that counsel's questioning had brought the Plaintiff to tears.  Defendant's counsel then told the Plaintiff that "it would be best for everyone if [Plaintiff] would resign from BIC and accept a number".  Individuals who the Plaintiff named as witnesses to the sexually harassing conduct were interviewed and instructed by HR not to speak with the Plaintiff and to forget that their conversation with HR ever happened.

Since the filing of her complaint with the CHRO and EEOC, the Plaintiff is excluded from meetings she formerly attended and is shunned by her co-workers and supervisors.  Her direct supervisor Mr. Koletsos no longer speaks to the Plaintiff, but communicates only through email.  He also requires another person to be in the office any time that he has a meeting with the Plaintiff.  Further, following the filing of her CHRO and EEOC complaints, the Plaintiff was given a distinctly less favorable "Managers Comments and Results" write up at her yearend review by Mr. Koletsos.  This was the first time that her competency, ownership and management skills have been downgraded in her over ten years of employment with the Defendant.

Further prior to the filing of her lawsuit, the Plaintiff was cited by Mr. Koletsos for the quality of her work.  In contrast to the behavior prior to the lawsuit, Mr. Koletsos now repeatedly finds fault with Plaintiff's work, often sending it back to be corrected over and over again in contrast to his other direct report who is not subjected to this behavior.

### III.   **LEGAL STANDARD**

In ruling on a motion to dismiss the court must adhere strictly to tightly drawn principles designed to ensure that plaintiff's who have pleaded cognizable causes of action, are afforded their day in court.

The court's function in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is not to decide if the plaintiff will prevail at trial, "but merely to determine whether the complaint itself is legally sufficient."  Festa v. Local 3 Int'l Board of Electrical Workers, 905 F.2d 35, 37 (2d Cir. 1990).  "[T]he threshold that a complaint must meet to survive a motion to dismiss for

8

failure to state a claim is exceedingly low." Schaffer v. Ames Dept. Stores, Inc., 889 F.2d 41, 43 (D.Conn. 1990). The court is limited to considering the facts stated in the complaint, Allen v. West Point Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991), and must accept them as true and draw all reasonable inferences in the plaintiff's favor. Papasan v. Allain, 478 U.S. 265, 283 (1986); Easton v. Sundram, 947 F.2d 1011, 1014-15 (2d Cir. 1991), cert. denied, 504 U.S. 911 (1992); Mennone v. Gordon, 889 F.Supp. 53, 55 (D.Conn. 1995). Even if the complaint is "neither artful nor of great specificity in its claim, "this is not fatal as long as it states merely, a "colorable" claim. Church of Scientology Intern v. Eli Lilly & Co., 778 F.Supp. 661,665-66 (S.D.N.Y. 1991). Dismissal of a complaint for failure to state a claim is a 'drastic step.'" (Internal citations omitted) Meyer v. Oppenheimer Management Corp., 764 F.2d 76, 80 (2d Cir. 1985). Thus, a motion to dismiss cannot be granted unless the court is convinced "beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir. 1955); see Warner v. Orange County Dept. of Recreation, 827 F.Supp. 261, 263 (S.D.N.Y. 1993) (Goettel, J.) (when plaintiff alleges civil rights violation, courts should apply the rule of no dismissal unless beyond doubt that no set of facts can be proved in support of claim).

A complaint need only provide a short and plain statement "that will give the defendants fair notice of what the plaintiff's claim is and the grounds upon which it rests." (Internal quotes, citation omitted) Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 113 S.Ct. 1160, 1163 (1993); see also, Fed. R. Civ. P. 8; Siegelman v. Cunard White Star Ltd., 221 F.2d 189, 196 (2d Cir. 1955); Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986). The detailed facts of the plaintiff's complaint are hardly the type of broad or vague conclusory

statements courts typically find insufficient to state a claim.  <u>Alfaro Motors, Inc. v. Ward</u>, 814 F.2d 883, 887 (2d Cir,1987).  Much to the dismay of the defendant courts do not read complaints "with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality."  <u>Sealfon v. United States</u>, 322 U.S. 575, 579 (1948).

## IV.   <u>ARGUMENT</u>

### a.   <u>Plaintiff Has Pleaded Sufficient Facts Sufficient to State a Claim Under Title VII and CFEPA</u>

Despite the Defendant's arguments to the contrary, the Plaintiff has alleged a claim of actionable sexual harassment under Title VII and CFEPA.  It should be noted that while Defendant relies on the decision by the CHRO not to retain the matter for full investigation, that decision by the CHRO is in no way binding upon the matter before the Court and should have no persuasive value.  The standard used by the CHRO is different than the standard used in reviewing a Motion to Dismiss under Fed. R. Civ. P 12(b)(6), and the Court should not utilize the decision by the CHRO in its analysis of the Defendant's Motion to Dismiss or the Plaintiff's Objection.  Further, during those proceedings, the Plaintiff was represented by different counsel who failed to properly prosecute her claims by filing a rebuttal as is permitted by statute.  Therefore the CHRO did not have a full and proper view of the Plaintiff's claims when it made its merit assessment review decision.

### i.   <u>Conduct Before November 17, 2009 and Before March 17, 2010.</u>

The incidents alleged prior to November 17, 2009 (for Title VII violations) and before March 17, 2010 (for CFEPA violations), are actionable and can be considered by the Court

because they are part of a continuing violation and a pattern of sexual harassment that permeated the Defendant's male-centered work environment.  "A Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate 180- or 300-day period, but a charge alleging a hostile work environment will not be time barred if all acts constituting the claim are part of the same unlawful practice and at least one act falls within the filing period."  AMTRAK v. Morgan, 536 U.S. 101 (U.S. 2002).  "Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years." Id. at 115. (internal citation omitted).  A Plaintiff need only file a claim within either 180 or 300 days of any act that is part of the hostile work environment.  The Supreme Court has gone further to explain that an act constituting part of a hostile work environment can be considered as part of a continuous act even if there is a significant period of time in between the acts constituting the hostile work environment.

> The following scenarios illustrate our point: (1) Acts on days 1-400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1-100 and on day 401, but there are no acts between days 101-400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim.

Id. at 118 (U.S. 2002).

The Defendant has argued in its Motion to Dismiss, that since there are periods of time up to even five years between some of the sexually harassing actions, that the

pattern of sexually harassing conduct permeating the Defendant's work environment cannot be a continuing violation of a hostile work environment.  The Second Circuit has emphasized that focusing on the period of time in between hostile actions is inappropriate.  "[A] realistic picture of the hostile workplace alleged by the employee was not obtained by focusing on a two-year stretch of time in which he failed to allege acts of hostility and using that time to dilute the strength of his claims based on two discrete periods of more intense harassment. We also emphasized that the severity of such comments must be considered in the light most favorable to the plaintiff." La Grande v. DeCrescente Distrib. Co., 370 Fed. Appx. 206, 210 (2d Cir. N.Y. 2010)(citing Aulicino v. N. Y. City Dep't of Homeless Servs., 580 F.3d 73, 83-84 (2d Cir. 2009)).

The actions constituting the hostile work environment alleged by the Plaintiff were spread out over the eleven years that the Plaintiff has worked for the Defendant and involved numerous individuals, many in supervisory or management positions including Company Directors.  The fact that many people were involved in creating the hostile work environment does not weaken the Plaintiff's claim, it demonstrates the extent of how pervasive the sexually harassing culture, allowed to exist at the Defendant's workplace, really is.

The Defendant has also claimed that alleged intervention by Defendant's HR severs the line between conduct before the investigation and after.  In doing so, the Defendant wholly misstates the Plaintiff's Complaint.  In fact, the paragraphs cited to by the Defendant in support of its contention that the Plaintiff's complaints were investigated and that the Defendant took corrective action say exactly the opposite.  The Plaintiff alleged that her complaint was not properly investigated and that nothing was

done to correct the action.  (Compl. ¶ 85). The Defendant also claims that following this

complaint that the individual did not engage in similar conduct again.  This completely

ignores the fact that the Plaintiff had previously complained to HR about this same

individual, no corrective action was taken, and the individual continued to harass the

Plaintiff. (Compl. ¶ 75-83).  Therefore, the Defendant's argument that the supposed

investigation by HR severs the continuing violation is entirely invalid, as the Plaintiff's

allegation states in black letter that no corrective action was taken by the Defendant.

For these reasons, the sexually harassing actions occurring before November 17,

2009 and March 17, 2010 are actionable because they are part of a continuing violation of

a hostile work environment that spanned from 2002 or 2003 to the present; this violation

was allowed to continue to exist by the Defendant with no corrective action being taken.

## 1. <u>Even if Time Barred, Plaintiff's Allegations May Be Considered as Background Evidence.</u>

Even if the Court determines that the incidents occurring before March 17, 2009 (for

Title VII violations) and March 17, 2010 (for CFEPA violations) are time barred for the purposes

of liability, those incidents may still be considered by the Court as relevant background evidence

in support of Plaintiff's claims.  Title VII does not "bar an employee from using the prior acts as

background evidence in support of a timely claim." <u>AMTRAK</u>, 536 U.S. at 113; see also

<u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 220 (2d Cir. N.Y. 2004)(holding that regarding a plaintiff's

claims of persistent promotion denials, a plaintiff "can sue only for denials occurring after [300

day deadline]. Nevertheless, evidence of earlier promotion denials may constitute relevant

'background evidence in support of a timely claim,' and we will consider it as such.").

Therefore, the Court can consider previous evidence of harassment as background evidence to demonstrate that the Defendant has allowed a culture of sexual harassment to exist without taking corrective action to prevent it.

### ii.  The Plaintiff Has Properly Stated A Claim of Sexual Harassment.

Plaintiff, in Counts One, Two and Four, has alleged facts sufficient to state a claim of Sexual Harassment under Title VII and CFEPA.  "To state a hostile work environment claim in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive, that is, . . . the conduct creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex.'" Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007)(citing Harris v. Forklift Sys., 510 U.S. 17, 21 (U.S. 1993).  The Supreme Court has established a non-exhaustive list of factors relevant to determining whether a workplace is so severely or pervasively hostile as to support a Title VII claim.  These include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with plaintiff's work; . . . whether it unreasonably interferes with the employee's work performance[;]" and "[t]he effect on the employee's psychological well-being[.]" Schiano v. Quality Payroll Sys., 445 F.3d 597, 605 (2d Cir. N.Y. 2006) (citing Harris, 510 U.S. at 23).

The Supreme Court noted that whether sexual harassment alters the conditions of employment "is not, and by its nature cannot be, a mathematically precise test," Harris,

510 U.S. at 22, and "can be determined only by looking at all the circumstances," Id. at 23. "[N]o single factor is required."  Schiano, 445 F.3d at 605.  To determine "whether an environment may be considered sufficiently hostile or abusive to support [a Title VII claim]," courts must consider "the totality of the circumstances." Williams v. Westchester, 171 F.3d 98, 100 (2d Cir. 1999). The factors outlined above must be evaluated "cumulatively" so that the Court can "obtain a realistic view of the work environment." Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir.1997).

## 1. **Defendant's Sexually Harassing Conduct Was Severe And Pervasive**

The Plaintiff has alleged a series of actions taken by various individuals, who with a single exception, were in a position to influence the Plaintiff's career.  These individuals were Plaintiff's supervisors, Defendant's managers, Directors, Vice Presidents and President.  These individuals were in a sufficiently high enough position in the company hierarchy to significantly influence the culture of the company and they have created an atmosphere that is permeated with sexually motivated harassing and humiliating conduct.  The Defendant has argued that the actions alleged by the Plaintiff do not constitute conduct that is severe or pervasive enough to constitute actionable sexual harassment.  Indeed, the Defendant is correct that Title VIII is not meant to be a "general civility code" for the workplace.  See Oncale v. Sundowner Offshore Services, Inc. 523 U.S. 75, 80-81 (1998).  However, the conduct alleged by the Plaintiff goes beyond simple the "ordinary slings and arrows that suffuse the workplace every day" Ahern v. Shinseki, 629 F.3d, 49, 59 (1st Cir. 2010).

It should be noted that the Plaintiff need not allege conduct that is both severe and pervasive, an allegation of conduct that is either sufficiently severe or sufficiently pervasive is enough to satisfy the requirements of Title VII and CFEPA. The conduct of the Defendant and its employees was indeed severe and pervasive.

- In 2002 or 2003, at an annual sales meeting, the General Manager and President of BIC showed the mixed male-female group a picture of the model Kathy Ireland in a bathing suit

- On another occasion during the Plaintiff's midyear formal review, Jerry Simmons, a sales and trade marketing director, expressly told the Plaintiff that he would not promote her if she ever got pregnant.

- On one occasion Mr. Simmons told the Plaintiff repeatedly that his favorite song was "Chitty Chitty Bang Bang", emphasizing the word "bang" in a sexual sense.

- On another occasion he told the Plaintiff that he was "hung like a giant sub".

- Mr. Simmons also showed the Plaintiff a picture of a Mini Cooper automobile with a picture of women's breasts painted on it.

- Another time while the Plaintiff was walking by, Mr. Simmons grabbed the Plaintiff's arm inappropriately.

- In or around October of 2007, the Plaintiff and her supervisor Tim Koletsos attended a company function, a United Way Benefit in Milford, Connecticut. During the benefit, Mr. Koletsos discussed the Plaintiff's recent divorce and asked her if she liked the "lickey lickey".  He also stated that the Defendant's President and General Manager, Rick McEttrick thought that the Plaintiff was a lesbian and had asked if she liked the "lickey lickey".

- Later on that evening, Mr. Koletsos told the Plaintiff that she had a "sweet ass".

- On or about November 15, 2007, Mr. Koletsos, the Director of Marketing, forced the Plaintiff to go get drinks with him.  During the evening Mr. Koletsos told the Plaintiff that his favorite form of sexual behavior was to first have sexual intercourse and then finish in his wife's mouth, he told the Plaintiff that the bartender was a lesbian and asked if Plaintiff thought she had nice breasts, and he made sexual advances toward the Plaintiff while inappropriately touching the Plaintiff in her car.

- On another occasion, while at a company sales meeting in Hawaii, a sales representative told the Plaintiff that she had "become wet" while looking at a passing surfer, he then repeated the same vulgar remark to Mr. Koletsos in front of the Plaintiff, Mr. Koletsos laughed.

16

- On another occasion, a Senior Brand Manager, Joe Franzino made and laughed at a comment regarding the size of balls during a presentation.  The Senior Vice President, General Manager and Vice President of Marketing all witnessed this.

- On June 8, 2010 the Vice President of Sales, Patrick Cordle made comments to a table that he was sitting at that his favorite kind of pen was the kind where the woman is in a bathing suit that falls off when the pen is turned upside down.  He also stated that he forgets his pants wherever he goes and once had to borrow pants from a co-worker that fit, but were too tight in the crotch.  He continued by saying that the country club that they were at was clothing optional, that he could not use his right hand to masturbate anymore because of a wrist injury and proceeded to invite all of the women at the table to go home with him that night.  These statements were witnessed by Director of Marketing, Tim Koletsos, and the Vice President of Marketing, Traci Gentry along with other male senior managers.

- On another occasion, a supervisor and Senior Packaging Engineer, came to Plaintiff's desk on June 30, 2010 and stated that he had to get a penis reduction because his back was killing him from carrying around so much weight.

- On August 16, 2010, Plaintiff was asked by the male Director of Trade Marketing during a sales meeting whether she used birth control.

- On August 18, 2010, during a sales presentation, Joseph Franzino, the Senior Brand Manager, inappropriately stated that competitors could "suck it".

- At a meeting on August 19, 2010, Traci Gentry made inappropriate comments about candy that looked like "cute little penises".

- On August 26, 2010, Mr. Koletsos presented the Plaintiff with an award for having worked for the company for ten years.  When presenting her with the award in his office, Mr. Koletsos spent most of the time discussing embarrassing and intimate issues including her marriage, her divorce and what Mr. Koletsos called the Plaintiff's "commitment issues" relating to men.

- On October 5, 2010, at a meeting with HR representatives present, Jim Geraci spoke about blowjobs being given on planes.  HR personnel, although present, did nothing to inhibit or thereafter discipline Mr. Geraci concerning his statement.

- Just several days later on October 7, 2010, Mr. Geraci told the Plaintiff that his dessert "was like an orgasm in his mouth".

- On October 27, 2010, Mr. Koletsos again made intimate comments about the Plaintiff's upcoming second marriage and divorce when the Plaintiff was leaving work to attend her brother's wedding.

These incidents are more than sufficient to state a claim for actionable sexual harassment under Title VII and CFEPA.  The inappropriate sexual touching on the part of Mr. Koletsos and Mr. Simmons alone are sufficient to allege a hostile work environment. See Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. N.Y. 1999)("Our law is clear, for example, that even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment under Title VII.").  The Second Circuit has repeatedly held that much less severe conduct was sufficient to constitute a hostile work environment. See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010)(holding that approximately six sexual comments, on occasion grabbing or tickling the Plaintiff and staring at the Plaintiff in a sexual manner constituted a hostile work environment); Gregory v. Daly, 243 F.3d 687, 692-693 (2d Cir. N.Y. 2001)(holding that making demeaning comments about women, making sexually demeaning statements, initiating unwelcome physical conduct, standing close to the Plaintiff, and using innuendos, and vulgar and sexually explicit conduct was sufficient to state a claim for hostile work environment).  Further, it is important for the Court to view these incidents as a whole and not to focus on any one incident in particular.  "The focus of this inquiry, therefore, is "the nature of the environment itself." Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir. 1997); see also Williams v. General Motors Corp., 187 F.3d 553, 563 (6th Cir. 1999) ("The totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of

the hostile-work-environment cause of action.").  The Plaintiff in the present case has produced a litany of similar events grounded in sexually abusive conduct that have contributed to her claimed hostile work environment, and has alleged that the Defendant has allowed a continuing hostile, humiliating and demeaning environment.  "A plaintiff need not present a list of specific acts." Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 318 (2d Cir. N.Y. 1999); see also Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997)(allegations of constant harassment confirmed by co-workers sufficient to create a triable issue of fact even where the plaintiff did not remember details of every incident). When viewed as a whole, the incidents that the Plaintiff has alleged show that the Defendant has allowed an atmosphere of sexually harassing, humiliating and demeaning behavior to occur on a regular basis.

The Defendant has claimed that since the incidents alleged by the Plaintiff in her Complaint "occurred on about 17 days of her more than eleven years of employment with BIC", that such conduct cannot be severe or pervasive.  This calculation, however, ignores the fact that the harassment by the Defendant and its employees was a continuing pattern that included the periods of time in which the Defendant claimed to be investigating incidents yet took no corrective action whatsoever.  The Plaintiff worked in a sexually permissive environment that allowed such sexually harassing behavior to occur and moreover overtly supported it by failing to take corrective action or disciplining those responsible including Directors and Vice Presidents.  In fact, since 2003, the only effort that the Defendant took to try to prevent sexual harassment was holding a sexual harassment seminar, yet that was only after the Plaintiff had filed her complaint with the CHRO and EEOC.

Further, as discussed above, the length of time between incidents constituting a hostile work environment is not determinative when evaluating the allegations in the light most favorable to the Plaintiff.

> We think that, in order to take the facts of this case in the light most favorable to [Plaintiff], the court should have discounted from its analysis, if not altogether disregarded, the intervening period between comments by one supervisor and comments by another. In our view, a 'realistic' picture of the hostile workplace alleged by [Plaintiff] is not obtained by focusing on a two-year stretch of time in which he fails to allege acts of hostility, and using that time to dilute the strength of his claims based on two discrete periods of more intense harassment.

Aulicino, 580 F.3d at 84.  Therefore the Defendant's effort to minimize the pervasiveness of the sexual harassment suffered by the Plaintiff by showing that some of the occurrences were separated in time is a disingenuous attempt to paper over a continual atmosphere permitted and further aided by the absence of a check on such occurrences at the corporate level.

## 2.   Defendant's Actions Were Based on the Plaintiff's Sex

The Plaintiff has properly alleged that the conduct on the part of the Defendant and its employees was directly related to and due to her sex.  "Although sexual harassment is usually thought of in terms of sexual demands, it can include employer action based on [sex] but having nothing to do with sexuality." Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. N.Y. 2001)(citing 3 Lex K. Larson, Employment Discrimination § 46.01[3] (2d ed. 2000)).

The comment by Mr. Simmons that the Plaintiff would not be promoted if she ever got pregnant is clearly directed to the Plaintiff because she is female, if the Plaintiff

were male, Mr. Simmons could not have made such a comment.  Mr. Simmons'
continued comments regarding "bang[ing]" and being "hung like a giant sub" and his
actions of showing the Plaintiff a car with breasts painted on it and inappropriately
touching the Plaintiff were also based on her gender.  They are a part of a continued
uncorrected "boys' club" atmosphere permitted by the Defendant in which women are
routinely humiliated and demeaned through the use of overtly sexual comments meant to
inflict just that sense of upon women employees.

This atmosphere was perpetrated by other male supervisory and managerial
employees at the highest levels of BIC despite the Company's sexual harassment
policies.  Mr. Koletsos made intimate comments to the Plaintiff regarding her recent
divorce and asked whether she liked the "lickey lickey", a direct reference to the
Plaintiff's gender and her sexual orientation.  Mr. Koletsos also told the Plaintiff that the
Defendant's President and General Manager Mr. McEttrick had also said the same
statement regarding the Plaintiff liking the "lickey lickey", referencing the Plaintiff's
gender and sexual orientation.  That same night, Mr. Koletsos told the Plaintiff that she
had a sweet ass, a comment again related to the Plaintiff's gender, as it can be assumed
Mr. Koletsos would not likely have made such a comment to a male subordinate.

Mr. Koletsos continued his harassment of the Plaintiff following his return from a
business meeting with the Plaintiff.  He forced the Plaintiff to go have drinks with him
and proceeded to discuss his sexual exploits and how he liked to have sex with his wife,
clearly testing Plaintiff's reaction to his less than subtle sexual overture.  He then asked
the Plaintiff whether she liked the bartender's breasts while staring at the Plaintiff's chest.
When the Plaintiff drove Mr. Koletsos back to his car, he proceeded to inappropriately

touch the Plaintiff and make sexual advances towards her.  This entire episode clearly was directed at the Plaintiff due to the fact that she was a female.  Again, it is unlikely that Mr. Koletsos would have treated a male subordinate in a similar fashion.

Again while at a sales meeting in Hawaii, a sales representative told the Plaintiff that she had "become wet" while looking at a passing surfer, this is a clear sexual reference to the Plaintiff due to her gender, as that phrase relates only to sexual arousal in women.  This comment was then told to Mr. Koletsos, who instead of taking corrective action in line with the Defendant's sexual harassment policy, laughed along with the sales representative.

The actions of Mr. Cordle at the sales meeting dinner in June of 2008 were also directed at the Plaintiff due to her gender.  While some of his vulgar and lewd comments were made to the entire table, his invitation to the women at the table, including the Plaintiff, to go home with him since his wife was not at home was an invitation to each of the women at the table individually, unless he was contemplating mass sexual activity with all four women; the men at the table were not given a similar invitation.

Again on August 16, 2010, the Director of Trade Marketing asked the Plaintiff if she was on birth control during a sales meeting in front of various co-workers.  This comment relates directly to the Plaintiff's gender and clearly implicates her willingness to engage in sexual acts.  Similarly, on August 26, 2010, Mr. Koletsos' conversation with the Plaintiff regarding her marriage, divorce, and "commitment issues" relates to the Plaintiff being a female and to Mr. Koletsos' previous remarks regarding the Plaintiff's sexual orientation.

All of these incidents were directed at the Plaintiff specifically because of her gender.  There were also other incidents alleged by the Plaintiff that, while not directed solely to the Plaintiff, created an atmosphere in which women specifically were treated in a humiliating and degrading fashion.  See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69-70 (2d Cir. N.Y. 2000)("We have specifically held, however, that because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."). These incidents include *inter alia* the showing of pictures of women in bathing suits at a mixed male-female company function, Mr. Cordle's discussion of a pen with a naked woman on it, his pants being tight in the crotch and his inability to masturbate due to a wrist injury again at a mixed male-female company function, and Mr. Gerard's discussion of blowjobs being given on planes.  The Defendant argues that these incidents do not relate to the Plaintiff because many of them were made in the presence of both men and women, this argument fails.  "[T]he inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women are involved. . . . It would be exceedingly perverse if a male [supervisor] could buy . . . his company immunity from Title VII liability by taking care to harass sexually an occasional male worker, though his preferred targets were female."  Kaytor v. Elec. Boat Corp., 609 F.3d 537, 549 (2d Cir. Conn. 2010).

This "boys' club" atmosphere was perpetuated and allowed to continue by the Defendant despite the existence of clear policies of the Defendant that forbid such conduct.  Plaintiff was not alone in being subjected to the sexual harassment by the

Defendant's employees.  On November 1, 2010, Sheri Gasparon reported to the Plaintiff

that she was distressed by Teddi Mickus who showed her a Playboy lighter and thanked

her for posing for the picture by Adam Blumenthal.  This kind of conduct occurs

regularly at the Defendant's place of business without any corrective action ever being

taken.  "To demonstrate that the harassing conduct was continuing or pervasive, it is also

relevant to look at the treatment of other similarly situated individuals." See Perry v.

Ethan Allen, Inc., 115 F.3d 143, 151 (2d Cir. 1997); see also Cruz v. Coach Stores, Inc.,

202 F.3d 560, 570 (2d Cir. 2000) (noting that the Court may also look at the treatment of

other minorities not of the plaintiff's race). In evaluating the totality of the circumstances,

the Court must look at the evidence cumulatively "to obtain a realistic view of the work

environment." Chacko v. Dep't of Mental Health & Addiction Serv., 2010 U.S. Dist.

LEXIS 31597 (D. Conn. Mar. 30, 2010)(citing Schwapp v. Town of Avon, 118 F.3d 106,

111 (2d Cir. 1997)).  If Plaintiff is given the opportunity to conduct full and reasonable

discovery, Plaintiff will be able to demonstrate that many other females who worked

along with the Plaintiff were subjected to similar sexually harassing, humiliating and

demeaning conduct.  See Gorzynski, 596 F.3d at 103 ("The evidence does not reveal a

"mere offensive utterance," but a  pattern in which female employees such as Gorzynski

could expect sexual remarks and other harassment at any time. The fact that other women

in addition to Gorzynski testified to the harassing and pervasive nature of Celeste's

behavior further supports her claim.").  Plaintiff will also be able to demonstrate that

male employees were not subjected to similar conduct based on their gender.  See Riley

v. ITT Fed. Servs. Corp., 2001 U.S. Dist. LEXIS 3326 (D. Conn. Feb. 22, 2001)( "The

intent element of a § 1981 claim may be satisfied by an allegation that similarly situated employees who are not members of the protected class were treated differently.")

It is clear that the Plaintiff has alleged more than sufficient facts to demonstrate that the conduct of the Defendant and its employees was largely directed towards the Plaintiff due to the fact that she was a female.  Plaintiff has also alleged and will be able to prove that the Defendant has allowed an atmosphere permeated with sexually harassing, humiliating and demeaning conduct towards all women to occur without taking any proper or effective corrective action.

### iii.   Plaintiff Has Alleged That Defendant And It's Employees Conduct Was So Severe Or Pervasive As To Alter the Terms And Conditions of Her Employment.

As discussed above in section IV(a)(ii)(1), the atmosphere of repeated and regular sexually harassing conduct on the part of Defendant's employees directed towards the Plaintiff and other female employees was so severe and pervasive that it did alter the terms and conditions of Plaintiff's employment.  Plaintiff was forced to work in an environment where she was constantly being harassed, humiliated and demeaned due to her gender.

Fed. R. Civ. P. 8 requires that the Plaintiff make "a short and plain statement of the claim", which the Plaintiff has done.  The Plaintiff has properly alleged conduct that when viewed in the light most favorable to the Plaintiff is sufficiently severe and pervasive as to alter the terms and conditions of her employment.  Therefore, the

Defendant's Motion to Dismiss must be denied as to the Plaintiff's Counts One, Two and
Four alleging sexual harassment and a hostile work environment.

### iv.   Defendant Cannot Avail Itself of the Ellerth/Faragher Defense

The Defendant has argued that it is entitled to an Ellerth/Faragher affirmative defense.  In
order to be entitled to a defense under Ellerth and Faragher, the employer must show that it
exercised reasonable care to prevent and correct promptly any sexually harassing behavior and
that the Plaintiff unreasonably failed to take advantage of any preventative or corrective
opportunities provided by the employer.  Petrosino, 385 F. 3d at 225.  An Ellerth/Faragher
defense fails where the Defendant has not exercised reasonable care to prevent sexually
harassing behavior where the supervisors and managers knew of a sexually-charged atmosphere
and failed to take steps to remedy the situation. Colapietro v. DMV, 2010 U.S. Dist. LEXIS
62828, 17-18 (D. Conn. June 24, 2010). Further, despite offering a reasonable avenue of
complaint to a plaintiff, employer defendants can still be held liable if the plaintiff can show that
they "knew, or in the exercise of reasonable care should have known, about the harassment yet
failed to take appropriate remedial action." Howley v. Town of Stratford, 217 F.3d 141, 154 (2d
Cir. Conn. 2000) (internal quotation marks omitted).  To demonstrate that the Defendant had
knowledge of the harassment, a Plaintiff need only show that:

> (1) someone had actual or constructive knowledge of the harassment, (2)
> the knowledge of this individual can be imputed to the employer, and (3)
> the employer's response, in light of that knowledge, was unreasonable.
> With respect to imputing the knowledge of employees to an employer, we
> have explained that[a]n official's actual or constructive knowledge of
> harassment will be imputed to the employer when principles of agency
> law so dictate. That will be the case when a) the official is at a sufficiently
> high level in the company's management hierarchy to qualify as a proxy
> for the company, or b) the official is charged with a duty to act on the

knowledge and stop the harassment, or c) the official is charged with a
duty to inform the company of the harassment.

<u>Duch v. Jakubek</u>, 588 F.3d 757, 763 (2d Cir. N.Y. 2009)(citing <u>Torres</u>, 116 F.3d at 636-37).

"When an employee's complaint raises the specter of sexual harassment, a supervisor's

purposeful ignorance of the nature of the problem . . . will not shield an employer from liability

under Title VII." <u>Id</u>. at 766.

  In the present case, the Defendant was made well aware of the fact that the Plaintiff was

experiencing sexual harassment.

- In 2002 or 2003 the General Manager and President of the Defendant showed a mixed male-female group a picture of the model Kathy Ireland in a bathing suit.  As General Manager and President, his knowledge of his actions can be imputed to the Defendant; no corrective action was taken.
- On another occasion during the Plaintiff's midyear formal review, Jerry Simmons, a Sales and Trade Marketing Director, expressly told the Plaintiff that he would not promote her if she ever got pregnant. As a Director for the Defendant, Mr. Simmons' knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.
- Mr. Simmons' statement to the Plaintiff saying that she would not be promoted if she got pregnant was reported to Tim Koletsos, the Director of Marketing.  As a Director for the Defendant, Mr. Koletsos' knowledge of Mr. Simmons' actions can be imputed to the Defendant; no corrective action was taken.
- Mr. Simmons' statement to the Plaintiff saying that she would not be promoted if she got pregnant was also reported to Plaintiff's boss Jim Gluck, the Trade Marketing Manager. As a Manager for the Defendant, Mr. Gluck's knowledge of Mr. Simmons' actions can be imputed to the Defendant; again no corrective action was taken.
- Mr. Simmons' statement to the Plaintiff saying that she would not be promoted if she got pregnant was reported to Tim Koletsos, the Director of Marketing.  As a Director for the Defendant, Mr. Koletsos' knowledge of Mr. Simmons' actions can be imputed to the Defendant; no corrective action was taken.
- Mr. Simmons' statement to the Plaintiff saying that she would not be promoted if she got pregnant was reported to Tim Koletsos, the Director of Marketing.  As a Director for the Defendant, Mr. Koletsos' knowledge of Mr. Simmons' actions can be imputed to the Defendant; no corrective action was taken.
- Plaintiff again reported Mr. Simmons' statement saying that she would not be promoted if she got pregnant to Susan Lanzarotto, a Senior Brand Manager, who told her to speak with HR.  Plaintiff spoke about the incident with Bill MacDougall in Defendant's HR.

Clearly the complaint made to HR can impute knowledge to the Defendant.  Several months after the Plaintiff made her complaint she was informed that HR did not consider her complaint to be formal and that Mr. Simmons' statement was not sexual harassment or discrimination.  No corrective action was taken.

- On another occasion Mr. Simmons, a Sales and Trade Marketing Director, told the Plaintiff repeatedly that his favorite song was "Chitty Chitty Bang Bang", emphasizing the word "bang" in a sexual sense.  As a Director for the Defendant, Mr. Simmons' knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.

- On another occasion Mr. Simmons, a Sales and Trade Marketing Director, told the Plaintiff that he was "hung like a giant sub".  As a Director for the Defendant, Mr. Simmons' knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.

- Mr. Simmons, a Sales and Trade Marketing Director, also showed the Plaintiff a picture of a Mini Cooper automobile with a picture of women's breasts painted on it.  As a Director for the Defendant, Mr. Simmons' knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.

- Another time while the Plaintiff was walking by, Mr. Simmons, a Sales and Trade Marketing Director, grabbed the Plaintiff's arm inappropriately.  As a Director for the Defendant, Mr. Simmons' knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.

- Mr. Simmons' actions were again reported to HR by the Plaintiff.  The complaint made to HR clearly imputes knowledge to the Defendant.  Again, no corrective action was taken, only reinforcing the Plaintiff's feelings of powerlessness, institutional insensitivity and a pervasive male cultural bias.

- In or around October of 2007, the Plaintiff and her supervisor Tim Koletsos, the Director of Marketing, attended a company function, a United Way Benefit in Milford, Connecticut.  During the benefit, Mr. Koletsos discussed the Plaintiff's recent divorce and asked her if she liked the "lickey lickey".  As a Director for the Defendant, Mr. Koletsos' knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.

- Plaintiff was also told that the Defendant's President and General Manager, Rick McEttrick had stated that he thought that the Plaintiff was a lesbian and that she liked the "lickey lickey".  As the Defendant's President and General Manager, Mr. McEttrick's knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.

- Mr. Koletsos, the Director of Marketing, told the Plaintiff that she had a "sweet ass".  As a Director for the Defendant, Mr. Koletsos' knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.

- On or about November 15, 2007, Mr. Koletsos, the Director of Marketing, forced the Plaintiff to go get drinks with him.  During the evening Mr. Koletsos told the Plaintiff that his favorite form of sexual behavior was to first have sexual intercourse and then

finish in his wife's mouth, he told the Plaintiff that the bartender was a lesbian and asked if Plaintiff thought she had nice breasts, and he made sexual advances toward the Plaintiff while inappropriately touching the Plaintiff in her car.  As a Director for the Defendant, Mr. Koletsos' knowledge of his own actions can be imputed to the Defendant; no corrective action was taken.

- On another occasion, a sales representative told the Plaintiff that she had "become wet" while looking at a passing surfer; this comment was relayed to Mr. Koletsos, the Director of Marketing.  As a Director for the Defendant, Mr. Koletsos' knowledge of this comment being relayed to him can be imputed to the Defendant; no corrective action was taken, in fact, Mr. Koletsos laughed at the statement along with the sales representative.

- On another occasion, a Senior Brand Manager, Joe Franzino made and laughed at a comment regarding the size of balls during a presentation.  The Senior Vice President, General Manager and Vice President of Marketing all witnessed this.  As the Defendant's Manager, Senior Vice President, General Manager and Vice President of Marketing all witnessed this incident, their knowledge can be imputed to the Defendant; no corrective action was taken.

- On June 8, 2010 the Vice President of Sales, Patrick Cordle made comments to a table that he was sitting at that his favorite kind of pen was the kind where the woman is in a bathing suit that falls off when the pen is turned upside down.  He also stated that he forgets his pants wherever he goes and once had to borrow pants from a co-worker that fit, but were too tight in the crotch.  He continued to say that the country club that they were at was clothing optional, that he could not use his right hand to masturbate anymore because of a wrist injury and proceeded to invite all of the women at the table to go home with him that night.  These statements were witnessed by Director of Marketing, Tim Koletsos, and the Vice President of Marketing, Traci Gentry along with other male senior managers.  The knowledge of these statements made by the Vice President of sales and witnessed by the Director of Marketing and the Vice President of Marketing along with other senior managers can impute knowledge to the Defendant; no corrective action was taken at that time despite the Vice President of Marketing stating during the comments that it "looked bad".

- Plaintiff again formally reported the comments made by the Vice President of Sales, Patrick Cordle to the Director of Marketing Tim Koletsos.  The knowledge of this complaint by the Defendant's Director imputes knowledge to the Defendant; no corrective action was taken, Mr. Koletsos simply said that he thought Mr. Cordle was joking.

- When Plaintiff continued to push the matter, Mr. Koletsos then reported the incident to the Vice President of Marketing, Traci Gentry, who had also witnessed the incident.  Ms. Gentry spoke with HR.  HR questioned the Plaintiff regarding how much the Plaintiff had to drink and whether she thought Mr. Cordle was joking.  The report to HR imputes knowledge to the Defendant; again no corrective action was taken by the Defendant.  Mr. Cordle offered to apologize, but it was made clear that this was not at the direction of the Defendant.

- On August 16, 2010, Plaintiff was asked by the Director of Trade Marketing during a sales meeting whether she used birth control.  As a Director for the Defendant, his knowledge of his own statement can be imputed to the Defendant; no corrective action was taken.

- On August 18, 2010, during a sales presentation, Joseph Franzino, the Senior Brand Manager, inappropriately stated that competitors could "suck it".  As a Manager for the Defendant, Mr. Franzino's knowledge of his own statement can be imputed to the Defendant; no corrective action was taken.

- At a meeting on August 19, 2010, Traci Gentry, the Vice President of Marketing, made inappropriate comments about candy that looked like "cute little penises".  As a Vice President of the Defendant, Ms. Gentry's knowledge of her own statement can be imputed to the Defendant; no corrective action was taken.

- On August 26, 2010, Mr. Koletsos, Director of Marketing, presented the Plaintiff with an award for having worked for the company for ten years.  When presenting her with the award in his office, Mr. Koletsos spent most of the time discussing embarrassing personal issues including her marriage, her divorce and what Mr. Koletsos called the Plaintiff's "commitment issues".  As a Director of the Defendant, Mr. Koletsos' knowledge of his own statement can be imputed to the Defendant; no corrective action was taken.

- On October 5, 2010, at a meeting with HR representatives present, Jim Geraci spoke about blowjobs being given on planes.  HR's presence in the meeting and being a witness to the statement imputes knowledge to the Defendant; no corrective action was taken.

- On October 27, 2010, Mr. Koletsos, Director of Marketing, again made comments about the Plaintiff's marriage and divorce when the Plaintiff was leaving work to attend her brother's wedding.  As a Director of the Defendant, Mr. Koletsos' knowledge of his own statement can be imputed to the Defendant; no corrective action was taken.

As can be seen from these incidents, not only did the Plaintiff make two complaints to HR, but she made numerous complaints to various Managers, Directors and Vice Presidents of the Defendant.  In fact, it was the same Managers, Directors, Vice Presidents, General Managers and President who were the individuals perpetuating the sexual harassment.  These are the individuals that are responsible for carrying out the Defendant's policies and ensuring that they are complied with and that sexual harassment does not occur in the work place.  These individuals are responsible, according to Defendant's policies to report and correct any incidents of sexual harassment that they witness and yet they are the very same people who are creating

the sexually harassing, humiliating and degrading environment.  These individuals are responsible for setting the tone at the Defendant and look at what tone they have set.

Upon having knowledge of a claim of sexual harassment, a Defendant then must perform an investigation into the alleged harassment. "The law does not require that investigations into sexual harassment complaints be perfect." Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. Pa. 1997). However, since "the choice of an appropriate remedial measure often will depend upon information gathered through an investigation, it is appropriate to consider the nature and scope of an employer's investigation when evaluating the adequacy of its response to the harassment." Brittell v. Department of Correction, 247 Conn. 148, 171 (Conn. 1998).  Further, a defendant cannot shield itself from liability simply because it failed to discover the existence of sexual harassment through an insufficient investigation.

> [W]e acknowledge that "there may be cases in which an employer's investigation is so flawed that it could not be said that the remedial action was adequate. For example, the investigation might be carried out in a way that prevents the discovery of serious and significant harassment by an employee such that the remedy chosen by the employer could not be held to be reasonably calculated to prevent the harassment." Thus, an employer cannot insulate itself from responsibility for failing to take effective remedial action by claiming that it was unable to confirm the existence of harassment in circumstances in which it made little effort to do so.

Id. (internal citation omitted).  The investigation by the employer must be thorough enough to determine whether sexual harassment occurred and to identify those involved.

Despite the Defendant's Managers, Supervisors, Vice Presidents, Directors, General Manager, President and HR being aware of the sexually harassing conduct experienced by the Plaintiff, nothing was done by the Defendant to take any corrective action.  When the Plaintiff reported her harassment, she was repeatedly denied any assistance, was laughed at or was told that the perpetrators were simply joking.  No investigation was done by Defendant's HR to determine whether the Plaintiff and other

female employees found their work environment to be sexually harassing.  In fact, HR protected Defendant's managers and officers, those perpetrating the harassment, by ignoring the Plaintiff's complaints and telling her that they did not amount to sexual harassment, despite them being a direct violation of Defendant's policies.  No corrective or remedial action was ever undertaken by the Defendant against any of the individuals who had engaged in sexually harassing behavior with the Plaintiff.  Mr. Koletsos was never disciplined, transferred nor had his supervisory role over the Plaintiff changed despite his harassing and inappropriate behavior toward the Plaintiff and his sexual proposition toward the Plaintiff after demanding that she accompany him for drinks.  Mr. Cordle offered to apologize to the Plaintiff for his actions at a sales dinner, but it was made clear by HR that this was in no way related to any decision by HR, it was Mr. Cordle's own decision.

The only action taken by the Defendant was to have a sexual harassment training, yet this was only after the Plaintiff filed her complaints with the CHRO and EEOC, and as discussed above, it did nothing to prevent further sexual harassment.  Since the Defendant did not conduct a full and proper investigation and did not take any remedial action to prevent future harassment against the Plaintiff or her female co-workers, the Defendant cannot avail itself of the Ellerth/Faragher defense.

### b.  **Retaliation**

To establish a prima facie case of retaliation "a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find [1] that [s]he engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this

activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-206 (2d Cir. N.Y. 2006).

### i.  Plaintiff Engaged in Protected Activities Known to the Defendant

The Plaintiff filed her complaints against the Defendant with the CHRO and the EEOC on September 3, 2010.  It is "undisputed that [a Plaintiff] engage[s] in a protected activity when she file[s] a complaint with the CHRO." Martinez v. Conn. Library, 2011 U.S. Dist. LEXIS 107848 (D. Conn. Sept. 21, 2011).  The Defendant was clearly made aware of this filing, and has not disputed its knowledge of it.

The Plaintiff also participated in protected activities when she made her complaints to HR and to her supervisors and managers.  A complaint of discrimination made to management or a supervisor is a protected activity." Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992)(noting that the phrase "opposed any practice" [in Section 704(a) of Title VII] encompasses an individual's complaints to supervisors).  The Defendant was aware of these complaints as well, the complaints were made directly to Defendant's HR or to supervisors and managers sufficiently high up in Defendant's hierarchy to constitute actual knowledge on the part of the Defendant.

### ii.  Plaintiff Suffered Adverse Employment Actions

For a Plaintiff to demonstrate that a particular employment action is adverse, the standard applied is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 252 (D. Conn. 2008). The Second Circuit has also held that "adverse employment actions are not limited to 'pecuniary emoluments'" and that "[l]esser actions such as negative employment evaluation letters may also be considered adverse." Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. N.Y. 2002)(citing Preda v. Nissho Iwai Am. Corp., 128 F.3d 789, 791 (2d Cir. 1997) and Morris, 196 F.3d at 110).

Following the Plaintiff filing her CHRO and EEOC claims, she was subjected to a harassing investigation by Defendant's attorney's who spent over four hours questioning the Plaintiff about her complaints.  The Plaintiff was not allowed any breaks despite the fact that she was repeatedly reduced to tears; Plaintiff was also denied any lunch. Plaintiff was then informed that it would be best if she "would resign from BIC and accept a number".  Thereafter, all witnesses that the Plaintiff had named were told not to speak with the Plaintiff and to forget that their discussion with HR happened.  This has made it more difficult for the Plaintiff to conduct her job, because her co-workers are uncooperative and no longer speak to her.  Plaintiff has also been shunned by management and Plaintiff's supervisor only communicates with her through email. Plaintiff has also received a negative year end review from Mr. Koletsos. See Treglia, 313 F.3d at 720 (2d Cir. N.Y. 2002)(holding that negative performance reviews can be considered adverse employment actions).

While these actions alone may not be sufficient to constitute an adverse employment action, when viewed as a whole they are the kind of actions that would dissuade a reasonable employee from making such a complaint of discrimination.  See Byra-Grzegorczyk, 572 F. Supp. 2d at 252 (noting that "plaintiff must [still] show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.").  When viewed as a whole, the actions of the Defendant constitute adverse employment actions against the Plaintiff.

### iii.   A Causal Connection Exists Between the Plaintiff's Protected Activity and Defendant's Adverse Employment Actions

Evidence of a causal connection between a plaintiff's protected activity and an adverse employment action can be proven in two ways, "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant".  Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

In the present case, the adverse actions taken against the Plaintiff manifested almost immediately following the Plaintiff filing her complaints with the CHRO and EEOC.  Therefore, the Plaintiff can demonstrate a causal connection between her protected activity and the Defendant's adverse employment actions due to their close proximity in time.  Further, Defendant has not claimed that there is no causal connection

between these activities and the Plaintiff's filing of her CHRO and EEOC complaints, the Defendant merely states that they do not amount to adverse actions, which as discussed above is false.

### iv.   Plaintiff Has Experienced Additional Retaliatory Actions Following the Filing of Her Federal Complaint

Since the filing of the Plaintiff's Complaint with this Court, the actions taken against her by Defendant and its employee's has escalated.  Throughout her employment with the Defendant, the Plaintiff has always performed her job in a superior manner and was even promoted three times by the Defendant.  The quality of her work was never an issue previously.  There are two direct reports to Mr. Koletsos in his department that perform substantially similar functions.  Prior to Plaintiff's Federal Complaint, she was praised for her work and received excellent reviews.  Immediately following the filing of her Complaint with this Court, the Plaintiff's supervisor, Mr. Koletsos has been making the Plaintiff redo almost every assignment that she is given, stating that he does not think that they are good enough, even when there are no problems with the Plaintiff's product.  This is making it extremely difficult for the Plaintiff to fulfill her job responsibilities when she is being made to redo almost all of her work.  It is also putting additional strain on other employees who work closely with the Plaintiff.

Plaintiff is aware that these allegations were not included in her Complaint, however, that is because they have occurred subsequent to the Complaint's filing. Plaintiff is filing a motion to amend her Complaint concurrently with this Objection requesting leave to add these additional facts.

### c. **Negligence.**

While the Defendant has asked for the entirety of Plaintiff's Complaint to be dismissed, it should be noted that Defendant has not moved to Dismiss Count Seven of Plaintiff's Complaint alleging negligence against the Defendant, nor has the Defendant made any argument in support of such claim.  Therefore, the Plaintiff's claim of negligence in Count Seven should not be dismissed.

### V.    **CONCLUSION**

For the above-stated reasons, the Plaintiff respectfully requests that the Defendant's Motion to Dismiss be denied in its entirety.

Plaintiff,
NICOLE ALTIERI

By:  _____/s/_____
Eugene N. Axelrod, Esq. (ct 00309)
Axelrod & Associates LLC
8 Lunar Drive
Woodbridge, CT 06525
Tel: (203) 389-6526
Fax: (203) 389-2656
Plaintiff's Attorney

## **CERTIFICATION**

I hereby certify that on October 18, 2011 a copy of the foregoing Motion was electronically filed and served on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing through the Court's CM/ECF System.

By               /s/              .

                Eugene N. Axelrod, Esq.  (ct00309)