# Exhibit 1

## Unreported Cases



NILDA MARTINEZ, PLAINTIFF, v. STATE OF CONNECTICUT, STATE LIBRARY, DEFENDANT.

CIVIL ACTION NO. 3:09cv1341(VLB)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2011 U.S. Dist. LEXIS 107848*

September 21, 2011, Decided
September 21, 2011, Filed

**COUNSEL:** [*1] For Nilda Martinez, Plaintiff: William Sylvester Palmieri, LEAD ATTORNEY, Law Offices of William S. Palmieri, LLC, New Haven, CT.

For State of Connecticut, State Library, Defendant: Maria A. Santos, LEAD ATTORNEY, Attorney General's Office-HTFD, Hartford, CT.

**JUDGES:** Hon. Vanessa L. Bryant, United States District Judge.

**OPINION BY:** Vanessa L. Bryant

**OPINION**

MEMORANDUM OF DECISION GRANTING DEFENDANT'S [DOC. #32] MOTION FOR SUMMARY JUDGMENT

Before the Court is a motion for summary judgment filed by the Defendant, State of Connecticut State Library. The Plaintiff, Nilda Martinez ("Martinez"), brings this action for monetary damages against her current employer, the State of Connecticut State Library. The Plaintiff alleges claims of discrimination, retaliation, and hostile work environment based upon her race, ethnicity and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000 *et. seq.* (Count One). The Plaintiff further alleges discrimination, retaliation, and hostile work environment in violation of the American with Disabilities Act of 1990 ("ADA"), *42 U.S.C. § 12111 et seq.* due to the Defendant's purported unwillingness [*2] to accommodate her chronic asthma (Count Two), and discrimination, retaliation, and hostile work environment in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), *Conn. Gen. Stat. § 46a-60 et seq.* (Count Three). In addition, the Plaintiff asserts a cause of action for intentional infliction of emotional distress (Count Four). For the reasons stated hereafter, Defendant's motion for summary judgment is granted.

Facts

The following facts relevant to Defendant's motion for summary judgment are undisputed unless otherwise noted. Martinez is a Hispanic female, born in Puerto Rico and a citizen of the State of Connecticut. [Doc. #32]. In May of 1988, Martinez began working with the Connecticut Library for the Blind and Physically Handicapped, which is a part of the Connecticut State Library system. [*Id.*].

Martinez was hired as a "clerk typist," and she remained employed in that classification at all times relevant to the motion for summary judgment. Martinez alleges that she is working outside of her job

Case 3:11-cv-00905-AVC   Document 26-2   Filed 10/18/11   Page 3 of 48

Page 2
2011 U.S. Dist. LEXIS 107848, *2

classification and asserts that her assigned duties including filing, transfers, answering phones, annotating books, and dealing with the mail are not within the "clerk typist" [*3] job classification. [Doc. #1, Complaint at ¶ 5 and Doc. #43]. In September of 1996, Martinez filed an internal grievance asserting her belief that she was forced to work outside of her job class; however, after performing an independent investigation, the State Library's Principle Personnel Officer and the State Department of Administrative Services ("DAS") hearing office found that she was working within her class and her grievance was denied in April of 1997. [Doc. #32]. Martinez filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in April of 2009 asserting the she was working outside of her job classification and on April 29, 2009, the CHRO also found that Martinez was working within her class. [Doc. #32, Ex. C, CHRO Report Summary at 25]. In addition, Martinez alleges that her supervisor, Carol Taylor ("Taylor") "unlawfully prevented plaintiff from obtaining a class update." [Doc. # 43]. However, the testimony Plaintiff cites in support of this allegation relates to Martinez's grievance that she was working out of class. See [Doc. 34, Martinez Dep. at 74-78 and 145-156]. Martinez alleges that after this complaint regarding her job classification [*4] her workload increased and she was denied training. [Doc. #43 and Doc. #34, Martinez Dep. at 130].

Since 1989, Mary Minow ("Minow") has been a coworker of Martinez. Minow is a white, non-Hispanic female, and employed as a Library Technical Assistant. [Doc. #32]. Martinez's supervisor Taylor is also a white, non-Hispanic female. Taylor began working with the Library in 1989 as State Library Unit Head and continued in that position at all times relevant to this motion. [Doc. #32, Ex. B, Taylor Aff. ¶ 3]. Martinez alleges that both Minow and Taylor subjected her to a hostile work environment. [Doc. #43, Doc. #1 Complaint ¶ 7]. Martinez's assertion is based on nine derogatory comments made about her Hispanic ancestry and race by Minow: "I cannot believe these stupid people, they come to America, sometimes they do better than us. They do not even speak fluent English, but they want to take over;" "She wants to look like us. She does not understand slang, so you can get away with insulting her by using slang and she would not know what you are talking about;" "Their families are broken, the men beat the women, their children are illiterate;" "How can she pass those classes to get an Associates [*5] Degree, if she can hardly speak the language?;" a joke about Martinez's deviled egg dish which Martinez had used to serve the "Puerto Rican desert flan;" a comment that Martinez would be unable to keep the house that she bought, that Minow would call Martinez stupid; and Minow made a remark mocking Martinez for being in a coma. [Doc. #43]. Martinez did not specify the dates when these comments were made nor did she specify if the comments occurred on the same day or over a period of days, weeks, months or years.

Martinez also alleges that Minow once approached Taylor while Martinez was within earshot and said "Cheers" in regard to the death of Martinez's brother. [Doc. #43]. Martinez does not state what Minow said to lead her to believe the comment was made in reference to her brother. In addition, Martinez alleges that "Minnow [sic] knows when the plaintiff is crying even though the plaintiff is trying to hide it. Mary looks for opportunity to make we [sic] a fool of the plaintiff or to laugh at or to make fun of her" and that Minow made fun of Martinez's accent. [Id.]. In her deposition, Martinez was asked to give examples of Defendant's harassing behavior and she testified that once [*6] at a pizza party, "there was only one chair that was empty that I assumed that was my chair. And that chair was just facing the - the wall, and it was like saying you're segregated ... it is like telling me you cannot sit with the others." [Doc. #34, Martinez Dep. at 186].

Martinez alleges that Taylor "witnessed many of these comments and failed to prevent, stop or address them in any manner whatsoever, despite plaintiff's upset and distress. Instead, Taylor laughed at the offensive remarks." [Doc. #43]. However, Taylor denies this and asserts that she was not aware that Minow harassed Martinez at any time and that she did not witness or laugh with Minow at any harassing comments toward Martinez. [Doc. #32, Ex. B, Taylor Aff. ¶ 23, 26]. Taylor further states that she overheard Minow's coma comment; however, she did not think that it was directed at Martinez or anyone in particular. [Id. at Taylor Aff. ¶ 25].

The Defendant also highlights that Minow, Taylor and Martinez had a good working relationship for many years. Martinez stated in her deposition that she was friends with both Minow and Taylor, and she further indicated her then present affection by stating "I love Carol Taylor. I'm [*7] sorry. I have to say yes." With respect to Mary Minnow she spoke in the past tense

2011 U.S. Dist. LEXIS 107848, *7

testifying that "Mary was one of my favorites in there. I was always looked up to her." [Doc. #34, Martinez Dep. at 110, 123]. Furthermore, Martinez testified that she gave them both birthday cards and that she gave Minow a gift. [*Id.*] at 120 - 123]. The record is unclear as to when the comments were made by Minow in relation to the card and gift giving. [*Id.*].

Martinez was diagnosed with chronic asthma in 1996. She alleges that her asthma is so severe on one occasion it caused her to lapse into a coma. [Doc. #43.]. The Defendant was aware that Martinez had asthma, however the Defendant disputes the severity of her asthma. Martinez asserts that she gave Taylor a doctor's note stating that she could not be exposed to excessively cold conditions; however, Taylor states that she never received this note. [Doc. #34, Martinez Dep. at 199 - 200; Doc. #32, Ex. B, Taylor Aff. ¶ 33]. In July or August of 2006, Martinez complained to Taylor that the cold temperature in the library aggravated her chronic asthma. [Doc. #43]. In response, Taylor adjusted the building temperature to the extent possible. When Martinez [*8] complained about the cold in the winter of 2005-2006, Martinez was told on March 30, 2006 that she could have a portable heater at her desk. [Doc. #34, Martinez Dep. at 203]. Martinez acknowledged in a handwritten note that Taylor informed her that she was unable to adjust the building temperature and that she was allowed to bring in a heater. [*Id.*]. Nevertheless, Martinez alleges that Taylor once raised the temperature per the request of a white supervisor in late 2006. [Doc. #43]. Martinez also admitted in her own deposition testimony that the cold building temperature did not really affect her ability to perform her job functions. [Doc. #34, Martinez Dep. at 204]. The record is devoid of any facts concerning the exact or even approximate building temperature on any date.

Martinez also generally alleges that she filed complaints of discrimination and harassment and as a result her workload increased. [Doc. #43]. Besides her grievance that she was working out of her job classification in 1996, Martinez during her deposition only identifies one other time she complained about Minow and Taylor's behavior. Martinez alleges that around July 2006 she complained to her union representative [*9] Nancy Buckland that Minow and Taylor discriminated against and harassed her and that Buckland created a written grievance which Martinez signed. However, Martinez testified that she did not know

if the grievance was filed. In particular, Martinez testified that it was her belief that Buckland "never filed it, but it's been written" [Doc. # 34, Martinez Dep. at 91-92].

On October 18, 2006, both Martinez and Minow attended a training session related to the new libray telephone system. [Doc. #32]. The training session was led by Taylor. During this session, Taylor explained the library procedure regarding calling in sick. At this time, Minow made a personal insult to her disability a she was once in a coma as a result of an asthmatic attack. [Doc. #43]. This was the comment Taylor acknowledges hearing Minow say, but denies that it was in reference to Martinez. There are no facts in the record of the temporal proximity of Martinez's coma and the comment.

Later that same day, at approximately 4:00 PM, Martinez confronted Minow about the coma comment in a bathroom and [*10] both women became upset. [Doc. #32]. After, the conversation became mutually heated, Martinez and Minow left the bathroom and immediately went to Taylor's office, and Taylor observed that both were very upset and speaking loudly at the same time. [Doc. #32, Ex. B, Taylor Aff. ¶10]. Minow entered Taylor's office first, followed by Martinez. Martinez alleges that Taylor yelled at Martinez to get out of her office, but allowed Minow to remain and told Minow that she would take care of her. [Doc. #43 and Doc. #1, Complaint ¶ 18]. She further alleges that Taylor physically pushed her out of her office. [Doc. #43 and Doc. #1, Complaint ¶ 19]. Taylor asserts, however, that the altercation caused Taylor "great concern," and she as calmly as possible asked Martinez to leave her office in an effort to keep the situation from escalating further. [Doc. #32, Ex. B, Taylor Aff. ¶ 10]. Taylor stated that she asked Martinez to leave first because Martinez was closest to the door. [*Id.* at Taylor Aff. ¶ 11]. She further asserts that Martinez refused to leave and began to yell at Taylor. [*Id.* at Taylor Aff. ¶ 13]. After repeated requests, and after calling for the help of her assistant, Taylor guided [*11] Martinez out of office. [*Id.* at Taylor Aff. ¶ 13-14]. Defendant alleges that Martinez herself later demonstrated before two internal investigators that Taylor guided her out of her office by placing her palms on Martinez's shoulders and gently pushing, however not with enough force to move the body. [*Id.*]. Taylor immediately sent both Minow and Martinez home for the day, and after they left Taylor called Louise Carey

("Carey"), Principal Human Resources Specialist at the Connecticut State Library, in order to report the incident in compliance with the State's Zero Tolerance Policy for Workplace Violence. [Doc. #32, Ex. B, Taylor Aff. ¶ 15]. Carey was out of her office at the time, however, so the incident was immediately reported to the Fiscal Administrator Manager in her stead. [Id.].

According to statewide policy, an investigation must occur once there has been a complaint of violence in the workplace and there is no room for a supervisor's discretion. [Doc. #32, Ex. C, Carey Aff.]. The investigation was conducted by Carey. Carey's office is located in Hartford and at no time has she worked in the same building as Martinez, Minow, or Taylor. [Doc. #32, Ex. C, Carey Aff. ¶ 5]. Carey [*12] ultimately interviewed Martinez twice as a part of her investigation and Martinez's union representative was present at both times. Carey also interviewed Minow, Taylor, and several other employees who work at the library during her investigation. [Doc. #32]. It was during this investigation that Martinez raised her claim of race-motivated harassment against Minow, and did so after being notified by Carey that Minow was alleging that the bathroom incident was the result of a pattern of harassment perpetrated by Martinez. [Doc. #32, Ex. C, Carey App. ¶ 14].

In the course of Carey's investigation, Martinez admitted that she followed Minow into the bathroom for the purpose of confronting Minow about the coma comment that she had made during the training session. [Doc. #32, Ex. C, Carey Aff. ¶16]. Carey prepared a validated statement of her investigative interview which was reviewed and signed by Martinez. The validated statement indicated that Martinez had followed Minow into the bathroom to "talk with her about the comments" and that she wanted to speak with Minnow "in the bathroom because it would be more private," which she reiterated in her deposition testimony. [Doc. #34, Martinez [*13] Dep. 215-216]. After the investigation was completed, Carey concluded, among other things, that (1) Martinez intimidated a coworker, failed to follow a directive from her supervisor and violated the Connecticut State Violence in the Workplace Prevention Policy and (2) there was no evidence the Martinez was subjected to harassment, discrimination, or disparate treatment. [Doc. #32, Ex. C, Carey Aff. ¶ 18].

Once she concluded her investigation, Carey contacted Paul Bodenhofer ("Bodenhofer"), Labor Relations Specialist with the State of Connecticut, Office of Labor Relations, and Susan Phillips ("Phillips"), Principal Human Resources Specialist for the Office of the State of Connecticut Secretary of State, to discuss her investigative summary and seek recommendations for the appropriate discipline. Phillips met with Carey on November 16, 2006 and the conversation with Bodenhofer occurred on December 12, 2006. [Doc. #32, Ex. D, Phillips Aff. ¶¶5, 8 and Bodenhofer Aff. ¶¶7-9]. Phillips recommended that the State Library consider suspending Martinez for a day without pay, and Bodenhofer stated that the incident was serious and warranted significant discipline at the level of suspension. [Id.]. [*14] On December 12 Bodenhofer recommended that it would be appropriate to reduce the discipline to a written warning if Martinez agreed to a management referral to the Employee Assistance Program ("EAP") and would agree to follow their recommendations, if any. [Id.].

Martinez filed an Affidavit of Illegal Discriminatory Practice with the CHRO on December 14, 2006 which was two days after Bodenhofer and Carey came to a preliminary agreement regarding Martinez's discipline. Martinez alleges after she filed the CHRO complaint her workload increased and that she was further harassed by Minow and Taylor. [Doc. #43].

Martinez received notice on January 2, 2007 that a pre-disciplinary meeting ("Loudermill Hearing") was going to be held on January 10, 2007. [Doc. #32]. Martinez, accompanied by Debbie Austin ("Austin"), the president of her union, was given the opportunity at this meeting to respond to the charges and present any evidence on her behalf. No new evidence was presented. [Doc. #32, Ex. C, Carey Aff. ¶28-31]. Martinez alleges that "at the hearing, the defendant tried to compel [her] to give up her rights under state and federal law, including withdrawing her pending CHRO complaint, [*15] in return for dropping the false claims against her." [Doc. # 43 and Doc. #1, Complaint ¶25]. In her deposition testimony, Martinez clarified that allegation by stating that it was Austin who wanted her to "give up her rights." [Doc. #34, Martinez Dep. 231]. Martinez did not clarify what she meant by "give up her rights," but upon questioning she discussed that she subjectively felt that Austin was in "collaboration" with Carey, "holding secret meetings" while Martinez was waiting for their help in filing a formal grievance against Taylor and Minow. [Id.

].

During the hearing, Defendant presented Martinez with a stipulated agreement in which they proposed to lower the discipline to a written warning if Martinez agreed to a management referral to EAP. Notably, the agreement expressly stated that "[t]his agreement would not prohibit Ms. Martinez from pursuing her current claim with CHRO." [Doc. #32, Ex. C, Stipulated Agreement].

Twelve days later, on January 22, 2007, Martinez refused this offer and was given a one-day suspension without pay as a result of the October 18, 2006 incident. [Doc. #32, Ex. C, Carey Aff. ¶33-34]. Martinez also alleges that she was forced to sign a letter confirming [*16] her acknowledgement of her one-day suspension under threat of discharge. [Doc. #43 and Doc. #1 Complaint ¶26]. However, Martinez clarified this allegation in her deposition and testified that Austin told her that, "Well, listen, you know what, you either sign or you're going to have to go because these people don't want--don't want to wait and I cannot wait either." [Doc. #34, Martinez Dep. 235]. Martinez testified that she interpreted this comment as "It was, like, you sign or you out." [*Id.*].

The CHRO made a Finding of No Reasonable Cause on April 29, 2009. Martinez received a right to sue from the EEOC on May 28, 2009 and filed her complaint in the District of Connecticut on August 24, 2009.

Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010)*. "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn [*17] in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v.*

*Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir. 2006)* (internal quotation marks and citation omitted). In addition, "[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp., No.3:03cv481, 2004 U.S. Dist. LEXIS 22112, at *4, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004)* (internal quotation marks and citations omitted).

Analysis of Title VII Employment Discrimination Claim

Martinez alleges that the Defendant discriminated against [*18] her by unlawfully preventing her from obtaining a class update and suspending her for a day without pay on the basis of her race and national origin. Under Title VII, Plaintiff's claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp., v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. The *McDonnell Douglas* standard requires that Plaintiff establish a *prima facie* case of discrimination by showing that (1) she is part of a protected class; (2) that she was qualified for his position; (3) that she suffered an adverse employment action and (4) that the circumstances surrounding the employment action give rise to an inference of discrimination. *Id.* The Second Circuit has noted that the burden to establish a prim facie case is "minimal" or "de minimis." *Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005)*.

If Plaintiff can establish a *prima facie* case, the burden shifts to the Defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell, 411 U.S. at 802*. As this stage, Defendants need only proffer, not prove, the existence of a nondiscriminatory reason for their employment decision. *See Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. [*19] "This burden is one of production, not persuasion, it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (internal quotations omitted).

If Defendant meets its burden of production, the

Case 3:11-cv-00905-AVC   Document 26-2   Filed 10/18/11   Page 7 of 48

Page 6
2011 U.S. Dist. LEXIS 107848, *19

burden shifts back to Plaintiff to show that the legitimate, nondiscriminatory reason offered by the Defendant is mere pretext for illegal employment discrimination. *McDonnell, 411 U.S. at 804.* "Although the intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves, 530 U.S. at 143.*

The Defendant challenges the Plaintiff's Title VII race claim on the basis that Martinez's EEOC right to sue notice referred only to "national origin," and therefore her Title VII claim must fail in regard to "race" because she failed to exhaust administrative prerequisites. The Court does not find this fact to be fatal to Martinez's claim as the Second Circuit has held that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are [*20] reasonably related to those that were filed with the agency. A claim is reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Deravin, III v. Kerik, 335 F.3d 195, 200-201 (2d Cir. 2003)* (internal quotation marks and citations omitted); *see also Alonzo v. Chase Manhattan Bank N.A., 25 F. Supp. 2d 455, 460 (S.D.N.Y. 1998)* (holding that a race discrimination claim was reasonably related to a national origin claim because "it has not been established that the designation of being an Hispanic precludes a claim of racial discrimination, given the uncertainty among courts as to whether 'Hispanic' is better characterized as race or a national origin.").

Martinez has satisfied the first two prongs of her *prima facie* case as it is undisputed that she is a member of a protected class and there is no evidence in the record suggesting that she is not qualified for her position.

i. Analysis of Whether Martinez Suffered an Adverse Employment Action

Martinez alleges that she was forced to work outside of her class when she was required to do such additional tasks as filing, transfers, [*21] answering phones, annotating books, and dealing with the mail and that she was denied a class update by Taylor in connection with this grievance. [Doc. #43]. From the evidence in the record, it appears that Martinez's allegation regarding the denial of a class update is focused solely on her allegation that she was working out of her job classification. The

Court notes that Defendant argues that to the extent that Martinez is alleging that she was denied a class update prior to February 17, 2006 that claim should be time barred. However, Martinez does not specify the exact dates when she was denied updates and therefore the Court in viewing the facts in the light most favorable to the non-moving party assumes that Martinez's claims were timely filed.

To suffer an "adverse employment action," Martinez must have suffered something more than an unpleasant situation. She must point to evidence of more than inconvenience; she must show an action that rises to the level of "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a [*22] particular situation." *Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)* (internal quotation marks and citation omitted). In addition, the Second Circuit has held that for conduct to constitute an adverse employment action, it must be a "materially adverse change in the terms and conditions of employment." *Galabaya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).* In support of this claim, Martinez relies on her deposition testimony that consists solely of conclusory accusations of discrimination and her unsubstantiated belief that she was subject to pervasive discrimination and harassment. The only factual support for this claim is her unverified complaint in which she asserts that she has been forced to perform additional duties such as filing, transfers, answering phones, annotating books, and dealing with the mail. Contrary to Martinez's belief, the defense offers public records which establish that these responsibilities are within the job classification of "clerk typist" as outlined in the Department of Administrative Service's ("DAS") Class Specification dated May 26, 2009 and the DAS Job Description dated December 19, 1997. [Doc. #32, Ex. [*23] B]. Both of these documents describe the "purpose of the class" as "accountable for performing a full range of general clerical functions" [*Id.*]. They also contain an in-exhaustive list of the duties of the class which include "basic processing, reception, filing, record keeping, bookkeeping, and typing" as well as assisting in maintaining inventory and ordering supplies.

The Defendants also offer evidence that after Martinez filed a grievance in September of 1996, DAS conducted an independent investigation and found that

Martinez was working within her job classification and that CHRO later concurred. [Doc. #32, Ex. B, CHRO Report Summary]. Moreover, Martinez does not challenge either of these investigations or their conclusions. Plaintiff alleges in her Local Rule 56(a)2 Statement that "plaintiff has sought an increase in job class through DAS, which found that she is working out of class" [Doc. #43]. However, the testimony which Plaintiff cites in her Local Rule 56(a)2 Statement does not support this allegation as Martinez testified that it was not DAS but her union steward Mary King who concluded that she was working out of class. [Doc. #34, Martinez Dep. at 77-78]. The Court finds [*24] that a rational jury when viewing the evidence in the record could not conclude that Martinez was working out of her classification and therefore the Court finds there are no genuine issues of material fact in dispute with respect to Martinez's allegation that she was discriminatorily denied a class update. Accordingly, Martinez has not provided sufficient evidence to demonstrate that she suffered an adverse employment action in connection with her claim that she was denied a class update. Defendant's motion for summary judgment on Martinez's claim based on a denial of a class update is granted.

Martinez also asserts that Defendant failed to provide her with training despite her requests. [Doc. #43]. To the extent that Martinez is asserting that the failure to provide training was an adverse employment action she cannot do so as Martinez failed to raise this claim in her complaint and it is well established that "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion" *Thomas v. Egan, 1 Fed.Appx. 52, 54 (2d Cir. 2001); Lyman v. CSX Transp., Inc., 364 Fed.Appx. 699, 701 (2d Cir. 2010)* (finding that district courts are "justified' [*25] in 'brushing aside' further argument not alleged in complaint but raised for first time in opposition to summary judgment")(*quoting Syracuse Broad. Corp. v. Newhouse, 236 F.2d 522, 525 (2d Cir. 1956)*); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1183, at 23 n.9 (3ed.2004) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims.").

Martinez also alleges she suffered an adverse employment action when she was suspended without pay in connection with the bathroom altercation with Minow. The Court notes that Martinez was given the opportunity at the hearing to receive a written warning instead of a

one-day suspension without pay if she agreed to a management referral to the EAP and that written warnings alone do not constitute adverse employment actions. *See Abraham v. Potter, 494 F. Supp. 2d 141, 147 (D. Conn. 2007)* (Courts in this circuit have found that "reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.") (internal quotation marks and citation omitted). By [*26] refusing to accept the referral to the EAP, Martinez elected the higher level of discipline she received by refusing discipline which did not constitute an adverse employment action. The Court notes that Martinez's role therefore should undermine a conclusion that Defendant took an adverse employment action against her.

In addition, courts in the Second Circuit have found that a suspension without pay in certain circumstances can constitute an adverse employment action. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223-224 (2d Cir. 2001)* (holding that one-week suspension without pay is adverse action, even if pay is later reimbursed, because plaintiff "at least suffered the loss of the use of her wages for a time"); *Page v. Connecticut Dep't of Pub. Safety, Div, of State Police, 185 F.Supp.2d 149, 157 (D. Conn. 2002)* ("In this case, plaintiff was suspended for two days without pay. Thus, she lost wages. She was also orally counseled for three alleged incidents of unacceptable work behavior and then reprimanded in writing. These would be sufficient to support a jury's finding that she suffered adverse employment action.").

While the Second Circuit has not yet decided whether [*27] a one-day suspension without pay alone constitutes an adverse employment action, district courts within the Circuit have come to different conclusions on the issue. One court in the Southern District of New York has suggested but did not decide that a one-day suspension without pay could constitute an adverse employment action. *Satterfield v. United Parcel Serv., Inc., No.00CIV.7190, 2003 U.S. Dist. LEXIS 17229, at *35, 2003 WL 22251314, at *10 (S.D.N.Y. Sept. 30, 2003)* ("[a]s for [plaintiff's] one-day suspension, this action arguably does fall within the Second Circuit's definition of 'materially adverse' action since plaintiff presumably was forced to forego one day's worth of wages") (*citing Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223-224 (2d Cir. 2001)*). In addition,

another court in the District of Connecticut found that a one-day suspension without pay in connection with other disciplinary measures could be considered an adverse employment action. *Cormier v. City of Meriden, 420 F. Supp.2d 11, 21 (D. Conn. 2006)* (finding that "the one-day suspension without pay, which also resulted in a one-year loss of eligibility for the crew-leader premium, and the written disciplinary letters, which were placed [*28] in plaintiff's personnel file, can be considered adverse employment actions"). In contrast, a court in the Southern District of New York concluded that a one-day suspension without pay did not as a matter of law constitute an actionable adverse employment action because it was not material. *Dobrynio v. Central Hudson Gas & Electric Corp., 419 F.Supp.2d 557, 564-565 (S.D.N.Y. 2006)* (holding that "I reject as a matter of law Plaintiff's contention that the loss of one day's pay worked a substantial change in the terms and conditions of his employment. Indeed, it did not work any change in the terms and conditions of his employment at all! Plaintiff was suspended for a day: he did not work; he was not paid for staying home on the day of his suspension. When he returned after one day off the job, it was to the same position, with the same title and office, at the same salary, with the same duties and perquisites. An employee will no doubt view suspension, for whatever reason (including the most justified discipline), as an *adverse* employment action. But being suspended for a single day, with no long term consequences whatever, is not an actionable adverse employment action because it is [*29] not *material*.") (emphasis in the original). The Court finds the *Dobrynio* court's reasoning persuasive. Here, Martinez did not suffer any other short term nor any long term consequences as a result of the suspension nor did she suffer a material change in the terms and conditions, benefits or responsibilities of her employment. Like *Dobrynio*, Martinez returned after her one day off to the same job, the same position, the same title, the same duties and the same salary. Here as well, Martinez elected a one day suspension, rejecting a less onerous and beneficial alternative. Accordingly, the Court finds that Martinez did not suffer an adverse employment action when she was suspended without pay for one day. However, assuming arguendo that Martinez did suffer an adverse employment action, while Martinez could likely demonstrate that the circumstances surrounding the suspension gave rise to an inference of discrimination, she would be unable to rebut Defendant's proffered legitimate non-discriminatory reason and demonstrate that such reason was a pretext for discrimination.

**ii. Analysis of Whether the Circumstances Surrounding Martinez's Suspension Without Pay Gives Rise to an Inference [*30] of Discrimination.**

Here, Martinez alleges that an inference of discrimination can be drawn from the fact that Minow had made racist comments to Martinez in which Taylor acquiesced and therefore both Minow and Taylor displayed a discriminatory animus. While neither Taylor nor Minow were involved with the decision to suspend Martinez, Martinez alleges that Minow essentially provoked the bathroom altercation when she made the coma comment and Taylor, as Martinez's supervisor, initiated the investigation which led to Martinez's suspension without pay. Arguably, Minow's alleged comments and Taylor's alleged acquiescence to those comments could be considered stray remarks as neither were involved in the decision to suspend Martinez. "Stray remarks by an employer do not prove discriminatory animus unless there is a causal connection to plaintiff's alleged adverse employment action." *Trojanowski v. Blakeslee Prestress, Inc., No. 3:08cv548 (WWE), 2009 U.S. Dist. LEXIS 95935, at *10, 2009 WL 3340426, at *4 (D. Conn. Oct. 15, 2009)*. However, when viewing the facts in the light most favorable to the non-moving party, the Court finds that the central involvement of both Minow and Taylor in the incident that sparked the investigation [*31] that led to Martinez's suspension supports a "de minimus" inference of discrimination. *See Jasmin v. New York State Dept. of Labor, No.04 Civ.10237, 2007 U.S. Dist. LEXIS 43898, at *21, 2007 WL 1746909, at *7 (S.D.N.Y. June 15, 2007)* (concluding that the "gravamen of Plaintiff's evidentiary support here is alleged discriminatory and threatening remarks made by [a supervisor]. Although Plaintiff has proffered no specific evidence of [the supervisor's] involvement in the pre-termination investigation, the time falsification charges or the termination decision, the Court will assume for purposes of this analysis that the temporal relationship among the alleged remarks, the various proceedings and the termination is sufficient to support an inference of improper motivation."). Here as in *Jasmin*, the temporal proximity of the remark in Taylor's presence to the initiation of the investigation and suspension is sufficient for purposes of this analysis to create an inference of improper motivation.

The Court notes that Defendant argues that to the

2011 U.S. Dist. LEXIS 107848, *31

extent that Plaintiff alleges that these comments by Minow were made before February 17, 2006 they are barred as untimely as Title VII requires a claimant to file a discrimination charge [*32] with the EEOC within 180 days of the alleged unlawful employment action. *Civil Rights Act of 1964, § 706(e), 42 U.S.C.A. § 2000e-5(e).* However, Defendant's argument is misplaced as Martinez is citing to those comments to prove an inference of discrimination and to rebut Defendant's legitimate non-discriminatory reason and is not asserting that the unlawful employment action which is the basis of her claim was those discriminatory comments.

iii. Analysis of Whether Defendant's Legitimate Non-Discriminatory Reason for Martinez's Suspension Was a Pretext for Discrimination

The Defendant has a proffered legitimate, non-discriminatory reason for their adverse employment action. Defendant asserts that its decision to suspend Martinez was the result of a three-month formal investigative process led by the Principal Human Resources Specialist who did not work with Minow or Taylor, which consisted of the input of multiple supervisory administrators and a hearing where Martinez was provided with representation by her union and had the ability to present evidence on her own behalf. Defendant concluded after this formal investigation and hearing that Martinez's conduct violated the State's Violence [*33] in the Workplace Policy. Defendant's conclusion was in part based on Martinez's testimony during the investigation that she followed Minow into the bathroom for the sole purpose of confronting her regarding the coma comment. The Zero Tolerance Policy expressly defines violence to include "verbal abuse" and Martinez essentially admitted that she violated the policy when she intentionally confronted Minow in the bathroom. Defendants need only proffer, not prove, the existence of a nondiscriminatory reason for their employment decision. *See Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).*

Since Defendant has proffered a legitimate non-discriminatory reason for its action, Martinez now has the burden to demonstrate that this reason was a mere pretext for discrimination. Martinez has failed to present sufficient evidence to rebut the weight of the defendant's legitimate reason to demonstrate pretext. Martinez once again relies on the nine discriminatory comments which

Minow allegedly made and which she alleges that Taylor acquiesced in as evidence of pretext. However although Taylor responding to Martinez and Minow's entreaties initiated the investigation of the altercation, [*34] neither Minow nor Taylor were involved in the decision to discipline Martinez. Therefore Martinez cannot impute their alleged discriminatory animus to the individuals who actually made the decision to suspend her. *Howe v. Town of Hempstead, No.04CIV0656, 2006 U.S. Dist. LEXIS 78927, at *22, 2006 WL 3095819, at *7 (E.D.N.Y. Oct. 30, 2006)* ("Racist comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the adverse employment action. This connection exists if the comments were made by the decision-maker or by someone who had great influence over the decision-maker.") (citation omitted). The Court further notes that Minow's alleged comment regarding Martinez's brother's death is not related to Martinez's race or national origin nor do Martinez's allegations that Minow called her stupid and therefore do not support a finding of pretext.

In addition, Martinez attempts to rebut the Defendant's proffered reason with her own unsubstantiated belief that every individual including her own union representative involved in the investigation and hearing that led to her discipline was in collaboration against her. Martinez offers no evidence admissible or otherwise [*35] to support her belief. *See Goenaga v. March of Dimes Birth Defects Found., 51 F. 3d 14, 18 (2d Cir. 1995)* (A motion for summary judgment "will not be defeated merely ... on the basis of conjecture or surmise.") (internal quotation marks and citation omitted). During her deposition, Martinez vaguely asserted that Austin, her union representative, was in collaboration with Carey. However, Martinez provides no specific facts or evidence demonstrating that Austin was involved in the decision to discipline her, that Austin had or exerted any influence over Carey Bodenhofer or Phillips, or that Austin was motivated by racial animus herself. *Harrison v. North Shore University Hosp., No.CV04-2033, 2008 U.S. Dist. LEXIS 17330, at *35, 2008 WL 656674, at *13, (E.D.N.Y. March 6, 2008)* ("Plaintiff's attempts to overcome the legitimate reasons advanced by defendant are conjectural and fall short of the mark. Again, he relies solely upon his statements that he was discriminated against. As discussed *supra,* he has provided no admissible evidence to support his allegations. An assumption devoid of evidence to support

it is conclusory, and mere conclusory allegations" cannot establish a pretext to defeat a motion for summary judgment [*36] ... As plaintiff has put forth no evidence to show that defendant's reasons for his termination were pretextual, there is no genuine issue of fact for a jury to determine.") (internal quotation marks and citations omitted).

Moreover, Martinez does not present any evidence that Carey, Bodenhofer, or Phillips--the individuals who actually investigated and disciplined Martinez--were motivated by racial animus. The only racial animus that Martinez has alleged was on the part of Minow and Taylor--two individuals who had no role in the decision-making that led to her suspension. *See Jasmin, 2007 U.S. Dist. LEXIS 43898, [WL] at *7* (finding that Plaintiff's reliance on a supervisor's discriminatory comments to demonstrate pretext unpersuasive as "Defendant has proffered affidavits asserting that [the supervisor] was neither involved in the initiation of the investigation or the decision to issue the Notice of Discipline and denying that the decision was based on any consideration of Plaintiff's race, ethnic background, or any prior litigation or complaints brought by Plaintiff against DOL or any of its employees."). Moreover, Martinez presents no evidence that Minow or Taylor had any influence over Carey, Bodenhofer, [*37] or Phillips. Martinez cannot rely on the alleged racists comments made by Minow and acquiesced to by Taylor absent some demonstration or nexus beyond her own unsubstantiated belief linking Minow and Taylor's alleged animus to Carey, Bodenhofer, or Phillips.

Further, Martinez attempts to establish pretext through her unsubstantiated allegation that "at the hearing, the defendant tried to compel [her] to give up her rights under state and federal law, including withdrawing her pending CHRO complaint, in return for dropping the false claims against her." [Doc. # 43 and Doc. #1, Complaint ¶25]. However this contention is soundly refuted by the record. Martinez's own testimony belies this allegation as she testified that it was her belief that Austin, her union representative, wanted her to "give up her rights" and not any of the individuals who made the decision to discipline her. [Doc. #34, Martinez Dep. 231]. During the deposition, Martinez was asked to further clarify what she meant by "give up her rights," and in response she discussed that she subjectively felt that Austin was in "collaboration" with Carey, "holding secret meetings" while Martinez was waiting for their help in filing [*38] a formal grievance against Taylor and Minow. [*Id.*]. Martinez has presented no evidence that Carey, Bodenhofer, or Phillips, who were involved in the decision to suspend her, tried to compel her to give up her rights under state and federal law. Moreover, this allegation is further undermined by the undisputed fact that during the hearing Defendant presented Martinez with a stipulated agreement in which they proposed to lessen the discipline to a written warning if Martinez agreed to a management referral to EAP which agreement expressly stated that it did not prohibit Martinez from pursuing her CHRO claim. [Doc. #32, Ex. C, Stipulated Agreement].

Martinez also attempts to prove pretext through her unsubstantiated allegation that she was forced to sign a letter confirming her acknowledgement of her one-day suspension under threat of discharge. [Doc. #43 and Doc. #1 Complaint ¶26]. However, it is unclear to the Court how being forced to sign an acknowledgement of the undisputed fact that she received discipline demonstrates that the discipline was motived by discrimination. Furthermore, Martinez testified that the perceived threat came from Austin, her union representative and not from [*39] any the individuals who made the decision to suspend her. Lastly, it is unclear from Martinez's deposition testimony whether Austin actually ever threatened Martinez with discharge. In particular, Martinez testified that Austin told her "Well, listen, you know what, you either sign or you're going to have to go because these people don't want-- don't want to wait and I cannot wait either." [Doc. #34, Martinez Dep. 235]. In her deposition, Martinez stated that she interpreted Austin's comment as "It was, like, you sign or you sign you out." [*Id.*]. Martinez does not cite any admissible evidence to show that any defendant threatened her with termination.

Lastly, Martinez baldly alleges that "defendant was quite concerned that plaintiff would file a discrimination claim with the Connecticut Commission on Human Rights and Opportunities. On several occasions, the plaintiff was questioned about the matter, including being asked when and by whom her complaint would be filed." [Doc. #43]. However after reading through the over forty pages of deposition testimony Plaintiff cites in support of this assertion, the Court finds no discernible basis for the assertion. At most, Martinez testified that her union [*40] representative Mary King - not the Defendant stated "come and tell me, Nilda, don't call me if you're don't gonna to file a grievance ... I cannot continue

coming here for nothing. If you want to file a grievance or what?" [Doc. #34, Martinez Dep. at 168-169]. Martinez also testified that it was her belief that Carey "didn't want me to get union representation." [*Id.* at 171].

Martinez has simply offered no evidence that would allow a reasonable jury to conclude that the decision to suspend her without pay was anything other than a genuine good-faith business decision. "As the Second Circuit has explained, although evidence showing that an employer made an erroneous or poor business decision is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons, there is a distinction between a poor business decision and a reason manufactured to avoid liability. In an ADEA or Title VII case, a plaintiff may be able to put into question the genuineness of the employer's putative non-discriminatory purpose by arguing that the stated purpose is implausible, absurd or unwise." *Barney v. Consolidated Edison Co. of New York, No.CV-99-823, 2009 U.S. Dist. LEXIS 127178, at *55, 2009 WL 6551494, at *17 (E.D.N.Y. Oct. 1, 2009)* [*41] (internal quotation marks and citations omitted). Here, there is nothing in the record that would convince a reasonable jury that the decision to suspend Martinez was anything but a good-faith business decision as the decision was not implausible, absurd or unwise.

Martinez cannot rely on her hyperbolic and conclusory statements unsupported by admissible evidence that everyone was against her because of her race and national origin to rebut Defendant's non-discriminatory reason. *See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)* ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."). Considering the substantial evidence in the record documenting Martinez's inappropriate conduct which formed the basis of Carey, Bodenhofer, and Phillips decision to suspend Martinez and the lack of any nexus between the alleged racists comments made by Minow and the decision to suspend Martinez, it is unlikely that a reasonable jury would conclude that Defendant's proffered reason was a pretext for discrimination. Accordingly, Plaintiff has failed to rebut [*42] Defendant's non-discriminatory reason and summary judgment is therefore granted on Plaintiff's Title VII employment discrimination claim.

## Analysis of Title VII Retaliation Claim

Martinez alleges that Defendant retaliated against her by suspending her without pay after she had filed a complaint with the CHRO on December 14, 2006. Martinez also has generally alleged that she complained to Defendant about Minow and Taylor's conduct and as a result her workload increased. To establish a *prima facie* claim for retaliation, the plaintiff must show that (1) she engaged in a protected activity; (2) her employer is aware of the activity; (3) the employer took some adverse action against him; and (4) a causal connection exists between the protected activity and the adverse action that a retaliatory motive played a party in the adverse employment action. *Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001)*. Retaliation claims are also analyzed using the burden-shifting framework set forth in *McDonnell Douglas.*

In connection with Martinez's general allegation that she complained about Minow and Taylor's conduct and as a result her workload increased, Martinez has failed to support her *prima facie* case [*43] of retaliation. Besides the CHRO complaint, Martinez in her deposition testimony only identified one other instance where she complained about Minow and Taylor's conduct around July 2006. However, Martinez testified that she complained to her union representative not to Defendant and that while her union representative wrote up a grievance, she did not know if the grievance was ever filed. In particular, Martinez testified that it was her belief that Buckland "never filed it, but it's been written" [Doc. # 34, Martinez Dep. at 91-92]. Therefore, Martinez cannot demonstrate that her employer knew that she had engaged in a protected activity. The Court notes that the definition of protected activity does encompass "informal protests of discriminatory employment practices," such as "making complaints to management." *Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)*. However, Martinez's complaint to her union representative cannot be construed to have been a complaint to management. Moreover, there is no evidence in the record that anyone at the library was even aware that Martinez had complained to her union representative. *See Mack v. Otis Elevator Co., 326 F.3d 116, 129-130 (2d Cir. 2003)* [*44] ("Neither these assertions nor anything else we have found in the record would support a reasonable fact-finder's conclusion that Connolly's behavior toward her was retaliatory. Mack has not elicited any evidence to support the notion that Connolly was aware of her

complaints to Gallina or Reiff, or that as a result of this awareness he engaged in or escalated the hostile work environment to which he subjected her. As noted, Local 1 did not file a grievance for Mack while she was employed by Otis because she did not cooperate with Union officials or follow Union procedures with respect to any such grievance."). Accordingly, Martinez has failed to establish a *prima facie* case of retaliation in connection with her alleged July 2006 complaint.

To the extent that Martinez is alleging that her workload increased as a result of her grievance in 1996 regarding working outside her job classification and that she was discriminatorily denied a class update as a result of this grievance, the Court notes that this claim would be time barred as Title VII requires a claimant to file a discrimination charge with the EEOC within 180 days of the alleged unlawful employment action. Civil Rights Act of [*45] 1964, *§ 706(e), 42 U.S.C.A. § 2000e-5(e).*

It is undisputed that Martinez engaged in a protected activity when she filed a complaint with the CHRO and that her employer was aware of the activity. The Court notes that the Supreme Court has broadened the spectrum of conduct that can qualify as an adverse employment action for retaliation cases. *Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 61-62, 66, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).* The Supreme Court has said that for retaliation claims adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* Here a one-day suspension without pay could arguably defer a reasonable worker from making or supporting a charge of discrimination.

Martinez argues that an inference of causation can be supported by the temporal proximity between her CHRO complaint and the Loudermill Hearing and subsequent suspension. When temporal proximity alone is used to show causation, the proximity must be "very close" in order to support a *prima facie* case of retaliation. *Clark Cnty. School Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)* (20 month period suggested, "by itself, no causality [*46] at all"); *see also Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483, 503 (S.D.N.Y. 2010)* ("most of the decisions in this Circuit that have addressed this issue have held that lapses of time shorter than even three months are insufficient to support an inference of causation"); *Ghaly*

*v. U.S. Dept. of Agric., 739 F. Supp. 2d 185, 200 (E.D.N.Y. 2010)* (nine month period between protected conduct and retaliation did not support causation); *Ragin v. E. Ramapo Cent. School Dist., No. 05 Civ. 6496, 2010 U.S. Dist. LEXIS 32576, 2010 WL 1326779 at *24 (S.D.N.Y. Mar. 31, 2010)* (five month period did not support causation); *but see Martin v. State Univ. of N.Y., 704 F. Supp. 2d 202, 230 (E.D.N.Y. 2010)* (failure to promote retaliation claim occurring just over three months after protected conduct did demonstrate causation where that was the first opportunity for accused to take retaliatory action). Here there was less than month between the filing of Martinez's CHRO complaint on December 14, 2007 and the Hearing that occurred on January 10, 2007 which is sufficient to support an inference of causation. Martinez has therefore supported a *prima facie* case of retaliation in connection with her suspension.

As discussed [*47] above, Defendant asserts that its decision to discipline Martinez was the result a formal investigation which concluded that Martinez had engaged in conduct that violated the Workplace Violence Policy. Since Defendant has proffered a legitimate non-retaliatory reason for its decision to suspend Martinez, the burden has shifted back to Martinez to demonstrate that the proffered reason is mere pretext for retaliation. The Court notes that it is well-established in the Second Circuit that "without more, ... temporal proximity is insufficient to satisfy [a plaintiff's burden]" to rebut defendant's proffered legitimate non-retaliatory reason. *Simpson v. New York State Dep't of Civil Servs., 166 Fed.Appx. 499, 502 (2d Cir. 2006)* (citing *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 770 (2d Cir. 1998)*). In addition, the fact that Martinez disagreed with Defendant's conclusion that her behavior during the bathroom incident was inappropriate and violated the Workplace Violence Policy is alone insufficient to create a triable issue of fact. *See Fleming v. MaxMara USA, Inc., 644 F. Supp.2d 247, 266 (E.D.N.Y. 2009)* ("First, there is no evidence that defendants' reason for terminating plaintiff's [*48] employment is pretextual. While plaintiff argues that her behavior during the incidents cited by defendants was appropriate and justified, a plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact.").

Martinez relies on the same evidence as discussed

above to demonstrate that Defendant's decision to discipline her was carried out in retaliation for her CHRO complaint. As noted above, Martinez cannot rely on the alleged racist comments or alleged discriminatory actions of Minow and Taylor to demonstrate retaliatory animus as neither Minow nor Taylor were involved in the decision to discipline Martinez. Martinez also cannot rely on her unsubstantiated belief that everyone involved in the investigation and hearing, including her own union representative Austin, was collaborating against her to demonstrate retaliatory animus. Further, Martinez has not put into evidence any specific facts which demonstrate that Carey, Bodenhofer or Phillips who made the decision to suspend her were driven by a retaliatory animus.

As discussed above, Martinez alleges that "at the hearing, [*49] the defendant tried to compel [her] to give up her rights under state and federal law, including withdrawing her pending CHRO complaint, in return for dropping the false claims against her." [Doc. # 43 and Doc. #1, Complaint ¶25]. If this allegation was actually supported by the evidence in the record, Martinez would have likely been able to demonstrate a retaliatory animus. However, as explained above, Martinez's own testimony belies this allegation as she testified that it was her belief that Austin, her union representative, wanted her to "give up her rights" and not any of the individuals who made the decision to discipline her. [Doc. #34, Martinez Dep. 231]. Further, Martinez clarified that what she meant by "give up her rights," was her belief that Austin was in "collaboration" with Carey, "holding secret meetings" while Martinez was waiting for their help in filing a formal grievance against Taylor and Minow. [Id.]. There is no evidence in the record that anyone at the hearing tried to compel Martinez to withdraw her pending CHRO complaint or threatened to discipline her more harshly if she did not withdraw the complaint. Likewise as discussed above, the Court finds that Martinez [*50] has failed to support her allegation that "defendant was quite concerned that plaintiff would file a discrimination claim with the Connecticut Commission on Human Rights and Opportunities. On several occasions, the plaintiff was questioned about the matter, including being asked when and by whom her complaint would be filed." [Doc. #43].

Moreover, Defendant has presented evidence which undermines a finding of pretext. Defendant asserts that by December 12, 2007 Carey, Bodenhofer and Phillips had all discussed the results of Carey's investigation of the bathroom incident and preliminary concluded that

Martinez should be disciplined with a one-day suspension without pay. They also decided that they would offer Martinez the option of receiving a written warning if she agreed to a management referral to the Employee Assistance Program ("EAP") and would agree to follow their recommendations, if any. [Doc. #32, Ex, D, Phillips Aff. ¶5, 8, Doc #32-7, p.5; Ex. D, Bodenhofer Aff. ¶8]. Therefore, Defendant had preliminarily determined what the appropriate discipline should be prior to Martinez even filing her complaint with the CHRO on December 14, 2007. Martinez presents no evidence that by [*51] December 12 Carey, Bodenhofer or Phillips were aware that she was going to be engaging in a protected activity. See Long v. AT & T Information Systems, Inc., 733 F.Supp. 188, 206 (S.D.N.Y.1990) (dismissing retaliation claim because plaintiff failed to establish that the individuals who fired him had any knowledge of plaintiff's EEOC complaint filed three weeks prior to termination). While Defendant had knowledge of Martinez's CHRO complaint at the January 10, 2008 hearing when they made the final decision regarding what discipline was appropriate, the fact that Defendant did not increase the level of discipline from its preliminary determination suggests that its actions were not driven by a retaliatory animus. If Defendant had come to a preliminary determination regarding discipline and then after learning about the protected activity subsequently changed its mind regarding the discipline, such a course of events could possibly provide evidence of a retaliatory animus. However here, the evidence in the record suggests otherwise. After learning about the protected activity, Defendant did not change its mind regarding the appropriate discipline which suggests that its actions were not [*52] motivated by retaliation.

In addition, a finding of pretext is also undermined by the undisputed fact that during the hearing Defendant presented Martinez with a stipulated agreement in which they proposed to lower the discipline to a written warning if Martinez agreed to a management referral to EAP which expressly stated that it did not prohibit Martinez from pursuing her CHRO claim. [Doc. #32, Ex. C, Stipulated Agreement]. Contrary to Martinez's unsubstantiated allegation that Defendant tried to compel her to give up her rights, it appears that Defendant did just the opposite and expressly acknowledged that Martinez should not be prohibited from pursuing her CHRO complaint.

As discussed above, Martinez also attempts to prove

pretext through her allegation that she was forced to sign a letter confirming her acknowledgement of her one-day suspension under threat of discharge. [Doc. #43 and Doc. #1 Complaint ¶26]. However, it is unclear to the Court how being forced to sign an acknowledgement of discipline demonstrates that the discipline was motived by a retaliatory animus. Furthermore, as discussed above Martinez testified that the perceived threat came from Austin, her union representative [*53] and not from any the individuals who made the decision to suspend her. It also unclear from Martinez's testimony whether Austin actually threatened her with discharge as Martinez testified that Austin told her "Well, listen, you know what, you either sign or you're going to have to go because these people don't want--don't want to wait and I cannot wait either." [Doc. #34, Martinez Dep. 235]. In her deposition, Martinez stated that she interpreted Austin's comment as "It was, like, you sign or you out." [*Id.*].

Even when viewing the facts in the light most favorable to Plaintiff, a reasonable juror would not infer that retaliation was the true reason why Defendant suspended Martinez without pay. The only evidence in the record that supports a finding of retaliation is the temporal proximity between when Martinez filed her complaint with the CHRO and her suspension. Without more, temporal proximity alone cannot prove pretext. Moreover, the mere fact that an employee files a Title VII claim should not in and of itself prevent an employer from enforcing its disciplinary policies in a reasonable manner against that employee. *See Ianetta v. Putnam Investments, Inc., 183 F. Supp. 2d 415, 426-427 (D. Mass. 2002)* [*54] ("It is settled law that if an employer has set a course of action regarding employee discipline, it need not change that course of action because a Title VII claim has been made against it.") (*citing Clark County School District v. Breeden, 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)* for the proposition that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence of causality.")). Accordingly, Plaintiff has failed to rebut Defendant's non-retaliatory reason and summary judgment is granted on Plaintiff's Title VII retaliation claim in connection with her suspension.

Lastly, Martinez alleges that after she filed the CHRO complaint her workload increased, that she was assigned all the "dirty work" in the office including the fact that Defendant "heaped many other duties upon the plaintiff that were not part of the plaintiff's job description," and that "Taylor took away telephone responsibilities from plaintiff." [Doc.#43]. However, after reading through Martinez's deposition testimony, Martinez does not specifically identify what duties [*55] she was forced to take on after filing her CHRO complaint that were not a part of her job description. As discussed above, the DAS had already found that such tasks filing, transfers, answering phones, annotating books, and dealing with the mail fell within Martinez's job classification. [Doc. #42]. In addition, Martinez supports this allegation with only her own deposition testimony where she conclusory states that her workload was increased and that she was thrown off the phones. Martinez has not provided any specific facts which demonstrate that her workload was actually significantly altered. Based on the evidence in the record, a reasonable worker would likely not feel dissuaded from filing a discrimination claim after experiencing such a purported increase in workload. While it is arguable that a reasonable worker who receives a substantial increase in his or her workload might be dissuaded from filing a discrimination claim, Martinez has not provided evidence that her workload was substantially increased in a manner that caused any adverse consequences. *Gelin v. Geithner, No.06-cv-10176, 2009 U.S. Dist. LEXIS 24865, at *69, 2009 WL 804144, at *21 (S.D.N.Y. March 26, 2009)* (noting that material adversity standard [*56] in the retaliation context was not met where plaintiff "suffered no adverse consequences or experienced only trivial harms") (internal quotation marks and citation omitted); *White, 548 U.S. at 68* ("An employee's decision to report discriminatory behavior" simply does not "immunize [him] from those petty slights or minor annoyances that often take place at work and that all employees experience."). Here, there is no evidence in the record that Martinez suffered anything more than a trivial harm after her CHRO complaint was filed. Accordingly, summary judgment is granted as to all of Martinez's retaliation claims.

Analysis of Title VII Hostile Work Environment Claim

Martinez alleges that she was subjected to a hostile work environment on the basis of her race and national origin. Title VII makes it unlawful for an employer to subject individuals to a discriminatorily hostile or abusive

work environment. *Harris v. Forklift Sys. Inc.*, *510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*; *42 U.S.C. § 2000e-2(a)(1)*. To prove that a workplace is actionably "hostile" under Title VII, a plaintiff must demonstrate that: (1) she "subjectively perceive[d] the environment to be abusive;" (2) the conduct was so "severe or pervasive" [*57] that it created an "objectively hostile or abusive work environment", meaning "an environment that a reasonable person would find hostile or abusive;" and (3) the conduct created an environment abusive to employees "because of their race, gender, religion or national origin." *Harris, 510 U.S. at 21-22*. Plaintiff must demonstrate that her "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment." *Id.*

The Supreme Court has established a non-exhaustive list of factors relevant to determining whether a workplace is so severely or pervasively hostile as to support a Title VII claim. These include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with plaintiff's work; ... whether it unreasonably interferes with the employee's work performance[;]" and "[t]he effect on the employee's psychological well-being[.]" *Id. at 23*.

To determine "whether an environment may be considered sufficiently hostile or abusive to support [a Title VII claim]," courts must [*58] consider "the totality of the circumstances." *Williams v. Westchester, 171 F.3d 98, 100 (2d Cir.1999)* (citing *Harris, 510 U.S. at 23*). The factors outlined above must be evaluated "cumulatively" so that the Court can "obtain a realistic view of the work environment." *Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir.1997)* (citations omitted). This includes evaluating the "quantity, frequency, and severity" of the discriminatory incidents. *Id.* "In order to meet [her] burden, the plaintiff must show more than a few isolated incidents of racial enmity[.]" *Williams, 171 F.3d at 100.* Instead, the plaintiff "must establish that [her] workplace was permeated with instances of racially discriminatory conduct such as 'discriminatory intimidation, ridicule, and insult,' such that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.' *Id.* (citations omitted).

Martinez asserts in her complaint that

"[c]ommencing in or about 1989 and continuing to the present, Mary Minow...subjected the plaintiff to a hostile work environment" and that "[p]laintiff's supervisor, Carol Taylor, witness many of [Minow's] comments and failed to prevent, stop or address them in any [*59] manner whatsoever, despite plaintiff's upset and distress. Instead, Taylor laughed at the offensive remarks." [Doc. #1, Complaint ¶ 8]. In particular, Martinez alleges that Minow made nine derogatory comments about her ancestry and race, has made Martinez cry due to embarrassment on at least one occasion, that Minow and Martinez got in a fight in the bathroom over Minow's coma comment, and that Martinez is constantly assigned all of the "dirty work" in the office. Martinez alleges that this behavior occurred during her entire employment with the library, which has encompassed over twenty years.

First, Martinez has arguably not presented sufficient evidence to establish that she subjectively perceived the environment to be abusive. While Martinez asserts that she coped with anxiety and embarrassment because of the alleged abusive behavior of Minow and Taylor, her position is undermined by her own deposition testimony where she stated that she was good friends with both Minow and Taylow. She testified that "I love Carol Taylor. I'm sorry. I have to say yes" and "Mary was one of my favorites in there. I was always looked up to her." [Doc. #34, Martinez Dep. at 110, 123]. Furthermore, Martinez [*60] testified that she gave them both birthday cards and that she gave Minow a gift. [*Id.*]. The fact that Martinez considered herself to be friends with Minow and Taylor is simply incompatible with her allegation that Minow and Taylor had engaged in conduct so severe and pervasive that it altered the conditions of her employment. In addition, Martinez has presented no evidence that her job performance suffered as a result of the alleged abusive behavior of Minow and Taylor which likewise undermines an inference that Martinez subjectively perceived the environment to be abusive. *See Miller v. Praxair, Inc., No. 3:05-cv-402, 2009 U.S. Dist. LEXIS 51130, at *30, 2009 WL 1748026, at *11 (D. Conn. June 18, 2009)*("[Plaintiff's] own contention that her job performance never worsened as a result of the allegedly hostile environment is evidence that she did not even subjectively find the environment abusive.").

Second, assuming arguendo that Martinez has demonstrated that she subjectively perceived the environment to be abusive, Martinez has not shown that the "series of incidents were sufficiently continuous and

concerted [so as] to have altered the conditions of [her] working environment." *Howley v. Town of Stratford, 217 F.3d 141, 153-154 (2d Cir. 2000).* [*61] Courts in the Second Circuit have found that "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Holtz v. Rockefeller & Co., 258 F.3d 62, 76 (2d Cir, 2001)* (internal quotations and citations omitted). Here, nine specific comments, and potentially four personally upsetting events, occurring over a twenty-year period are not extensive or continuous enough to establish a claim of hostile work environment under Title VII. *Rios v. Buffalo and Fort Erie Public Bridge Authority, No.04-cv-375A, 2008 U.S. Dist. LEXIS 17911, at *7, 2008 WL 657121, at *3 (W.D.N.Y. March 7, 2008)* (finding that behavior complained of was "simply too infrequent and episodic to constitute a hostile work environment" where plaintiff identified "only about six specific instances of misconduct over a thirteen-year period of time"); *Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 354 (5th Cir. 2001)* (holding that eight incidents of racial harassment over a twenty-five month period were not sufficiently severe or pervasive to create a hostile work environment); *see also Thomas v. iStar Financial, Inc., 438 F. Supp. 2d 348, 363 (S.D.N.Y. 2006)* [*62] (noting that the Court need not consider "unsubstantiated allegations" that a supervisor targeted black employees for criticism and concluding that even if all the incidents had occurred, they were nothing more than isolated incidents.).

Lastly, the Court finds that several of the incidents that Martinez details would not reasonably be perceived as hostile or abusive. A reasonable person would likely not interpret that the workplace was abusive or hostile based on the fact that Martinez once attended a work place party and the only empty seat available was facing the wall.

Here, Martinez at most faced occasional, off-color remarks, and this alone cannot satisfy her burden to prove a hostile work environment. The infrequency of the comments, the fact that they did not interfere with her work, and her own statement that she considered herself to be friends with Taylor and Minow indicates that Martinez's work climate was not hostile. A reasonably jury could not conclude that a hostile work environment existed on the basis of the facts alleged and evidence in the record. Accordingly, summary judgment is granted as

to Plaintiff's Title VII hostile work environment claim.

Analysis of ADA Claims

Martinez [*63] contends that she faced discrimination, retaliation, and a hostile work environment due to her chronic asthma in violation of the ADA. In particular, Martinez alleges that Defendant refused to raise the temperature in the library to accommodate her asthma which she claims was exacerbated by cold temperatures. To establish a *prima facie* case under the ADA,[1] she must prove that (1) the Defendant is an employer subject to the ADA, (2) she was disabled within the meaning of the ADA, (3) she was otherwise qualified to perform the essential functions of her job, with or without accommodation, and (4) she suffered an adverse employment action because of her disability. *Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001).* Here, Martinez cannot establish a *prima facie* case because she fails to demonstrate that she is disabled within the meaning of the ADA.

> 1   The Court notes that the current version of the ADA incorporates the ADA Amendments Act of 2008 ("ADAAA") which introduced a new standard for evaluating whether an employee was "regarded as having such an impairment." However, the ADAAA applies only to claims arising on or after Jan. 1, 2009. This new definition is not applicable [*64] here because Martinez's claims arise in 2006.

The ADA defines "disability" as (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (b) a record of such impairment, or (c) being regarded as having such an impairment. *42 U.S.C. § 12102(1) (2006).* "The Supreme Court articulated a three-step process for determining whether a plaintiff has a disability under this subsection of the ADA. First, a plaintiff must show that he suffers from a physical or mental impairment. Second, [she] must identify the activity claimed to be impaired and establish that it constitutes a major life activity. Third, the plaintiff must show that that impairment substantially limits" the major life activity previously identified." *Rumbin v. Association of American Medical Colleges, No.3:08cv983, 2011 U.S. Dist. LEXIS 28580, at *25, 2011 WL 1085618, at *8 (D. Conn. March 21, 2011)* (citing *Bragdon v. Abbott, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998)*) (internal quotation marks and citation omitted).

Martinez satisfies the first two elements of the ADA definition of "disability." It is not in dispute that Martinez suffers from persistent asthma that requires medication. Second it is not in dispute that asthma [*65] affects Martinez's respiratory system limiting her ability to breathe, which is a major life activity. However, Martinez has failed to present evidence that her asthma substantially limited her ability to breath. Whether an impairment "substantially limits" a major life activity depends upon the facts of the particular case and such case-by-case analysis is particularly important in the context of an asthma-related ADA claim. *Castro v. Local 1199, National Health and Human Services Employees Union, 964 F. Supp. 719, 723 (S.D.N.Y. 1997)* ("The requirement of individualized analysis is particularly appropriate in the context of disability claims relating to asthma. As of 1990, over ten million Americans have been diagnosed with asthma. The severity of asthma varies a great deal among individuals. Symptoms may fall anywhere along the spectrum from mild to life-threatening, and the frequency of asthmatic episodes also varies greatly from person to person. With proper treatment, however, asthmatic symptoms can almost always be controlled.") (internal citation omitted); *Burke v. Niagra Mohawk Power Corp., 142 Fed. Appx. 527, 529 (2d Cir. 2005)* ("asthma does not invariably impair a major life [*66] activity.") (*citing Muller v. Costello, 187 F.3d 298 (2d Cir. 1999)*).

Courts in the Second Circuit have not extended ADA protection to plaintiffs whose asthma was infrequent, controlled by medication, limited to certain catalysts and did not impair their ability to work. *See Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir. 1994)* (an employee who had trouble breathing in only one location was not "substantially limited" in her ability to breathe); *Burke v. Niagra Mohawk Power Corp., 142 Fed. Appx. 527, 529 (2d Cir. 2005)* (an asthmatic employee was not disabled within the meaning of the ADA because her attacks were infrequent, her daily symptoms could be controlled with medication, and the employee did not show that her asthma affected her ability to work in general). Here, while Martinez has provided evidence that her asthma is chronic, she has provided no evidence that she suffered frequent asthmatic episodes at work. Martinez has presented a doctor's note dated March 29, 2007 which states that she has "severe persistent asthma requiring daily medication" and that she should "avoid excessively hot or cold air." [Doc. #32, Ex. B]. However, this doctor's note does not state that [*67] Martinez's

asthma cannot be controlled by medication or suggests that Martinez is unable to perform any aspect of her job functions. The Court notes that while Martinez makes general allegations that she was routinely denied an increased in the building's temperature by Defendant, she only identifies three specific instances where she complained of the cold to Taylor during her twenty-year employment with the library which suggests that her asthmatic episodes were not frequent. Moreover, Martinez admitted in her own deposition testimony that the cold building temperature did not affect her ability to perform her job functions. [Doc. #34, Martinez Dep. at 204]. Further, she does not claim that the failure to raise the temperature affected her ability to breath or caused her to suffer an asthmatic attack.

In addition, the Court finds the facts and holding of *Castro v. Local 1199, National Health and Human Services Employees Union* to be pertinent and persuasive to the present case. In *Castro*, the court concluded that an employee whose asthma was affected only by extreme temperatures failed to demonstrate that she was disabled within the meaning of the ADA or that her status as an asthmatic [*68] restricted her employment opportunities generally. *Castro, 964 F. Supp. at 725.* The *Castro* court concluded that the plaintiff, who worked as a union organizer, was not required to work in extreme temperatures for the bulk of her time and, when she occasionally had to lead employee demonstrations outside, she was "able to manage." *Id.* The court found that these facts indicated that the plaintiff's asthma did not substantially limit her ability to breathe or restrict her employment generally, and therefore she was not afforded protection under the ADA. *Id.* Martinez like the plaintiff in *Castro* has asthma that is exacerbated by cold temperatures and is likewise not required to work in extreme temperatures. Furthermore, like *Castro*, Martinez has indicated that her asthma does not affect her ability to work generally, therefore she is also "able to manage," and thus her status as an asthmatic did not restrict her employment opportunities generally. Based on the facts and evidence in the record, a reasonable jury could not conclude that Martinez's asthma substantially limited her ability to breath and accordingly the Court finds that Martinez has not presented evidence demonstrating that [*69] she is disabled within the meaning of the ADA.

Even assuming that Martinez is disabled within the meaning of the ADA, the Court notes that Defendant provided Martinez with a reasonable accommodation

Case 3:11-cv-00905-AVC   Document 26-2   Filed 10/18/11   Page 19 of 48

Page 18
2011 U.S. Dist. LEXIS 107848, *69

when they permitted her to bring in a space heater to work. *See Nugent v. St. Lukes-Roosevelt Hosp. Center, 303 Fed. Appx. 943, 946 (2d Cir. 2008)* (Employee's failure to follow up on her proposed accommodation barred her disability discrimination claim against employer under the ADA). The fact that Martinez did not take advantage of the reasonable accommodation offered should also preclude her from maintaining a disability discrimination claim.

The Court notes that a finding that a Plaintiff is not disabled under the ADA does not preclude a retaliation claim under the ADA and that retaliation claims under the ADA are analyzed under the same framework used in Title VII cases. *Lovejoy, 263 F.3d at 223.* "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)* [*70] (internal quotation marks omitted) (alteration in original). As discussed above, Martinez can only establish that she suffered an adverse employment action for retaliation purposes in connection with her suspension. However, Martinez fails to present any evidence that demonstrates that the decision to suspend her without pay was in any way related to her asthma. While Martinez does allege that the bathroom altercation was spurred by Minow's coma comment which Martinez interpreted to be a comment about her disability, there is no evidence she was suspended as a result of her disability. Rather, Martinez was suspended as a result of her behavior towards Minow in the bathroom which violated the State's workplace violence policy. Moreover, one stand-alone comment is not enough to support an inference of discrimination, and there is no suggestion that the individuals actually involved the decision to suspend Martinez had exhibited animus toward Martinez in regard to her asthma or factored her asthma into their disciplinary decision. *See e.g. Rosinski v. Am. Axle & Mfg., Inc., 402 Fed. Appx. 535, 538 (2d Cir. 2010)* (Plaintiff's claims under the ADA failed because "she did not provide any [*71] evidence that any of the adverse actions taken against her had anything to do with any disability she may have had or have been perceived to have"). Therefore, the court finds that a reasonable jury could not conclude based on the facts alleged and the evidence in the record that Martinez suffered an adverse employment action because of her asthma. Accordingly,

summary judgment is granted on all of Plaintiff's ADA claims.

The Defendant raises an affirmative defense with respect to Martinez's ADA claim. Defendant asserts that claims brought under Title I of the ADA are barred by the *Eleventh Amendment* and sovereign immunity principles and to the extent that Martinez is seeking money damages she is barred from doing so by the *Eleventh Amendment*. [Doc. #37]. Since the Court has granted summary judgment on Plaintiff's ADA claims based on substantive grounds, the Court need not address whether Defendant is entitled to this affirmative defense.

Analysis of CFEPA Claims

Martinez alleges that she faced discrimination, retaliation, and a hostile work environment based upon her race, ethnicity and national origin in violation of CFEPA. The standards governing discrimination, retaliation, and hostile [*72] work environment under CFEPA are the same as those governing Title VII. *See Craine v. Trinity College, 259 Conn. 625, 637 n.6, 791 A.2d 518 (2002)* ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both."); *State v. Commission on Human Rights and Opportunities, 211 Conn. 464, 470, 559 A.2d 1120 (1989)* (The intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII; therefore, Connecticut courts look to federal case law for guidance in interpreting that provision of the CFEPA); *Brittell v. Dep't of Correction, 247 Conn. 148, 165-168, 717 A.2d 1254 (1998)* (the standards governing a hostile work environment claim under the CFEPA are the same as those governing a claim under Title VII). Therefore the foregoing analysis regarding Martinez's Title VII claims applies to Martinez's corresponding CFEPA claims and accordingly the Court likewise grants summary judgment on Martinez's discrimination claims under CFEPA.

Martinez also asserts a claim of discrimination based on her alleged disability under CFEPA. While Connecticut courts apply the same standards under the ADA to analyze CFEPA disability claims, Connecticut [*73] courts have interpreted CFEPA's definition of "disability" to be significantly broader than the ADA's definition of "disability" because CFEPA does not require that the chronic impairment "substantially limit" a major life activity. *Grunberg v. Quest Diagnostics, Inc., No.3:05-cv-1201, 2008 U.S. Dist. LEXIS 8205, at *11-12*

*n.2, 2008 WL 323940, at *4 n.2 (D. Conn. Feb. 5, 2008).* "CFEPA ... provides that '[p]hysically disabled' refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness....The statute does not define 'chronic,' but courts have defined it as 'marked by long duration or frequent recurrence' or 'always present or encountered.' ... With reference to diseases, the term 'chronic' has been defined to mean 'of long duration, or characterized by slowly progressive symptoms; deep-seated or obstinate, or threatening a long continuance; distinguished from acute.'" *Logan v. SecTek, Inc., 632 F. Supp. 2d 179, 184 (D. Conn. 2009) (quoting Conn. Gen. Stat. § 46a-51(15)).*

For Martinez to be protected under CFEPA, her asthma must have been a chronic impairment. When viewing the facts in the light most favorable [*74] to the plaintiff, a reasonable jury could infer that Martinez's asthma was a chronic impairment because she has had her asthma for ten years, her asthma has been of such a severity that an attack once placed her in a coma, and she continues to have asthma to this date. *See Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 88 (D. Conn. 2010)* (a reasonable jury could infer that the plaintiff's asthma was "chronic" under CFEPA because she produced evidence which suggested that her asthma was marked by long duration, such as that she had had it since childhood, exhibited severe symptoms during her employment, and continued to have the condition to that present).

In order to succeed on her CFEPA disability claim, Martinez must demonstrate that she suffered an adverse employment action because of her disability. As discussed above, the Court does not find that Martinez suffered an adverse employment action when she was denied a class update or was suspended for one-day without pay for purposes of her substantive employment discrimination claim, but that Martinez did suffer an adverse employment action when she was suspended for purposes of her retaliation claim. Assuming arguendo that Martinez [*75] did suffer an adverse employment action for her substantive employment discrimination and her retaliation claims when they suspended her, as discussed above, Martinez has presented no evidence that demonstrates that the decision to suspend her without pay was in any way related to her asthma. Therefore, the court finds that a reasonable jury could not conclude based on the facts alleged and the evidence in the record

that Martinez suffered an adverse employment action because of her asthma.

Further as discussed above, Defendant provided Martinez with a reasonable accommodation for her asthma when they allowed her to use a space heater. Martinez has not indicated why a space heater was unsatisfactory to accommodate her request that the temperature be raised, and she has not detailed any other reasonable accommodation which could have alleviated the temperature in the building and yet was denied. Martinez's failure to follow up on the proposed accommodation should also bar her disability discrimination claim under CFEPA. *See Nugent v. St. Lukes-Roosevelt Hosp. Center, 303 F. App'x 943, 946 (2d Cir. 2008).* For the foregoing reasons, the Court grants summary judgment on all of Martinez's [*76] disability discrimination claims under CFEPA.

Analysis of Intentional Infliction of Emotional Distress

Martinez asserts a cause of action for intentional infliction of emotional distress ("IIED") against Defendant. However since the Defendant is a state library, Plaintiff's claim is barred by the doctrine of sovereign immunity. In order to be subject to suit in federal court, a state must expressly and unambiguously waive its *Eleventh Amendment* immunity or Congress must clearly express its intention to revoke the immunity in language of a particular statute. *Martires v. CT Dept. of Trans., 596 F. Supp. 2d 425, 445 (D. Conn. 2009) (citing Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304-305, 110 S. Ct. 1868, 109 L. Ed. 2d 264 (1990)).* While Connecticut has expressly waived its sovereign immunity in regard to discrimination claims brought under CFEPA, for example, Connecticut has not waived its sovereign immunity from the common law claim of IIED. *Oppedisano v. Southern CT State Univ., No. 3:07-cv-1693, 2009 U.S. Dist. LEXIS 47659, at *8, 2009 WL 1605904, at *3-4 (D. Conn. June 5, 2009) (citing Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 447-448 (2d Cir. 1999); Gaynor v. Martin, 77 F. Supp. 2d 272, 281-282 (D. Conn. 1999)).* [*77] As a result, Martinez cannot maintain a cause of action against the State of Connecticut State Library for intentional infliction of emotional dress and summary judgment is hereby granted on that claim.

Conclusion

Based upon the above reasoning, the Defendant's [Doc. #32] motion for summary judgment is GRANTED and all of Plaintiff's claims have been accordingly dismissed.

IT IS SO ORDERED.

/s/

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: September 21, 2011



ELSAMMA CHACKO, Plaintiff, v. STATE OF CONNECTICUT, DEPARTMENT
OF MENTAL HEALTH AND ADDICTION SERVICES, Defendant.

3:07-cv-1120 (CFD)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2010 U.S. Dist. LEXIS 31597*

**March 30, 2010, Decided**
**March 30, 2010, Filed**

**COUNSEL:** [*1] For Elsamma Chacko, MD, Plaintiff: Diane C. Mokriski, LEAD ATTORNEY, O'Connell, Flaherty & Attmore, Hartford, CT; Katrena K. Engstrom, LEAD ATTORNEY, John R. Williams and Associates, LLP, New Haven, CT; Robert B. Flynn, LEAD ATTORNEY, O'Connell, Flaherty & Attmore-Htfd, Hartford, CT.

For CT Dept of Mental Health and Addiction Services, Defendant: Beth Z. Margulies, LEAD ATTORNEY, Attorney General's Office, Hartford, CT; Josephine S. Graff, LEAD ATTORNEY, Attorney General's Office - Elm (Htfd), Hartford, CT.

**JUDGES:** CHRISTOPHER F. DRONEY, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHRISTOPHER F. DRONEY

**OPINION**

**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Elsamma Chacko, brings this action for race/national origin discrimination, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.* The defendant, Connecticut Department of Mental Health and Addiction Services ("DMHAS"), moves for summary judgment. For the reasons that follow, the defendant's motion is granted in part and denied in part.

**I. Background** [1]

1   The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted [*2] by the parties. They are undisputed unless otherwise indicated. It should be noted that the defendant objects to the plaintiff's Local Rule 56(a)2 statement because she did not ask permission to file a subsequent statement and because it allegedly attempts to change her prior admissions and prior sworn testimony. Although the Court recognizes the defendant's objection, the Court will consider Chacko's Local Rule 56(a)2 statement in conjunction with the other statements, admissions, and evidence submitted by the parties.

Chacko is an Asian female of Indian descent. Since January 23, 2004, Chacko has been employed by DMHAS in the position of Principal Physician at the Connecticut Valley Hospital ("CVH"). CVH is a hospital for inpatients who are wards of the State and who have psychiatric disorders, substance abuse disorders, or co-occurring disorders. The hospital has three divisions:

the Whiting Forensic Division ("Whiting"), which is a maximum security facility; the General Psychiatry Division ("GPD"); and the Addiction Services Division ("ASD"). Each division is further broken down into units, and the divisions have different numbers of patients and units. All three of these divisions [*3] are under the umbrella of the Ambulatory Care Services Unit ("ACS").

At all relevant times three other doctors at CVH held Chacko's position of Principal Physician: Dr. Dargan, an Asian female of Indian descent; Dr. Saeedi, an Asian male of Iranian descent; and Dr. Timmerman, a Caucasian male. Additionally, Dr. Engelman, a Caucasian male, and Dr. Santhappa, an Asian male, were two of approximately five staff physicians working at CVH. [2] At the times relevant to this lawsuit, the doctor-to-unit assignments were made by the Director of ACS, Barbara Forgit, the Medical Director, Dr. Kenneth Freedman, and the Chief of Professional Services, Dr. Cynthia Conrad. Forgit, Freedman, and Conrad assert that they made duty assignments using an algorithm that factored in patient acuity, the complexity of the management of the patient's condition, and the turnover of patients. Chacko disputes that this algorithm was ever used. In addition to making regular duty assignments, Freedman, Conrad, and Forgit also made duty assignments for coverage when a physician or practitioner was absent. These coverage assignments were in place pursuant to a prepared schedule. Chacko argues that while these coverage [*4] arrangements were sufficient when a doctor was absent for one or two days, they were insufficient when a doctor was absent for a longer period of time. Moreover, Chacko claims that even when she was covering for another physician, the Physician's Assistants ("PAs") and Advanced Nurse Practitioners ("APRNs") were only assigned to help the Caucasian doctors. For example, although APRN Tagon-Conroy was supposed to help out where needed, according to Chacko she was assigned to the Caucasian doctors almost exclusively.

2   Dr. Engleman was eventually given the title of Principal Physician.

At the core of Chacko's complaint is her claim that she and other Asian doctors were assigned heavier workloads than their white counterparts, and that when she complained about the heavier workload, her supervisors retaliated against her by giving her negative performance reviews and "micro-managing" her work. [3]

The parties dispute the relative difficulty of work in each of the three divisions of the hospital. The defendant argues that GPD has a relatively static population with minimal turnover and average acuity and medical complexity. Therefore, the defendant contends, compared to ASD and Whiting, GPD [*5] units are less work-intensive because ASD and Whiting have high turnover rates and require doctors to complete new histories and physicals frequently. Chacko, on the other hand, argues that GPD units are more work-intensive than units in Whiting and ASD, as chronic patients are also susceptible to more serious illness than residents of other units. Moreover, GPD has 88% of the deaths in the hospital and generates the largest number of visits to outside emergency rooms and acute care facilities. Chacko argues that while Whiting is labeled "maximum security" because the patients have legal problems, it is in actuality populated with younger patients whose medical issues are minimal.

3   It should be noted that several of Chacko's exhibits are charts and summaries that she personally compiled. These exhibits are not sworn under oath, and at least in some cases the source of the information is unclear.

A. 2004 Coverage for Dr. Dargan

When Chacko began her clinical work at CVH in March 2004, she was assigned three units in the GPD division. [4] From March 8, 2004 through June 11, 2004, however, her actual workload was significantly greater because she was assigned to cover Dr. Dargan's units while [*6] Dargan was on extended medical leave. During this time, CVH hired Dr. Shah, a 120-day staff physician, to assist in coverage of Dargan's units. Chacko did not have to cover Dargan's units on days when Shah worked at CVH, but the parties dispute how many days Shah actually worked. Chacko claims that Shah worked only about two-and-a-half days per week, while the defendant contends Shah worked for sixty-one days during this period. Additionally, Ed Drew and Frank Martin helped Chacko with her assigned coverage during this period, though Chacko claims their help was minimal.

4   Those units were: B3N (Intensive Treatment Unit), B2S (Traumatic Brain Injury Unit), and B2N (Acquired Brain Injury Unit).

Dr. Dargan worked four hours a day from June 11,

2010 U.S. Dist. LEXIS 31597, *6

2004 through June 30, 2004. Chacko claims that she covered the remainder of Dargan's wards during this time period. Chacko also alleges that she had to cover Dargan's units from September 3, 2004 through November 30, 2004 while Dargan was out on worker's compensation. Chacko alleges that this approach to coverage was typical. Specifically, Chacko claims that although Asian physicians typically covered the entire workload of an absent physician, Caucasian [*7] physicians had the absent doctor's shift split among several different clinicians.

**B. July 2004 Six-Month Probationary Performance Appraisal**

On July 23, 2004, Dr. Freedman completed Chacko's initial probationary performance appraisal. According to Chacko, her rating was a "4.5" which translates to an "excellent" rating. [5] The performance review, however, did note a few areas where improvement was needed. Specifically, Freedman noted that Chacko "needs to improve time management skills. Needs to improve completion of Medical Histories and Physicals in a more timely fashion. Needs to improve documentation on pharmacologic therapy."

> 5 The performance review noted an overall rating of "4"; however, an average of all of the individual ratings does result in a "4.5" rating overall.

**C. Rosellen Duncan Complaints & Incident; Chacko's Suspension**

Chacko contends that in February 2005, four Asian physicians and Dr. Engelman met with Barbara Forgit to report significant problems with Forgit's secretary, Rosellen Duncan. On July 21, 2005, an incident occurred between Chacko and Rosellen Duncan in which Chacko allegedly grabbed Duncan's arm. Chacko denies grabbing Duncan's arm. On December 7, 2005, after [*8] an internal investigation, Chacko was suspended without pay for ten days for violating DMHAS General Work Rule # 19, by "angrily grabb[ing] the arm of [Rosellen Duncan][,] pull[ing] [Duncan] towards you and demand[ing] that she look at your face." The defendant claims that there is no evidence that Forgit or Freedman participated in the decision to suspend Chacko or that they were otherwise involved in the investigation of the complaint. According to Chacko, however, Forgit participated in the investigation and grievance

procedures, asking purported witnesses to write statements as part of the investigation, attending meetings with Chacko and an HR representative, and testifying against Chacko in the arbitration proceedings. Chacko challenged the suspension through the internal grievance procedure, and the arbitrator reduced the suspension to one day, finding that the ten day suspension was without just cause. Although the punishment was found excessive, the arbitrator also found that "Dr. Chacko did grab Ms. Duncan's arm and that Ms. Duncan's version of the incident must be accepted."

On July 26, 2005, six Asian physicians wrote a memo to Forgit summarizing their continuing problems [*9] with Ms. Duncan. According to Chacko, Forgit ignored these issues and later required any contact with the ACS office to go through Duncan directly.

**D. Redistribution of Work Assignments**

On July 28, 2005, Dr. Freedman announced that, effective August 1, 2005, workloads would be redistributed because a part-time physician was leaving CVH. Chacko was assigned an additional unit in the redistribution, bringing her workload to a total of four units. Staff Physician Dr. Engelman and Staff Physician Dr. Santhappa also carried four units. Under this arrangement, Dr. Engelman was responsible for approximately 79 patients in Whiting; Dr. Santhappa was responsible for 96 patients in the Dutcher Enhanced Security Service in Whiting; and Chacko was responsible for 89 patients in the GPD. Chacko contends that the reorganization resulted in increased workloads for Asians, but not for Caucasians, specifically noting that the workload for one Caucasian doctor remained the same while the workload for the other Caucasian doctor decreased. Chacko claims that she was told this arrangement was fair because she, Engleman, Timmerman, and Santhappa all had four units; however, Chacko asserts that the four units [*10] contained different amounts of work.

Following the redistribution announcement, Chacko wrote a letter to Forgit, dated July 29, 2005, requesting that she reconsider Chacko's assumption of a fourth unit. Specifically, Chacko said that "it is impossible for me to be responsible for all four of these particular units and provide acceptable patient care." Except for mentioning that only herself and Dr. Saeedi were assigned additional units, there was no reference or implication that Chacko's complaint was related to the fact that she is Asian. On

August 9, 2005, Forgit and Dr. Freedman met with Chacko to discuss her concerns. They discussed organization and time management, and Freedman provided examples of how Chacko might prioritize clinical work, including examples of clinical matters that could reasonably be left for the next day.

Following this meeting, Dr. Freedman and Forgit agreed that they would have weekly supervisory meetings with Chacko to go over Chacko's record-keeping and patient charts. Chacko argues that these meetings were punishment for her prior complaints. Apparently three meetings of this type were held on August 9th, 29th, and 31st of 2005. In September 2005, Dr. Conrad [*11] and Dr. Freedman decided to reduce Chacko's number of patients. According to Conrad, this change was made "because Dr. Chacko's clinical work was not as thorough as it needed to be, [and] she was not following up with patients' medical issues and she was not properly documenting the patients' charts." This change resulted in Chacko losing one unit and gaining another, the net result being that she was responsible for ten fewer patients.

E. Official Complaints

Chacko filed an internal Affirmative Action Complaint on September 7, 2005 alleging discrimination based on race/color and national origin. Although the investigator noted that Chacko's caseload was larger than that of the Caucasian doctors, and was the second largest in ACS, he also found that the hospital's policy against racial and national origin discrimination was not violated. The plaintiff then filed a complaint dated October 18, 2005 and that was received by the Commission on Human Rights and Opportunities ("CHRO") on October 21, 2005. DMHAS received notice of the complaint on November 9, 2005.

F. 2005 Performance Appraisal

Chacko was supposed to receive an annual performance appraisal on September 19, 2005. Although the performance [*12] appraisal was signed by Dr. Freedman on September 19, it was not signed by Forgit or Conrad until December, and was not given to Chacko until December 27, 2005. Chacko claims that some of the comments written on her appraisal were not actually written in September, but were "backdated" and actually written after she filed her complaint with the CHRO. Particularly of note was the fact that the review mentioned her suspension, although that was not decided until December.

Chacko alleges that her overall rating for this evaluation was "3.5," which correlates to a "good" rating. Her review, however, reported her overall rating as a "1," or an "unsatisfactory." Chacko claims that Freedman and Forgit intentionally miscalculated her average rating. Although Chacko's evaluation was, in general, better than unsatisfactory, it included the following comments: "time management problems which need significant improvement"; "still needs to improve time management when cross-covering"; "documentation needs greater detail. PEs need to be reliably completed on time"; "needs to be more flexible with cross-coverage or assignment changes"; "progress note documentation needs much more detail"; "poor documentation [*13] on laboratory results and their interpretation"; "consultation request forms often have insufficient documentation requiring them to be returned for further elaboration"; "needs to prioritize tasks better to improve efficiency and time management." In response to the unsatisfactory performance review, Chacko received a letter from Human Resources dated January 18, 2006, noting that she could be subjected to possible dismissal.

According to Chacko, she complained about the evaluation to union delegate Michele Daniels, who then complained to Human Resources. At a meeting with personnel administrator Fred Ferris, Daniels pointed out that the math in the evaluation did not add up to a score of "1" and that the appraisal had been inappropriately held back. Because the evaluation was not completed within the appropriate time period, it was removed from Chacko's personnel file on February 17, 2006.

G. Other Allegedly Discriminatory Practices

Chacko also claims that Caucasian doctors were given paid time off to attend conferences, while similar requests by Asian doctors were refused. Moreover, Dr. Saeedi, an Asian physician, was apparently compelled to move his belongings into a different office [*14] when Dr. Timmerman, a white doctor, was hired. According to Chako, Saeedi's new office was in an older, less convenient building. Chacko claims that the treatment of Timmerman was in stark contrast to her own experience upon arrival at the hospital--namely, she was required to share an office with another Asian physician for months before she received her own office. Chacko claims that these discriminatory actions were repeated when Forgit gave the Caucasian Dr. Engelman the office of Dr.

Santhappa, an Asian doctor who was away in India. According to Chacko, Santhappa returned from India to find all of his belongings removed, and he was without an office for two months. Similarly Dr. Dargan was allegedly asked to empty her office so that two Caucasian employees, neither with patient care responsibilities, could have it instead.

H. Supplemental Doctor Affidavit [6]

[6]   The defendant argues that these affidavits should be disregarded because they were not listed as potential witnesses in response to the defendant's interrogatories. However, both of these individuals are employees of the defendant, both are of Asian descent, Chacko describes the level of work given to both individuals in her [*15] interrogatories, and both individuals signed the letter to Forgit regarding Duncan's behavior. Therefore, the defendant had notice of their potential relevancy to this case.

Chacko also submits the affidavit of Dr. Saeedi, who states that he has "observed [the] preferential treatment [that] has been extended to Caucasian physicians who joined the staff," and that "I believe that the plaintiff has been the recipient of similar discriminatory treatment at work during her tenure with the defendant." Dr. Dargan echoes these statements in her affidavit, noting that during her employment she has "witnessed the administration give preferential treatment to Caucasian physicians, at the expense of non-Caucasian physicians." Saeedi's supplemental affidavit also corroborates Chacko's claim that he had to give up his office, as well as his PA, for Dr. Timmerman.

Chacko claims that the defendant violated Title VII by assigning Asian physicians significantly heavier workloads than Caucasian physicians, by creating a hostile work environment based on race and national origin, and by repeatedly retaliating against her when she complained about the treatment of Asian physicians.

The defendant moves for [*16] summary judgment claiming that the allegations of heavier workload do not constitute an adverse employment action under Title VII and that, even if it did, the defendant has offered a legitimate non-discriminatory reason for the assignment of workloads--the algorithm--which Chacko cannot rebut. The defendant also argues that Chacko's claims are all facially neutral and, as such, cannot support her

allegations of hostile work environment. Finally, defendant claims that Chacko cannot establish an adverse employment action or a causal connection between allegedly protected activity and the claimed adverse employment action for the purposes of her retaliation claim.

II. Discussion [7]

[7]   The defendant argues that the Court should disregard Chacko's "new" arguments because they were not raised previously and were not disclosed during discovery. However, in her motion to supplement the opposition to the motion for summary judgment, Chacko does offer an explanation for not raising these arguments sooner--namely, that she brought numerous errors to the attention of her counsel, but that counsel had failed to raise these issues with the Court. Much of the "new" information that Defendant complains [*17] of is information or facts that are in the possession of the defendant and/or its employees. Additionally, because the motion to supplement was granted, in part, to address these "new" arguments, the Court declines to disregard them.

A. Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See *Fed. R. Civ. P. 56*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (quoting *Fed. R. Civ. P. 56(c)*); accord *Miner v. Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993)*. A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248*.

When examining a motion for summary judgment the Court resolves all ambiguities and draws all permissible factual inferences [*18] in favor of the nonmoving party. *Patterson v. County of Oneida, NY,*

2010 U.S. Dist. LEXIS 31597, *18

*375 F.3d 206, 218 (2d Cir. 2004).* If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).* However, a party may not create a genuine issue of material fact by resting on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).*

## B. National Origin Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a).* Courts analyze these claims under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* Under this standard, to establish a prima facie case of discriminatory treatment based on an adverse job action, a plaintiff must show "1) that [s]he belonged [*19] to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).* The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." See *Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001).* Once a plaintiff has established a prima facie case, the defendant must then articulate "a legitimate, non-discriminatory reason for" the adverse employment action. *Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).* If the defendant is able to do so, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." *Id.*

"Direct evidence of discrimination is not necessary, because proof is seldom available with respect to an employer's mental processes. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial [*20] evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file. Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial. Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)* (internal citations omitted). The plaintiff may establish a genuine issue of material fact either through statistical or circumstantial evidence that the employer's reasoning is false and that discrimination motivated the employer. *Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1225 (2d Cir. 1994).*

It is undisputed that Chacko is a member of a protected class and that she is qualified to be a Principal Physician. The defendant contends, however, that Chacko has not suffered an adverse employment action and has not presented evidence giving rise to an inference [*21] of discriminatory intent.

### i. Adverse Employment Action and Inference of Discriminatory Intent

"An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Feingold, 366 F.3d at 152* (internal quotations and citations omitted). The Supreme Court recently wrote of adverse employment actions in the context of Title VII: "We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).* "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold, 366 F.3d at 152* (internal quotations and citations omitted).

Chacko's main argument regarding adverse employment action is that she experienced a disproportionately heavy workload because of her national origin. A "[d]isproportionately [*22] heavy workload could perhaps be an adverse action, if the

additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status, or exposed the worker to dangerous or extreme conditions not appropriate to her job classification." *Young v. Rogers & Wells LLP, No. 00 Civ. 8019(GEL), 2002 U.S. Dist. LEXIS 21541, 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 06, 2002)*. In Feingold, the Second Circuit held that the plaintiff had demonstrated that he was subjected to an excessive workload as a result of discriminatory intent. *Feingold, 366 F.3d at 153*. Specifically, the plaintiff presented evidence that cases originally assigned to African-American individuals were reassigned to white individuals, and that assignments were often re-shuffled to give the white individuals more work. See id.; see also *Avillan v. Potter, No. 04 Civ. 9019(PKC)(FM), 2006 U.S. Dist. LEXIS 80062, 2006 WL 3103309 (S.D.N.Y. Nov. 1, 2006)* (noting that plaintiff demonstrated adverse employment action when he was given more work than other employees "quite often"); *Warren v. N. Shore Univ. Hosp., No. CV-03-0019(DGT)(RML), 2006 U.S. Dist. LEXIS 73302, 2006 WL 2844259 (E.D.N.Y. Sept. 29, 2006)*, aff'd *Warren v. N. Shore Univ. Hosp., 268 F. App'x 95 (2d Cir. 2008)* (noting [*23] that plaintiff alleged adverse employment action because she was assigned a more strenuous workload, though declining to uphold plaintiff's retaliation claim for failure to cite evidence of pretext).

Chacko has put forward sufficient evidence to satisfy the minimal burden of demonstrating adverse employment action for the purpose of a prima facie case. The defendant's own exhibit notes that Chacko had a heavier caseload than the white doctors; in fact, the affirmative action investigator's report states that Chacko had the second-highest caseload of all the doctors--the first highest being held by another Asian doctor. [8] Moreover, while Chacko was assigned the same number of units as the Caucasian doctors, these units were not equivalent in workload. Additionally, while Chacko was covering for Dr. Dargan, Chacko sometimes had responsibility for double or more of a Principal Physician's normal workload. Chacko also notes that Caucasian doctors did not work such long coverage shifts for as many days.

8   The report also notes that the caseloads of the four other Asian doctors are smaller than the three Caucasian doctors; however, this finding is not dispositive.

Although Chacko did receive [*24] some assistance during her coverage period, it is disputed how much assistance she actually received. Moreover, she claims that she never received long-term assistance from a PA, although the white doctors, with lower caseloads, did. She presents additional evidence about PA assistance in the form of Dr. Saeedi's affidavit, in which Dr. Saeedi states he had to give his PA to the Caucasian Dr. Timmerman after Timmerman was hired. Finally, Chacko has presented evidence showing that when work was redistributed in 2005, the work was given to Asian employees instead of Caucasian employees.

Therefore, taking the facts in the light most favorable to the plaintiff, Chacko has established a prima facie case that the disproportionately heavy workload was an adverse employment action that occurred under circumstances giving rise to an inference of discriminatory intent on the part of the defendant. See *Graham, 230 F.3d at 39* ("A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group.").

*ii. Legitimate, Non-Discriminatory Reason*

The defendant has advanced [*25] a legitimate, nondiscriminatory reason for Chacko's heavy workload. Specifically, the defendant claims that Forgit, Dr. Freedman, and Dr. Conrad made duty assignments using an algorithm that factored in patient acuity, the complexity of the management of the patient's condition, and the turnover of patients. Moreover, in explaining Chacko's large caseload during Dr. Dargan's absence, the defendant notes that there was an established coverage system in which one doctor would cover for another doctor when that doctor was absent, and vice versa. Therefore, Chacko must demonstrate that a material issue of fact exists over whether this legitimate reason is a pretext for discrimination.

*iii. Pretext*

Chacko has demonstrated that material issues of fact exist regarding pretext. Although the defendant notes that the hospital used an algorithm to assign workload, no evidence of the application of this algorithm has been provided to the Court. Moreover, it does not appear that the algorithm accounts for the apparent disparity in assigning PAs. The defendant argues that because

Chacko admits she received the assistance of PAs during the time she was covering for Dr. Dargan, her claim that the PAs [*26] were assigned only to Caucasians fails as a matter of law. The amount of time that the PAs helped, however, is a disputed issue of material fact, and Chacko claims they gave her only three hours of assistance. Regardless of the amount, taking the facts in the light most favorable to the plaintiff, the evidence shows that the PAs remained assigned only to the Caucasian doctors, even though the two busiest physicians were Asian. Although Chacko's workload was eventually decreased, cf. *Sacco v. Legg Mason Inv. Counsel & Trust Co., 660 F. Supp. 2d 302, 313-14 (D.Conn. 2009)* (plaintiff's claim that increased workload was in retaliation to her complaint about harassment failed when, after she complained about the increased workload, her workload was reduced), the September 2005 decrease only resulted in a net loss of ten patients. This decrease does weigh against Chacko's argument of discrimination; however, this decrease alone is not sufficient to prove absence of material fact regarding discriminatory motivation. Thus, the defendant's motion for summary judgment on the Title VII discrimination claim is denied.

C. Hostile Work Environment

"When the workplace is permeated with 'discriminatory [*27] intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)* (citations omitted); see *Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003).* In evaluating the severity or pervasiveness of the allegedly discriminatory workplace conduct, a court must look at all of the circumstances. See *Harris, 510 U.S. at 23.* A non-exclusive list of factors that courts consider in making such a determination includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. Title VII is not "a general civility code," *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998),* and "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).*

As to the frequency, "[t]here [*28] is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." *Alfano v. Costello, 294 F.3d 365, 379 (2d Cir. 2002).* The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989);* see also *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)* ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief."). To demonstrate that the harassing conduct was continuing or pervasive, it is also relevant to look at the treatment of other similarly situated individuals. See *Perry v. Ethan Allen, Inc., 115 F.3d 143, 151 (2d Cir. 1997);* see also *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)* (noting that the Court may also look at the treatment of other minorities not of the plaintiff's race). In evaluating the totality of the circumstances, the Court must look at the evidence cumulatively "to obtain a realistic view of the work environment." *Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997).*

The standard for evaluating [*29] a hostile work environment claim is both subjective and objective: the victim must subjectively perceive the environment to be abusive so that it actually alters the conditions of the victim's employment, and the conduct must also be so pervasive or severe that a reasonable person would find the environment abusive. *Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).* The plaintiff must also show that the hostility was due to her membership in a protected class. *Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999).*

The defendant claims that portions of Chacko's hostile work environment claim are time-barred because she cites to incidents that occurred outside of the 300-day statutory limitation period. [9] See *42 U.S.C. § 2000e-5(e)(1).* However, as the Supreme Court noted in *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002),* hostile work environment claims are "composed of a series of separate acts that collectively constitute one unlawful employment practice." (internal quotations omitted). "The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, [*30] for purposes of the statute, that some of the component acts of the hostile work environment fall

outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. Because Chacko's claim encompasses acts from 2004 through 2007, and some of those acts occurred during the filing period (namely the August increase in workload), the court declines to find that any portion of the hostile work environment claim is time-barred.

9   The defendant does not argue that Chacko's other claims are time-barred, but rather that she failed to exhaust her "new arguments" in her CHRO filings. A district court can only hear Title VII claims that are either included in the administrative charge or based on conduct which is reasonably related to the conduct in the charge. *Butts v. N.Y. Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)*; see also *Francis v. City of New York, 235 F.3d 763, 766 n.1 (2d Cir. 2000)* (noting that although there was some language in Butts that stated the "reasonably related claims" had to [*31] occur subsequent to the administrative investigation, Butts itself held that two claims arising from uncharged, pre-charge conduct were exhausted). There are three types of situations where claims are "reasonably related" to those asserted in an administrative filing: (1)"where the conduct complained of would fall within the scope of the administrative investigation;" (2) where the employee alleges retaliation by an employer against the employee for filing an administrative charge; and (3) "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the administrative charge." *Butts, 990 F.2d at 1402-03*. "In this inquiry, the focus should be on the factual allegations made in the [administrative] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Pleau v. Centrix, Inc., 501 F. Supp. 2d 321, 326 (D.Conn. 2007)*. The defendant conclusively states that Chacko cannot fulfill any of these criteria. However, almost all of these "new" arguments fall under the classifications noted above. Chacko's CHRO complaint alleged disparate treatment between Asian and non-Asian physicians, particularly emphasizing [*32] heavier workloads, as well as retaliation for making those complaints.

Therefore, Chacko's claims that Duncan failed to assist Asian physicians with cross-coverage and that Caucasian physicians received more help during coverage clearly are within the scope of the administrative investigation. Moreover, because the CHRO complaint discusses the differential treatment of Caucasian and Asian physicians, Chacko's claims that Asian physicians were assigned less desirable offices and were forced to move for Caucasian physicians and that Caucasian physicians received more time off for conferences would also be within the scope of the CHRO investigation. Additionally's Chacko's claim that her performance evaluation was "mis-graded" would fall under classification number two--retaliation. Although it is questionable whether the claims that Duncan made several errors on the plaintiff's time sheets; that clinicians were required to sign their time sheets at Duncan's desk; that Duncan recently accused Dr. Dargan of theft; and that Duncan recently removed the plaintiff's name from an email list are exhausted, the Court's decision is unchanged regardless of the inclusion of these allegations in [*33] the analysis.

Turning to the merits, Chacko claims she was subjected to a hostile work environment because the Caucasian physicians were consistently treated differently than the Asian physicians. Specifically, she notes that the Caucasian physicians were favored in scheduling, the assignment of offices and PAs, as well as the allowance for continuing education. Moreover, Chacko points to Duncan's persistent and continued hostility, allegedly directed only toward Asian physicians, which culminated in accusations of improper physical contact and Chacko's suspension. Chacko claims that in response to her complaints regarding Duncan and Chacko's workload she was intimidated and humiliated by Forgit and Freedman. Specifically, she claims that within a week of the July 29, 2005 letter, she was accused of assaulting Duncan, which resulted in her suspension; that she was subjected to weekly reviews of her record-keeping; that she received a backdated "unsatisfactory" evaluation; and that she was warned that one more unsatisfactory evaluation could result in her termination.

These claims are all facially neutral. "Facially neutral incidents may be included, of course, among the 'totality

of [*34] the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on" the protected characteristic. *Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002)*; see also *Woods v. Newburg Enlarged City Sch. Dist., 288 Fed. Appx. 757, 759 (2d Cir. 2008)* ("Alfano's observation that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination presumed evidence of multiple acts of harassment, some overtly sexual and some not."). Because Chacko is "relying on facially neutral incidents," she must offer some additional evidence, circumstantial or otherwise, from which a reasonable jury could infer that the actions were discriminatory. See *Alfano, 294 F.3d at 378; Khan v. HIP Centralized Lab. Servs., Inc., No. CV-03-2411 (DGT), 2007 U.S. Dist. LEXIS 23721, 2007 WL 1011325, at *5 (E.D.N.Y. Mar. 30, 2007)*; see also *Raniola v. Bratton, 243 F.3d 610 (2d Cir. 2001)* (finding evidence of disparate treatment in hostile work environment claim where female officers were subjected to offensive sex-based remarks, denied work requests given to males, were subjected to higher standards and tougher [*35] details, and were given work normally given to the most junior officers).

In *Murray-Dahnir v. Loews Corp., No. 99 CIV, 9057 LMM, 1999 U.S. Dist. LEXIS 12973, 1999 WL 639699, at *4 (S.D.N.Y. Aug. 23, 1999)*, the District Court for the Southern District of New York granted a motion to dismiss, finding that the facially neutral actions alleged by the plaintiff could not support a claim of hostile work environment, though they might support a claim of failure to promote. There, the plaintiff claimed that he had extraordinarily longer working hours than non-African Americans, that he worked those hours without proper staffing and support, that his supervisors stopped directly speaking with him and publicly and unjustifiably admonished him on numerous occasions, and that he received a memorandum from his supervisors containing "illegitimate and pretextual criticism." Id.

Chacko has not shown that a genuine issue of material fact exists with regard to hostile work environment discrimination. As in Murray-Danhir, it appears that these "non-racial forms of hostility," without more, cannot support a claim of a racially hostile working environment. See id. (citing *Oteri-Harkins v. City of New York, No. 97-CV-2309 (JG), 1998 U.S. Dist. LEXIS 21876, 1998 WL 817689, at *7 (E.D.N.Y. Feb. 5, 1998)*).

[*36] For example, Chacko has offered no evidence, other than her speculation, that the incident regarding physical contact with Duncan was fabricated based on Chacko's race or national origin. Although Chacko maintains her innocence in the matter, the arbitrator did find that Chacko grabbed Duncan's arm and should have been suspended, albeit for only one day. Therefore, the evidence taken in the light most favorable to the plaintiff does not demonstrate that the suspension was based on race. Additionally, in her deposition Chacko admits that she had problems with her charts, and there is no evidence that the charts of all Asian physicians were hyper-scrutinized. Therefore, a reasonable juror would not infer that the meetings to review Chacko's work were based on her race. Finally, the remaining facially-neutral evidence is not severe or pervasive enough to be considered along the lines of "discriminatory intimidation, ridicule, and insult." The facts taken in the light most favorable to the plaintiff do not demonstrate an environment in which race-based abuse is so pervasive that a reasonable person would find it to be hostile. Therefore, the defendant's motion for summary judgment on Chacko's [*37] hostile work environment claim is granted.

D. Retaliation

Title VII also forbids retaliation against an employee for complaining of prohibited employment discrimination, stating that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by " Title VII. *42 U.S.C. § 2000e-3(a)*. To defeat a motion for summary judgment on a claim of retaliation, "the plaintiff must first present sufficient evidence to make out a prima facie case, that is, evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected participation or opposition under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)* (internal quotation marks and alterations omitted). [10] "If the plaintiff meets this burden and the defendant then points to evidence [*38] of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence

that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Id.

> 10   There is no issue of fact over whether the defendant was aware of Chacko's activity.

To succeed on a retaliation claim, the plaintiff must show that the employer could reasonably have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII. *Galdieri-Abrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)*; see *McDowell v. T-Mobile USA, Inc., 307 F. App'x 531, 534 (2d Cir. 2009)* (the plaintiff could not establish that he engaged in protected activity because he never explicitly complained about race discrimination, and there was no evidence, other than his own testimony, from which a jury could conclude that the supervisors could have understood the complaints were about race). "Absent a claim of unlawful discrimination, general complaints about employment concerns do not constitute protected activity under Title VII." *Potenza v. W. Irondequoit Cent. Sch. Dist., No. 06-CV-6407, slip op. 2009 U.S. Dist. LEXIS 79218, 2009 WL 2876204, at *6 (W.D.N.Y. Sept. 2, 2009).* [*39]

*i. Protected Opposition*

Chacko alleges retaliation for her July 29, 2005 letter to Forgit, in which she claims she "raised questions about the inequitable division of labor in work assignments between Asian physicians and the white physicians." In actuality, the July 29th letter does not specifically make any statements about Asian physicians being treated differently than white physicians. Rather, the letter merely states: "I also noticed that the net result of all these changes is that Dr. Saeedi and Dr. Chacko ended up with one extra unit each." This letter reads as a general complaint about work-related incidents. There is no indication in the letter that Chacko is complaining about discrimination based on race or national origin. Therefore, Chacko did not engage in protected activity by writing this letter.

The complaints against Duncan, however, are different. Chacko has alleged that in February 2005, Chacko, Dargan, Saeedi, and Santhappa all attended a meeting with Forgit at which they claimed that Duncan was rude to Asian physicians, but not to the Caucasian physicians. Dr. Engleman also attended that meeting, but stated that he [*40] had never had any problems with

Duncan. Although "rudeness" generally does not amount to a violation of Title VII, taking the facts in the light most favorable to the plaintiff, a reasonable jury could find that Chacko engaged in protected activity in making this complaint.

The second complaint about Duncan came from the Asian physicians via a letter dated July 26, 2005. Although this letter does not explicitly mention disparate treatment based on race, it does state that "[i]t is quite clear that some of the physicians are much more affected by [Duncan's] behavior than others." Taking this statement in light of the prior complaint and in the light most favorable to the plaintiff, a reasonable jury could find that Chacko engaged in protected activity in making this complaint.

On September 7, 2005 and October 18, 2005, Chacko filed an affirmative action complaint and a complaint with the CHRO, respectively. These filings constitute protected activity.

*ii. Adverse Action and Causal Connection*

An adverse employment action "is one that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Clayton v. City of Middletown, 564 F. Supp. 2d 105, 112 (D.Conn. 2008)* [*41] (citing *Burkybile v. Bd. of Educ., 411 F.3d 306, 313-14 (2d Cir. 2005)*). Chacko claims the following retaliatory adverse employment actions: increasing her workload; micro-managing her work in August 2005; the investigation of the Duncan complaint and ten-day suspension; her "unsatisfactory" and delayed employment evaluation and the subsequent threat of termination.

"To qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences." *Scafidi v. Baldwin Union Free Sch. Dist., 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003).* Embarrassment or anxiety are not sufficient to constitute adverse action. See id. District Courts within the Second Circuit have often found that "reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Abraham v. Potter, 494 F. Supp. 2d 141, 147 (D.Conn. 2007).* But cf. *Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)* (listing reprimand as a potentially adverse employment action). Here, Chacko

claims that the excessive scrutiny she experienced was accompanied by fourteen citations. [*42] There is no evidence, however, of what constitutes a citation. In her deposition Chacko states that a citation is "something I didn't do right. You know, something faulty with my care." (Chacko Dep. 134:8-9.) There is no evidence whether the citations were formal reprimands, were documented in Chacko's file, or had any other adverse effect on Chacko's employment. Moreover, in her deposition, Chacko admitted that there were problems with her charts. (Id. 177:12-14.) ("Q: But as far as your charts, did you agree that there were problems with your charts? A. Sure, sure."). Thus, the "excessive scrutiny" and citations received by Chacko were warranted criticism. See *Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002)* (noting that counseling session regarding areas that plaintiff admitted were of concern was not retaliation because criticism of an employee is not an adverse employment action). Therefore, because Chacko admitted problems with her charts and did not experience any negative results because of the meetings, the "excessive scrutiny" she experienced in August 2005 does not constitute adverse employment action.

Chacko's negative performance review and the accompanying letter regarding [*43] potential termination also do not constitute adverse employment action. "[N]egative performance evaluations, without any accompanying adverse consequences, are not adverse employment actions, a negative performance evaluation with adverse consequences may qualify as an adverse employment action." *Wilks v. Elizabeth Arden, Inc., 507 F. Supp. 2d 179, 194 (D.Conn. 2007)* (internal citations omitted)) (addressing negative performance evaluation as prima facie evidence of discrimination); see also *Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000)* ("A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment. An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." (citations omitted)). In *Riedinger v. D'Amicantino, 974 F. Supp. 322, 328 (S.D.N.Y. 1997)* the District Court for the Southern District of New York found that threats of termination and negative performance evaluations, along with changes in work schedule, denial of leaves of absence, [*44] and insults, demonstrated a prima facie case of adverse employment action because these threats at least

arguably affected the plaintiff's ability to perform her job.

Here, in response to her unsatisfactory employment evaluation, Chacko did receive a letter from HR stating that unsatisfactory evaluations could result in termination. However, the unsatisfactory evaluation was removed from her file, and there is no evidence that she experienced any adverse effects other than receiving the letter. See *Thomas v. Bergdorf Goodman, Inc., No. 03 Civ. 3066(SAS), 2004 U.S. Dist. LEXIS 25645, 2004 WL 2979960, at *10 (S.D.N.Y. Dec. 22, 2004)* (noting that "[t]he mere threat of disciplinary action, including the threat of termination, does not constitute an adverse action materially altering the conditions of employment"). But cf. *Abraham, 494 F. Supp. 2d at 148-49* (seven day "paper suspension" that was, one month later, designated as an "official discussion" could be considered a probationary period that may constitute an adverse employment action).

Although the withholding of the employment evaluation for five months and the miscalculation of Chacko's overall employee rating are questionable actions, there is no evidence that [*45] Chacko experienced any adverse consequences from them. Chacko may argue that these miscalculated performance reviews would deter other employees from making Title VII complaints; however, because the employment review was removed from Chacko's file in a timely manner and Chacko never experienced a cut in pay, a demotion or the like, this argument is significantly weakened. Therefore, Chacko has not demonstrated that the negative performance review was an adverse employment action.

Although a heavily burdened workload may constitute adverse employment action, Chacko has not produced any evidence that the increase in her work was casually connected to February 2005 her complaint about Duncan--the only complaint that arose before the increase in workload. "A causal connection between the adverse action and the protected activity, is established where a plaintiff offers, (1) direct proof of retaliatory animus directed against the plaintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities." *Hunter v. St. Francis Hosp., 281 F. Supp. 2d 534, 547 (E.D.N.Y. 2003)*. Moreover, for "mere temporal proximity" [*46] to be sufficient for the purpose of establishing causality, the proximity must be "very

close." *Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001).*

Here, Chacko neither has direct proof of retaliatory animus nor can she point to disparate treatment of similarly situated individuals as there does not appear to be any similar increase for half of the Asian physicians who complained about Duncan's behavior. Moreover, the time-span of nearly five months is too long to establish a causal connection based on proximity. See *Sicular v. New York City Dept. of Homeless Servs., No. 09 Civ. 0981(AKH)(AJP), slip op. 2010 U.S. Dist. LEXIS 10089, 2010 WL 423013 (S.D.N.Y. Feb. 4, 2010)* (citing cases holding that time periods less than three months were insufficient to establish a causal connection). Therefore, Chacko cannot claim retaliation based on increased workload.

Suspension is clearly an adverse employment action. Moreover, a reasonable jury could find the suspension to be causally connected to Chacko's complaint. However, as noted above, the defendant has put forward a legitimate reason for Chacko's suspension. The defendant claims it began its investigation into the Duncan incident based on Duncan's complaint [*47] and eyewitness statements, not because of Chacko's protected activity or her race. Chacko was then suspended after being found to have engaged in inappropriate physical contact with another employee. The imposition of the suspension was upheld by an independent arbiter, though the length of the suspension was decreased. Chacko has not presented any evidence other than speculation to show that the investigation or suspension was a pretext for discrimination on the basis of her race. Therefore, she can not claim retaliation on those grounds.

Therefore, taking the facts in the light most favorable to the plaintiff, a reasonable jury could not find that the defendant retaliated against Chacko in violation of Title VII. Thus, the defendant's motion for summary judgment is granted with respect to the retaliation claim.

### III. Conclusion

Accordingly, the defendant's motion for summary judgment [Dkt # 29] is GRANTED IN PART and DENIED IN PART.

SO ORDERED this 30th day of March 2010, at Hartford, Connecticut.

/s/ **Christopher F. Droney**

**CHRISTOPHER F. DRONEY**

**UNITED STATES DISTRICT JUDGE**

stated a claim under *§ 1981* because he failed to allege that he has an employment contract, as opposed to being an at-will employee. However, *§ 1981* also provides a cause of action when termination of at-will employment is racially motivated. *Lauture v. IBM Corp., 216 F.3d 258 (2d Cir. 2000)*.

Here the plaintiff alleges that when he was threatened with physical harm by a student, he retorted, indicating that he would not "stand around" and allow the student to harm him. As a result of the exchange with the plaintiff, this student complained to Robinson, who commenced an investigation. However, he does not allege that any white teacher's activities led to a student filing a complaint against that teacher with a supervisor, or any similar development. [3] A teacher whose conduct has led to the filing of a complaint by the student involved is [*8] in a materially different situation than a teacher against whom no complaint has been filed, and it is quite reasonable that there would be an investigation of the former but not of the latter. Moreover, while it is clear that the defendant knew of the plaintiff's infraction, there is no basis in the complaint for concluding that the defendant knew of the alleged infractions of the white teachers -- assuming those alleged infractions were comparable to the plaintiff's infraction.

> 3 In this context, it is pertinent that as to teachers not in the protected class, the plaintiff alleges only that they verbally and publicly objected to threats made by students. He does not allege that any white teachers retorted, indicating that he or she would not stand around and allow the student to harm him or her. He merely alleges that the white teachers verbally and publicly objected.

The plaintiff's remaining allegations that the investigation was a "clearly biased investigation" and that but for his race he would not have [*9] been discharged are merely conclusory assertions of intentional racial discrimination that cannot survive a motion to dismiss. See *Yusuf, 35 F.3d at 713* (dismissing *§ 1981* claim where allegations failed to provide specific factual support for a claim of racial motivation).

Since the plaintiff has not sufficiently alleged that a similarly situated white teacher was treated differently and the remainder of the plaintiff's allegations as to this claim are merely conclusory, the plaintiff's *§ 1981* claim should be dismissed.

**B. Count Two: Title VII**

The plaintiff sets forth two claims in Count Two of the complaint: one, that his employment was terminated because of his race, and two, that he was subjected, because of his race, to a hostile and abusive work environment because the defendant intentionally placed disruptive students in the plaintiff's classroom without his knowledge or permission, and suspended and investigated him. The defendant moves to dismiss these claims, arguing that the plaintiff failed to exhaust administrative remedies and fails to state a claim upon which relief can be granted.

**1. Failure to Exhaust Administrative Remedies**

The defendant [*10] argues that the plaintiff is barred from bringing suit on his Title VII claims because he has not obtained a right-to-sue letter from the EEOC. The court agrees. Under *42 U.S.C. § 2000e-5(f)* a plaintiff is required to obtain from the EEOC a right-to-sue letter prior to bringing suit on a Title VII claim. *Shah v. New York State Dept. of Civil Serv., 168 F.3d 610, 613 (2d Cir. 1999)* ("A Title VII claimant may bring suit in federal court only if he has filed a timely complaint with the EEOC and obtained a right-to-sue letter"). This letter may be requested by the claimant 180 days after filing a complaint with the EEOC. *42 U.S.C. 2000e-5(f) (1994)*.

The plaintiff argues that he should be allowed to proceed with his claim because 180 days had passed between the filing of his EEOC complaint and the filing of this action. He relies on *Perdue v. Roy Stone Transfer Corp., 690 F.2d 1091 (4th Cir. 1982)*. However, Perdue is inapposite. There the plaintiff was allowed to proceed with her lawsuit, even though she had not obtained a right-to-sue letter, because the defendant had breached an EEOC-negotiated [*11] settlement agreement, and the plaintiff had repeatedly requested from the EEOC, but had not received, a right-to-sue letter. No comparable situation exists here.

**2. Failure to state a claim**

With respect to his claim that his employment was terminated because of his race, in violation of Title VII, the plaintiff must carry the initial burden of establishing a prima facie case by showing that "(1) [he] was a member of a protected class; (2) [he] was qualified for the position; (3) [he] was discharged; and (4) the discharge occurred in circumstances giving rise to an inference of

discrimination." *Rosen v. Thornburgh, 928 F.2d 528, 532 (2d Cir. 1991).*

In setting forth this claim, the plaintiff relies on the same allegations he makes in support of his claim under *§ 1981*. For the reasons discussed above, the plaintiff has failed to allege circumstances giving rise to an inference of discrimination because he has not alleged a situation involving him that is reasonably comparable to that of non-minority persons he claims were treated disparately.

With respect to his claim that he was subjected to a hostile work environment, the plaintiff

must allege [*12] that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993);* see also *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).* Under *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998),* a plaintiff must allege "that the conduct at issue was not merely tinged with offensive sexual [or racial] connotations, but actually constituted discrimination . . . because of . . . sex [or race]." (Internal citations and quotations omitted). The hostile environment must be both subjectively and objectively offensive: one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Harris, 510 U.S. at 21-22, 114 S. Ct. 367.* [*13] The Supreme Court in Harris instructed that a court should look to all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance.

*Id. at 23, 114 S. Ct. 367.* In *Schwapp, 118 F.3d at 111,* the Second Circuit held that incidents occurring outside the plaintiff's presence may be relevant to the totality the circumstances. However, the incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283 n. 1, 141 L. Ed. 2d 662 (1998).*

*Gaynor v. Martin, 77 F. Supp. 2d 272, 277-78 (D. Conn. 1999).*

The plaintiff's hostile work environment claim is based on the allegation that Robinson intentionally placed disruptive students in his classroom without his knowledge or permission. However, the plaintiff also alleges that similarly situated white teachers were also threatened by students. This runs [*14] counter to an inference that the plaintiff was singled out because of his race, and he fails to set forth any additional relevant allegations. For instance, he does not allege that white teachers were given notice and their permission obtained before disruptive students were placed in their classes. Nor does he provide any other factual allegation that could support an inference that the workplace was permeated with discriminatory acts that were sufficiently pervasive to alter the conditions of his employment. He offers only a conclusory statement that it was so.

The plaintiff also alleges that the suspension and investigation of the plaintiff and the termination of his employment constituted a hostile work environment. Even when taken in combination with the plaintiff's other allegations, this allegation fails to describe an environment that is permeated with discriminatory intimidation, ridicule, or insult, or anything comparable, particularly in light of the fact that a student had complained about the plaintiff and this complaint preceded the suspension and investigation. Therefore, the plaintiff has failed to state a claim that he was subjected to a hostile work environment in [*15] violation of Title VII.

## C. Intentional Infliction of Emotional Distress

In support of his claim for intentional infliction of emotional distress, the plaintiff asserts that the defendant inflicted emotional distress by suspending, investigating,

and discharging the plaintiff, and by placing disruptive students in the plaintiff's classroom [4].

4   The plaintiff does not actually allege in Counts Three and Four of his complaint, as he argues in his memoranda, that the defendant placed disruptive students in his classroom. This allegation appears only in Count Two in support of his hostile work environment claim. However, the court assumes, *arguendo*, that the allegation appeared in all three of these counts.

A claim for intentional infliction of emotional distress must set forth the following elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme or outrageous; [*16] (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986).* Extreme and outrageous conduct is conduct "exceeding all bounds usually tolerated by a decent society." *Id. at 254, n. 5.* See also, *Restatement (Second) of Torts § 46, comment d* (1965) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"). Under Connecticut law, the court makes the initial determination of whether the defendant's alleged conduct rises to the level of extreme and outrageous. *Dobrich v. General Dynamics Corp., 40 F. Supp. 2d 90, 104-05 (D. Conn. 1999).*

When a teacher's supervisor responds to a student's complaint by suspending the teacher pending an investigation, and subsequently, upon completion of the investigation, discharges the teacher, that cannot, without more, constitute extreme or outrageous conduct. In fact, [*17] it has all of the appearances of being a prudent and reasonable course of action, even if the supervisor has intentionally placed disruptive students in that teacher's classroom, where it is also alleged that other teachers also had to deal with students who physically threatened them. See *Ziobro v. Connecticut Institute for the Blind, 818 F. Supp. 497, 502 (D. Conn. 1993)*(granting summary judgment because dismissal of employee following investigation and conclusion that she had written an anonymous letter alleging child abuse in defendant

school did not reach threshold level of extreme and outrageous conduct).

D. Negligent Infliction of Emotional Distress

Under Connecticut law, "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process," regardless of whether the termination itself was wrongful. *Parsons v. United Technologies Corp., 243 Conn. 66, 88-89, 700 A.2d 655 (1997)*(internal quotation marks and citation omitted). Here, there is no allegation of unreasonable conduct in the termination process.

The decision of the Connecticut [*18] Superior Court in *Karanda v. Pratt & Whitney Aircraft, 1999 Conn. Super. LEXIS 1244,* No. CV98-582025S, 1999 WL 329703, at *4-*5 (Conn. Super. Ct. May 10, 1999), has called into question the rule articulated in Parsons. In Karanda, the court noted that the Connecticut Supreme Court based its decision in Parsons on a 1986 decision, *Morris v. Hartford Courant Co., 200 Conn. 676, 682, 513 A.2d 66 (1986).* See *Karanda, 1999 Conn. Super. LEXIS 1244, 1999 WL 329703,* at *3, *5. Prior to the 1993 changes in the Connecticut Workers' Compensation Act, emotional injuries were compensable under the Act, and the ability of workers to recover from such injuries under the Act was the reason the Connecticut Supreme Court gave for the rule stated in Morris and cited with approval in Parsons. See id. In Karanda, the court therefore held that in light of the 1993 amendments to the Act eliminating coverage of emotional injuries, it would allow claims for emotional injury in the employment context.

Since the Morris decision predates the 1993 changes to the Worker's Compensation Act, the reasoning in Karanda seems, on its face, sound. However, the rule articulated in Parsons is [*19] stated in terms that are clear and unequivocal, Parsons was decided after the 1993 changes in the Act, and the Connecticut Supreme Court could specify other reasons why the rule stated in Parsons is still good law. [5]

5   The court noted in Parsons that:

The mere termination of employment, even where it is

2001 U.S. Dist. LEXIS 3326, *19

wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. "The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Madani v. Kendall Ford, Inc., 312 Ore. 198, 204, 818 P.2d 930 (1991). Parsons, 243 Conn. at 88-9.*

Accordingly, the defendant's motion to dismiss this claim is being granted.

IV. CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss (doc. # 7-1) is hereby GRANTED, and its motion for a more definite statement (doc. # 7-2) is hereby DENIED as moot.

The Clerk shall close this case.

It is so [*20] ordered.

Dated this 22nd day of February 2001 at Hartford, Connecticut.

Alvin W. Thompson

United States District Judge



TINA COLAPIETRO, Plaintiff, v. DEPARTMENT OF MOTOR VEHICLES, and
TIMOTHY KULISH, Defendants.

3:08cv238(WWE)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2010 U.S. Dist. LEXIS 62828*

June 24, 2010, Decided
June 24, 2010, Filed

**SUBSEQUENT HISTORY:** Motion granted by *Colapietro v. DMV Conn., 2011 U.S. Dist. LEXIS 85584 (D. Conn., Aug. 3, 2011)*

**PRIOR HISTORY:** *Colapietro v. DMV, 2008 U.S. Dist. LEXIS 70787 (D. Conn., Sept. 16, 2008)*

**COUNSEL:** [*1] For Tina Colapietro, Plaintiff: Beth Nesson Mercier, LEAD ATTORNEY, Michelson, Kane, Royster & Barger, Hartford, CT; Steven B. Kaplan, LEAD ATTORNEY, Michelson Kane Royster & Barger-ColumbusBlvdHtfd, Hartford, CT.

For Dept of Motor Vehicles State of CT, Defendant: Joseph A. Jordano, LEAD ATTORNEY, Attorney General's Office, Hartford, CT; Josephine S. Graff, LEAD ATTORNEY, Attorney General's Office - Elm (Htfd), Hartford, CT.

For Timothy Kulish, Defendant: Richard M. Franchi, LEAD ATTORNEY, Law Office of Richard M. Franchi, New Haven, CT.

**JUDGES:** Warren W. Eginton, Senior United States District Judge.

**OPINION BY:** Warren W. Eginton

**OPINION**

*MEMORANDUM OF DECISION ON DEFENDANT DEPARTMENT OF MOTOR VEHICLES'S MOTION FOR SUMMARY JUDGMENT*

Plaintiff Tina Colapietro brings this action alleging discrimination by defendants Department of Motor Vehicles ("DMV") and Timothy Kulish, Manager of the DMV Emissions Division. Specifically, plaintiff asserts that (1) defendant DMV violated *Title VII*; (2) defendant Kulish violated *Connecticut General Statutes § 46a-60(a)(5)*; and (3) Kulish is liable for intentional infliction of emotional distress. Both defendants have filed separate motions for summary judgment.

For the following reasons, [*2] DMV's motion for summary judgment is GRANTED in part and DENIED in part, and Kulish's motion for summary judgment is DENIED.

**BACKGROUND**

The parties have submitted statements of facts with supporting exhibits that reflect the following factual background. [1]

> 1   This factual background reflects the submissions of defendant DMV and plaintiff because defendant Kulish has failed to file a statement of facts in compliance with *Local Rule of Civil Procedure 56.*

2010 U.S. Dist. LEXIS 62828, *2

Plaintiff has been employed as an Emissions Agent at the DMV since 2000. As an Emissions Agent, plaintiff was responsible for the inspection of various DMV emissions facilities across the state.

In 2004, the DMV opened the Emissions Tech Center in Cheshire, Connecticut, which serves as the central office for the field operations component of the Emissions Division. The Cheshire facility is a secure building with security cameras inside and outside of the building. Plaintiff was assigned to work at this facility after its 2004 opening.

Defendant Kulish served as the Emissions Division Manager at the Cheshire facility. On January 9, 2004, Kulish received a three-day suspension as a result of a complaint against him concerning (1) his relationship [*3] with his secretary and another employee, Cherri Cedrone; (2) his misuse of state property; and (3) falsification of time sheets.

Plaintiff worked with three supervisors: (1) Cedrone, who was responsible for the video surveillance room that monitored independent garages performing emissions tests; (2) Michael DePaulo, who was in charge of making sure that the emissions testing equipment used at the testing locations functioned properly; and (3) William Mecca, who was in charge of coordinating covert operations by emissions agents checking on testing centers. Cedrone and DePaulo had been promoted to supervisors in 2003. [2]

2   Plaintiff claims that Cedrone was promoted because of her romantic liaison with Kulish.

When plaintiff was assigned to inspect testing facilities, she traveled throughout the work day, except when she came into the office two mornings per week to pick up paperwork. An assignment to perform covert inspections of testing sites required plaintiff to come to the Cheshire facility every day for an hour in the morning and a half hour at the end of the day. If she was assigned to conduct video surveillance, plaintiff would monitor cameras in the surveillance room from 8:00 [*4] a.m. to 4:30 p.m., except when she left to eat lunch, attend to personal needs or discuss matters with other DMV employees or customers. Plaintiff only met with Cedrone or Mecca when there was a question or when plaintiff needed copies.

Plaintiff received a "good" rating from Kulish on both her 2003 and 2004 performance reviews. According to plaintiff, in 2005, Cedrone initially recommended an "unsatisfactory" performance rating for her, but Kulish changed that rating to "good" after plaintiff provided him with additional information about her work activities. Plaintiff received a rating of "good" on her 2006 performance evaluation.

In her deposition, plaintiff averred that for, as far back as she could remember at the Cheshire facility, she observed Mecca's screen saver of a bikini-clad girl when she walked by Mecca's cubicle; if she wanted to talk to any of the four supervisors, she had to walk by that cubicle. Plaintiff recalled that Mecca also called her out of the surveillance room to watch a skit on his office computer that plaintiff described as "sexually explicit, "disgusting" and "gross."

Plaintiff testified that DePaulo showed her a website that contained one joke called "Spank [*5] the Monkey."

Plaintiff did not report or file any complaint immediately after these incidents involving DePaulo or Mecca. She attributes her failure to report misconduct to her fear of retaliation.

Plaintiff averred that Doris Hernaiz, Kulish's secretary, "always" posted jokes and cartoons "of a sexual nature" and that she gave plaintiff a straw shaped like a penis. Plaintiff described the atmosphere as "expressly sexual," that it was "just all the time," and that it was hard to pinpoint exact dates of incidents.

In December 2005, a video allegedly containing racially offensive and sexist content was played at a DMV office party. An anonymous party filed a complaint, prompting DMV's Affirmative Action Administrator Carmen Arroyo to commence an investigation. Plaintiff and other employees cooperated with the investigation. [3]

3   Plaintiff asserts that Kulish, Cedrone, Mecca, and DePaulo retaliated against her for cooperating with the investigation by monitoring her by video camera, shunning her, and giving her less desirable assignments. Plaintiff also maintains that Bureau Chief Nappi harassed her in 2006 and 2007 regarding the investigation.

In February 2006, plaintiff spoke with Affirmative [*6] Action Administrator Arroyo about sexually explicit

2010 U.S. Dist. LEXIS 62828, *6

materials in the work place. On February 10, 2006, plaintiff filed a formal complaint about sexual harassment. The complaint alleged that a "hostile environment" was fostered by defendants Kulish, Cedrone and DePaulo.

Plaintiff claims that, after February 10, 2006, Kulish placed her under surveillance within the Cheshire Emissions Tech Center. Plaintiff claims that, "from the beginning" of her tenure at the Emissions Tech Center, she knew that Kulish had access to the surveillance cameras and was manipulating and controlling them from his office. However, she was unaware that Kulish had been using the cameras to track her movements throughout the building until February 2007, at which time a police sergeant showed her video clips that he had seized from Kulish's office computer.

Plaintiff also claims that sometime during the year after February 10, 2006, Mecca followed her out to an emissions location on one occasion.

Also following her initial complaint in February 2006, plaintiff felt shunned by other employees within the DMV and was assigned to travel to different regions of the state to conduct covert operations. Plaintiff believes [*7] that she was assigned by Cedrone and Kulish to travel farther than usual in retaliation for filing her complaint.

That same year, plaintiff applied for a Contract Compliance Officer position, which represented a promotion. Thirteen individuals interviewed for the position and four were recommended for the promotion. The interviewers, Harry Grough, Greg Kelly, and Peter Rosso, assessed plaintiff as technically weak and lacking "confidence in dealing with customers/stations." Two other individuals who were not recommended for promotion were also noted as having weak technical skills. In a letter dated November 22, 2006, plaintiff was informed that she was not selected for the position.

In November 2006, plaintiff took a medical leave of absence.

On January 8, 2007, Kulish was placed on paid administrative leave pending an investigation into alleged violations of the DMV work rules or policies.

On January 29, plaintiff filed a written complaint with the DMV asserting a hostile environment within the

work place.

On February 2, plaintiff filed another written complaint describing defendant Kulish's video surveillance of her.

On February 7, Kulish was fired.

That same month, in response to her [*8] request for transfer, plaintiff was reassigned to another facility where she opened mail. When she returned to the Cheshire Emissions Tech Center, she was supervised by Henry Clough.

On April 12, 2007, plaintiff filed her charge of sexual harassment and retaliation with the Connecticut Commission of Human Rights and Opportunities ("CHRO").

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981).* In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).*

The burden is on the [*9] moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc., 664 F.2d at 351.* In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson, 477 U.S. at 255.*

If a nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then summary judgment is appropriate. *Celotex Corp., 477 U.S. at 323.*

If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson, 477 U.S. at 249.*

### DMV's Motion for Summary Judgment

Defendant DMV moves for summary judgment on the following grounds: (1) expiration of the statute of limitations, (2) insufficient evidence that a hostile environment existed, and (3) the affirmative defense that plaintiff failed to avail herself of the sexual harassment reporting procedures in place at the DMV. Defendant further asserts that plaintiff's retaliation claim must fail because she suffered no adverse action except the denial of a promotion, [*10] and she cannot establish a causal nexus between the denial of a promotion and her filing of a complaint.

### Statute of Limitations: Hostile Work Environment

Defendant DMV argues that plaintiff's hostile environment claim is untimely because all of the alleged incidents occurred in 2004 and 2005.

A plaintiff may bring a claim under *Title VII* only for acts of discrimination that occurred within the statutory period set by *42 U.S.C. § 2000e-5(e)(1)*. As defendant DMV points out, to set forth a timely claim, plaintiff was required to file her administrative charge with the CHRO within 300 days of the discriminatory act. *National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).* Defendant bears the burden of proof on the affirmative defense that plaintiff's claim is barred by the statute of limitations. *McGullam v. Cedar Graphics, Inc., 609 F. 3d 70, 2010 U.S. App. LEXIS 12159, 2010 WL 2366026, *5 (2d Cir. 2010).*

Hostile environment claims differ from claims based on discrete acts of discrimination because a hostile environment involves "repeated conduct" or the "cumulative effect of individual acts" and the "unlawful employment practice therefore cannot be said to occur on any particular day." *Morgan, 536 U.S. at 115.* [*11] "Under *Morgan,* a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related." *McGullam, 609 F.3d at 77, 2010 U.S. App. LEXIS 12159, 2010 WL 2366026 at *5.* Thus, the entire period of the hostile environment may be

considered so long as an act contributing to the hostile environment occurred within the statutory period. *Morgan, 536 U.S. at 117; see also Crowley v. L.L. Bean, Inc., 303 F.3d 387, 406 (1st Cir. 2002).* An act may be considered to be contributing to a hostile environment if an individualized assessment indicates that the incidents and episodes are related. *McGullam,     F. 3d   , 2010 U.S. App. LEXIS 12159, 2010 WL 2366026 at *5.*

Plaintiff filed her administrative charge with the CHRO on April 12, 2007. Therefore, the limitations period started on June 16, 2006 (300 days prior to April 12, 2007).

DMV maintains that plaintiff's deposition testimony establishes that all of the alleged sexually-related offensive acts complained of in the CHRO complaint occurred in 2004 and 2005. DMV argues that Kulish's video surveillance of plaintiff is the only specific conduct included in the CHRO complaint that is beyond 2005, and [*12] that such conduct was not based on plaintiff's sex so as to constitute an act of sexual harassment that renders timely the prior conduct.

However, plaintiff's testimony indicates that an on-going sexually-charged atmosphere was "all the time" at the DMV, and that she felt "petrified" by Kulish's ability to manipulate the surveillance cameras to track employees' movements and conversations within the building. The evidence indicates that Kulish used the camera to follow plaintiff and zoom in upon her. These alleged incidents appear to emanate from Kulish or those closely connected to him. Construing the evidence most favorably to the non-moving party, there exists at least a question of fact as to whether a continuing sexually hostile environment existed, whether Kulish's conduct was based on plaintiff's sex, and whether it was related to the prior incidents or contributed to the alleged hostile environment. The Court will deny summary judgment on the basis of the statute of limitations.

### Prima Facie Case: Hostile Work Environment

Defendant argues further that plaintiff's claim fails to meet the prima facie standard for hostile work environment.

A hostile work environment exists in violation [*13] of *Title VII* where the work environment is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions

2010 U.S. Dist. LEXIS 62828, *13

of the victim's employment and create an abusive working environment. *Harris v. Fork Lift Sys., Inc., 510 U.S. 17, 20, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*. To prevail on a hostile work environment claim, the plaintiff must show both (1) that her work environment was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the condition of her employment, and (2) that a specific basis exists for imputing to the employer the conduct that created the hostile environment. *Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996)*. Relevant factors include (1) the frequency of the discriminatory conduct, (2) the severity of the conduct, (3) whether it is physically threatening or merely an offensive utterance, and (4) whether it unreasonably interferes with an employee's work performance. *Harris, 510 U.S. at 23*. "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the [*14] environment rose to some objective level of hostility." *Leibovitz v. New York City Transit Auth. , 252 F.3d 179, 188 (2d Cir. 2001)*.

Isolated remarks or occasional episodes of harassment will not merit relief under *Title VII*; the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive. *See Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004)*. However, one act that is sufficiently severe may alter the plaintiff's conditions of employment without repetition. *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998), abrogated on other grounds by Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106*. Of course, a plaintiff claiming a sex-based hostile work environment under *Title VII* must demonstrate that the alleged hostility occurred because of her sex. *Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)*.

Defendant DMV asserts that plaintiff's exposure to any of the alleged offensive conduct was limited because she spent most of her working days either traveling to different parts of the state or in the video surveillance room watching remote video cameras of emissions centers around the state. Thus, defendant DMV argues that plaintiff cannot prevail [*15] because the "sporadic events that she described in her deposition did not permeate her work environment, nor did it materially prevent her from doing her job." However, plaintiff was still required to spend some time in the offices of the Cheshire Emissions Tech Center to perform certain duties or to meet with her supervisors or other staff. Whether the conduct that occurred was sufficient to alter her work environment is a factual question to be determined by the trier of fact. The Court will deny the motion for summary judgment on this ground.

*Affirmative Defense: Hostile Work Environment*

Defendant raises the affirmative defense articulated in *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)* and *Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*. An employer faced with vicarious liability for hostile environment where no tangible employment action occurred may defend against liability by proving by a preponderance of the evidence that (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided [*16] by the employer or to avoid harm otherwise. *Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807*.

A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth, 524 U.S. at 761*. Plaintiff's brief does not appear to contend that a tangible employment action is at issue. The Court will assume for purposes of ruling on this motion that the *Ellerth/Faragher* defense applies and will consider whether it mandates summary judgment in defendant DMV's favor.

Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is important to the determination of whether the employer has satisfied the first prong of this defense. *Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999)*. It is undisputed that defendant DMV had a Sexual Harassment Prevention Policy ("Policy") with a reporting procedure for complaints, and that plaintiff was informed of the Policy when she was hired. The Policy provided:

> Anyone who believes s/he has experienced sexual harassment, or has [*17] witnessed sexual harassment by any employee, vendor or any other person in

connection with her/his employment, should bring the matter to the immediate attention of the Department of Motor Vehicles' Affirmative Action Program Manager, Carmen E. Arroyo . . . . If the complainant prefers, s/he may report the matter directly to her/his supervisor. If the complainant feels uncomfortable reporting the harassment to her/his supervisor, s/he should immediately report the matter to any other member of management.

The Policy provides further that each manager "is responsible for maintaining a work environment free of sexual harassment" and for implementation of the Policy. "A supervisor or manager who receives a complaint about harassment, witnesses harassment, becomes aware of or believes that someone is engaging in prohibited conduct shall report it" to the Affirmative Action Program Manager. The Policy states that an investigation should be conducted in "as confidential a manner as possible . . . ."

As to the first prong, the evidence raises questions as to whether the DMV exercised reasonable care in preventing sexual harassment. Construing the evidence most favorably to plaintiff, it appears [*18] that the supervisors and managers were well aware of a sexually-charged atmosphere, even possibly perpetrating such environment, but failed to take steps to remedy the situation as required by the Policy. Even if the Court assumes that defendant DMV has satisfied the first prong of the affirmative defense, the Court will still deny summary judgment.

Despite her discomfort with the alleged sexually-charged environment commencing in 2004, plaintiff did not complain to Arroyo until February 2006. Although defendant bears the ultimate burden of persuasion on both elements of the affirmative defense, plaintiff bears a burden of production as to the reasons for her failure to avail herself of the reporting procedures. *Leopold v. Baccarat, Inc., 239 F.3d 243, 246 (2d Cir. 2001).* Here, plaintiff testified that she did complain to at least one supervisor, Mecca, that his screen saver of a bikini-clad female offended her. She maintains further that she did not take any immediate steps to report that the sexually hostile environment existed prior to February 2006 because employees knew that complaints against Kulish, Cedrone, Mecca or DePaulo would result in

retaliation.

An employee's concern for [*19] retaliation may only defeat the employer's affirmative defense where it is based on a credible fear that reflects more than a subjective belief. *Id.* Here, the reasonableness of plaintiff's conduct represents a question of fact for the trier of fact. Summary judgment will be denied on defendant DMV's affirmative defense.

*Retaliation*

Defendant DMV asserts that summary judgment should enter on plaintiff's retaliation claim because plaintiff cannot establish any adverse action aside from the denial of a promotion; she cannot prove a causal nexus between her failure to gain a promotion and her protected activity; and an underlying nonretaliatory motivation exists for the employment decision.

To establish a prima facie case of retaliation under *Title VII*, a plaintiff is required to show by a preponderance of the evidence that: (1) she participated in a protected activity, (2) the defendant knew of the protected activity; (3) she experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. *Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).* Plaintiff's burden in satisfying the prima facie case is minimal. [*20] *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1181 (2d Cir. 1996).*

The *McDonnell Douglas* burden shifting analysis applies to retaliation claims brought pursuant to *Title VII. See Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).* Therefore, If plaintiff establishes a prima facie case, defendant must articulate a legitimate, non-discriminatory business reason for the alleged retaliatory action, and then plaintiff must prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).*

*Materially Adverse*

Defendant asserts that the actions that plaintiff complained about do not constitute adverse employment action pursuant to the standard of *Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006),* which requires that a

Case 3:11-cv-00905-AVC   Document 26-2   Filed 10/18/11   Page 45 of 48

Page 7
2010 U.S. Dist. LEXIS 62828, *20

materially adverse employment action is one that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington* instructs that the significance of an alleged retaliatory act depends upon the particular circumstances and context of the workplace. Not every action taken by an employer that is adverse to the employee [*21] is "materially adverse," and therefore, plaintiff must prove that the harm suffered was more than "mere inconvenience." *Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 252 (D. Conn. 2008).*

The retaliatory actions alleged to be "materially adverse" include surveillance within the Cheshire facility, monitoring by a supervisor, diminished performance evaluations, rotation throughout "far-flung" parts of the state, harassment and abuse by other DMV supervisors and employees, a demeaning assignment opening mail after transfer to another facility, and failure to be promoted to the Contract Compliance Officer position. Defendant challenges as not materially adverse all of the above alleged actions with the exception of the failure to be promoted.

Generally, precedent within the Second Circuit has found that excessive scrutiny of an employee may cause an employee anxiety but it does not constitute a materially adverse action. *Deshpande v. Medisys Health Network, Inc., 2010 U.S. Dist. LEXIS 37891, 2010 WL 1539745, *14 (E.D.N.Y. 2010); See also Reddy v. Salvation Army, 591 F. Supp. 2d 406, 427 (S.D.N.Y. 2008).* However, excessive scrutiny and reprimands accompanied by negative results such as a decrease [*22] in pay or being placed on probation may establish a materially adverse action. *Uddin v. City of New York, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006).*

Defendant argues that the video surveillance and monitoring of plaintiff's work cannot be considered "materially adverse" because plaintiff understood that she could be monitored by cameras within the facility, her supervisor was authorized to verify her job performance, and she was not harmed by such surveillance. Defendant points out that plaintiff was not aware of the video surveillance until after Kulish had been placed on administrative leave in February 2007. Plaintiff has not shown any professional repercussion from the monitoring, and she did not know the extent of Kulish's surveillance although she felt she was being monitored.

However, the extent of Kulish's video surveillance

coupled with Mecca's monitoring raises an inference that plaintiff was being singled out for excessive scrutiny for a retaliatory purpose. Defendant has not set forth any reason that such monitoring was necessary for any legitimate business reason. In light of these exceptional circumstances, the Court finds that plaintiff has raised a question of fact as [*23] to whether the monitoring constitutes a materially adverse action in the context of retaliation. *See Dotson v. City of Syracuse, 2009 U.S. Dist. LEXIS 62174, 2009 WL 2176127 (N.D.N.Y. 2009)* (monitoring of plaintiff's phone conversation could be construed as materially adverse).

Plaintiff cites her diminished performance evaluations as retaliatory actions. Plaintiff contends that these evaluations contain increased criticism of her performance from prior years even if the actual performance rating did not change. However, negative comments, without more, have not been held to constitute a materially adverse action. *Ragin v. East Ramapo Cent. School Dist., 2010 U.S. Dist. LEXIS 32576, 2010 WL 1326779 (S.D.N.Y. 2010).* Plaintiff has not shown that the evaluations resulted in any adverse action or were in any way represented "materially adverse" action during her employment.

Plaintiff asserts that she was shunned and harassed by other employees in the DMV. According to her deposition testimony, her co-workers and supervisors stopped speaking to her except, on occasions, as required for business. However, *Burlington* explained that minor annoyances and snubbing by supervisors and co-workers' are not actionable as retaliatory actions. *548 U.S. at 68.* [*24] Similarly, Kulish's use of offensive words during meetings also constitutes an annoyance rather than a materially adverse action. Plaintiff has not established that the content or context of Kulish's language retain any connotations specific to her.

Plaintiff asserts further that Bureau Chief Nappi harassed her by repeatedly calling to arrange to meet her in private to discuss the investigation into the complaint against Kulish. A bureau chief's persistent phone calls to a subordinate employee could be construed as reasonably dissuading that employee from filing a complaint. Accordingly, Nappi's conduct raises a factual issue as to whether it constitutes materially adverse action to be determined by the trier of fact.

Plaintiff's allegation that her travel assignments were affected may also meet the materially adverse standard in

the context of retaliation. This Court recognizes that much decisional law is reluctant to find an adverse action where a plaintiff is assigned work that is part of the employee's job. *See Martinez-Santiago v. Zurich North America Ins. Co., 2010 U.S. Dist. LEXIS 4246, 2010 WL 184450 (S.D.N.Y. 2010)* (citing cases). Here, plaintiff's job may have encompassed assignments to far corners of [*25] the state. However, the Court must consider the context of the alleged materially adverse action. As *Burlington* observed, "one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the arduous duties and less time performing those that are easier or more agreeable." *548 U.S. at 71*. Obviously, an increase in road travel could prove sufficiently arduous that it would reasonably discourage an employee from filing a complaint. The Court finds that genuine issues of material fact preclude summary judgment on the basis that her travel assignments cannot be considered materially adverse. *See O'Neill v. City of Bridgeport Police Dept., 2010 U.S. Dist. LEXIS 51331, 2010 WL 2220579 (D. Conn. 2010)* (denying summary judgment as to whether, *inter alia,* temporary assignment to night shift constituted alleged materially adverse action).

Similarly, although she suffered no demotion in pay or title, plaintiff's transfer assignment opening mail could be considered by a jury to satisfy the standard for materially adverse employment action.

*Causal Connection*

Accordingly, the Court must consider whether plaintiff can establish a causal connection between her [*26] protected activity and the alleged retaliatory conduct: The monitoring, Nappi's phone calls, the assignments to far reaching corners of the state, the transfer assignment opening mail and the failure to be promoted.

"The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." *Sumner v. U.S. Postal Serv. 899 F.2d 203, 209 (2d Cir. 1990)*. "While the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a

causal relationship, the weight of authority supports the view that ten or twelve months is too long." *Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 617 (S.D.N.Y. 2008)*.

Here, plaintiff filed her internal complaints in February 2006 and January and February 2007. Plaintiff is not specific as to when the video surveillance commenced or the date of Mecca's monitoring except that such conduct [*27] occurred after filing of her first complaint. There exists at least an inference that plaintiff was singled out for the monitoring, and defendant has offered no other explanation for the need to monitor plaintiff's job performance except that it was within the purview of Kulish's and Mecca's authority. Accordingly, there exists a genuine issue of fact as to whether these events occurred in response to plaintiff's complaints, and the Court will leave plaintiff to her proof that this conduct was animated by retaliation.

There is also a strong inference that Nappi's communication with plaintiff concerned plaintiff's complaints, and therefore, the Court will also deny summary judgment on this assertion of retaliatory action.

According to plaintiff, after February 2006, she was rotated to do inspections in the New Haven rather than Hartford area. She has not specified any exact dates of these assignments nor has she demonstrated any inference that she was treated differently than other emissions agents. In fact, her deposition testimony vitiates any inference that her inspections were assigned with a retaliatory animus. She agreed that agents were rotated fairly and that the assignments balanced [*28] out over the year. Accordingly, plaintiff has failed to establish that a causal connection exists between her inspection assignments and her protected activity. The Court will grant summary judgment in defendant's favor on this assertion of retaliation.

However, plaintiff's transfer assignment opening mail occurred in close temporal proximity to plaintiff's protected activity in early 2007. Defendant has submitted no legitimate rationale for assigning plaintiff clerical work to satisfy her requested transfer. Accordingly, plaintiff is entitled to present this claim to the trier of fact.

Finally, the Court considers whether defendant DMV's failure to promote plaintiff to a Contract Compliance Officer position may represent a retaliatory act. The denial occurred approximately nine months after plaintiff's February 2006 complaint. Although the

temporal proximity between the two events is weak, the Court will assume for purposes of ruling on this motion that plaintiff has established the prima facie case.

Defendant submits as its legitimate, non-retaliatory reason that the committee of different managers, who had no connection to Kulish, Mecca, DePaulo or Cedrone, found that plaintiff did [*29] not interview as well as the other candidates recommended for the position. An employer need not prove that it made the wisest choice but only that the reasons for the decision were nondiscriminatory. *Davis v. State Univ. of N.Y., 802 F.2d 638, 641 (2d Cir. 1986); see also Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988)* (evidence that an employer made poor business judgment is insufficient to establish a genuine issue of fact as to pretext). An employer's hiring decision may be based on the impression that an individual makes during an interview so long as its explanation of reasons are clear and specific to afford a plaintiff a fair opportunity to demonstrate pretext. *Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 104-105 (2d Cir. 2001)*

Plaintiff's brief does not attempt to undermine defendant's legitimate rationale as pretextual by demonstrating weaknesses, implausibilities or contradictions in the proffered rational. *See Paladino v. DHL Express (USA), Inc., 2010 U.S. Dist. LEXIS 29264, 2010 WL 1257786 (E.D.N.Y. 2010)*. No evidence suggests that plaintiff was clearly superior to the other candidates or that anyone on the interviewing committee was even aware of her complaint in February [*30] 2006. Accordingly, the Court will grant summary judgment on the allegation that the denial of the promotion to Contract Compliance Officer is retaliatory.

*Defendant Kulish's Motion for Summary Judgment*

*Aiding and Abetting*

Defendant Kulish maintains that he cannot be liable for aiding and abetting pursuant to *Connecticut General Statutes § 46a-60(a)(5)* because he cannot be considered (1) an employer, (2) he did not aid and abet in the creation of a hostile environment to purposefully interfere with plaintiff's employment, and (3) he did not aid or abet in any retaliation. [4]

4  Defendant Kulish also appears to argue that he cannot be held liable for failure to promote plaintiff rather than Cedrone. However, plaintiff's

briefs make clear that she asserts a sexually hostile environment claim.

Pursuant to *Connecticut General Statutes § 46a-60(a)(5)*, an individual may be held liable for aiding and abetting his employer's discrimination. *Farrar v. Town of Stratford, 537 F. Supp. 2d 332, 356 (D. Conn. 2008)*. Aiding and abetting requires that more than one actor be involved in the conduct contributing to the discrimination. *Bolick v. Alea Group Holdings, LTD., 278 F. Supp. 2d 278, 282 (D. Conn. 2003)* [*31] (application of CFEPA's aiding and abetting provision against a sole perpetrator would be illogical). CFEPA's aiding and abetting provision encompasses any person who initiates, encourages or facilitates a discriminatory practice. *Murphy v. Robert Burgess & Norwalk Economic Opportunity Now, Inc., 1997 U.S. Dist. LEXIS 22750, 1997 WL 529610, *5 (D. Conn. 1997)*.

In this case, plaintiff has adduced sufficient evidence that raises genuine issues of fact as to whether defendant Kulish initiated, encouraged or facilitated the discriminatory practices resulting in a sexually hostile environment and retaliation.

*Intentional Infliction of Emotional Distress*

Kulish argues that he is entitled to summary judgment on the intentional infliction of emotional distress.

To prevail on her claim of intentional infliction of emotional distress, plaintiff must establish: (1) that defendant Kulish intended to inflict emotional distress or knew or should have known that his conduct would likely result in emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct in question was the cause of plaintiff's distress; and (4) that the emotional distress experienced by plaintiff was severe. *Carrol v. Allstate Ins. Co., 262 Conn. 433, 443, 815 A.2d 119 (2003)*.

Liability [*32] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would

arouse his resentment against the actor, and lead him to exclaim, Outrageous!

*Appleton v. Board of Educ. of Town of Southington, 254 Conn. 205, 210, 757 A.2d 1059 (2000)*. Here, the evidence raises questions of fact as to whether defendant Kulish's conduct meets this standard. The Court will leave plaintiff to her proof.

*CONCLUSION*

For the foregoing reasons, defendant DMV's motion for summary judgment [doc. # 57] is GRANTED in part and DENIED in part. Plaintiff may proceed against the DMV on her claim of hostile environment and retaliation based on her assertions of monitoring, Nappi's phone calls and transfer work assignment opening mail.

Defendant's Kulish's motion for summary judgment [doc. # 58] is DENIED.

/s/

Warren W. Eginton

Senior United States District Judge

Dated at Bridgeport, Connecticut this 24th day of June, 2010.